#3000257284

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
JUL 30 2026
CLERK, U.S. DISTRICT COURT
By JJF
Deputy

# UNITED STATES DISTRICT COURT
for the
Northern District of Texas

| | | |
|---|---|---|
| DHRUV NANDAKUMAR<br>*Plaintiff,* | ) | 3-26CV2535-B |
| | ) | Case No.____________ |
| -v- | ) | |
| UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER and UNIVERSITY OF TEXAS SYSTEM.<br>*Defendants.* | ) | **COMPLAINT AND JURY DEMAND** |

## CIVIL ACTION

*This action alleges, inter alia, violations of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Title VI of the Civil Rights Act of 1964, and the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983, arising from the University of Texas Southwestern Medical Center's failure to recognize, accommodate, or appropriately respond to Plaintiff's documented psychiatric disabilities and its subsequent imposition of punitive disciplinary measures culminating in his dismissal from medical school without fair process, thereby depriving Plaintiff of federally protected rights to disability accommodation, equal protection, and procedural due process.*

Plaintiff DHRUV NANDAKUMAR by way of Complaint against the Defendants, UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER and UNIVERSITY OF TEXAS SYSTEM, hereby states as follows:

## INTRODUCTION

1. This is a civil rights and disability-discrimination action brought under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Title VI and Title VII of the Civil Rights Act of 1964, and the Fourteenth Amendment, seeking redress for the unlawful dismissal of Plaintiff, a medical student at the University of Texas Southwestern Medical Center ("UTSWMC"), following disability-related conduct that the institution improperly treated as

intentional misconduct.

2. Between 2023 and 2025, Plaintiff experienced documented psychiatric disabilities, including Generalized Anxiety Disorder, ADHD, insomnia, and adjustment disorder, that materially affected his functioning during clinical rotations. Rather than initiating an accommodation process or providing required disability support, Defendants issued professionalism citations, imposed punitive measures, and escalated disciplinary action in violation of federal law and institutional policy.

3. The disciplinary process culminating in Plaintiff's dismissal was procedurally defective, biased, and inconsistent with due process. Defendants disregarded medical evidence, relied on selective and retroactive negative evaluations, denied Plaintiff a meaningful opportunity to be heard, and initiated a belated and irregular "accommodations" inquiry only after the dismissal decision had effectively been made.

4. Plaintiff seeks damages, declaratory relief, and a temporary injunction preventing Defendants from disseminating adverse academic or disciplinary records while this action is pending.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including federal civil-rights and anti-discrimination statutes. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3)–(4) for claims seeking redress for the deprivation of constitutional rights under color of state law.

6. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims, arising from a common nucleus of operative fact involving Plaintiff's dismissal from the medical program and Defendants' related conduct.

7. Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendant University of Texas Southwestern Medical Center's principal place of business is located in Dallas, Texas.

## PARTIES

8. At all times relevant hereto, Plaintiff DHRUV NANDAKUMAR was a medical student enrolled in the University of Texas Southwestern Medical Center's M.D. program and, upon information and belief, is an adult resident citizen of Collin County, Texas, with a residential address at 3021 Dove Creek Lane, Richardson, Texas 75082.

9. At all times relevant hereto, Defendant UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER ("UTSWMC") was and is a public institution of higher education located in Dallas County, Texas, with a principal business and mailing address at: UT Southwestern Medical Center, 5323 Harry Hines Blvd., Dallas, Texas 75390-9003.UTSWMC is a state actor for purposes of 42 U.S.C. § 1983 and is subject to federal civil-rights and anti-discrimination statutes.

10. At all times relevant hereto, Defendant UNIVERSITY OF TEXAS SYSTEM ("UT System") was and is a public university system and the governing entity responsible for oversight, administration, and policy enforcement at UTSWMC. UT System maintains its principal offices at: 210 West 7th Street, Austin, Texas 78701. UT System is likewise a state actor for purposes of 42 U.S.C. § 1983 and is subject to federal civil-rights and anti-discrimination statutes.

11. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave from the court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

12. All of Plaintiffs claims stated herein are asserted against University of Texas Southwestern Medical Center and any of its owners, predecessors, successors, subsidiaries, agents, and/or assigns.

## FACTUAL BACKGROUND

13. Defendant University of Texas Southwestern Medical Center is a public institution that functions as both an educational institution and a clinical institution where the medical school programs are administered.

14. Defendant University of Texas System is the owner and managing entity that oversees the University of Texas Southwestern Medical Center.

15. Plaintiff was a 3rd year student in 2025 who was performing his rotation requirements at the University of Texas Southwestern Medical Center.

16. On or about 2022, Plaintiff began medical school at the University of Texas Southwestern Medical Center, where he established a strong record of dedication and academic performance. He achieved an above A average on his pre-clinical organ system block grades.

17. During his subsequent clinical rotations, he displayed continued improvement and academic prowess. He achieved a pass on his first Internal Medicine clerkship despite his untreated psychiatric conditions and internal medicine administrative errors, resulting in the lack of inclusion of his honors evaluation by his supervising physician, Dr. Anne Brancaccio. On his subsequent clinical rotations, Plaintiff earned four honors (Psychiatry, Pediatrics, Neurology, Family Medicine) and two near-honors (Ambulatory, OBGYN). He achieved honors on the first portion of his surgical rotation before the events to be discussed occurred. These events resulted in him being told that he would fail his surgical trauma rotation without any evaluation or explanation given.

18. On or about 2025, Plaintiff took steps towards entering the school's physical

medicine and rehabilitation track including starting a sub-internship in the program and securing an away rotation at Harvard Medical School

19. Between August 2023 and July 2025, Dhruv Nandakumar was enrolled as a 3rd year in medical student at UT Southwestern Medical Center ("the UTSWMC"). The escalating injuries, both psychological and professional, arose from the UTSWMC's failure to recognize, accommodate, and appropriately respond to his documented disabilities. They resulted in his dismissal from the medical program on May 7, 2025, and were compounded by the institution's refusal to reinstate him despite clear evidence of medical stabilization and professional rehabilitation.

20. Mr. Nandakumar's first incident occurred in August 2023, when Mr. Nandakumar entered the anatomy lab corridor to assist first-year students, believing he was still acting in a teaching capacity. Although he had previously served as a teaching assistant, he had been informed that he was not authorized to access the lab that semester. His decision to enter the space was impulsive and driven by anxiety, a pattern later identified as symptomatic of untreated Generalized Anxiety Disorder and ADHD. Rather than recognizing this behavior as a manifestation of a disability, the UTSWMC issued a professionalism citation and failed to refer him for evaluation or support. This omission marks the beginning of a pattern of institutional negligence regarding disability-related conduct.

21. Between May and June 2024, Mr. Nandakumar underwent his first Internal Medicine clinical rotation. Due to administrative errors by Dr. Renee Abraham and Dr. Kehinde Odedosu, his honors faculty evaluation by Dr. Anne Brancaccio for his 1-month rotation at the Dallas Veterans Affairs Hospital was not included, resulting in a significantly lower grade of pass rather than high pass or near honors. Dr. Anne Bracaccio attempted to follow up with both mentioned physicians multiple times via email and phone calls but achieved no response until after

the submission period ended, when both she and Mr. Nandakumar were told it was "too late."

22. The events in internal medicine led to an exacerbation of his underlying untreated anxiety resulting in multiple panic attacks, heartburn, and 20-30 pounds of subsequent weight loss over the next 2 rotations. He underwent multiple endoscopies to try and identify the cause of his weight loss and heart burn. Dr. Norberto Rodriguez-Baez, an associate dean for student affairs assigned to Dhruv as his "pace advisor," was following up with him and made directly aware of all of these events and how they were affecting him on his ambulatory and psychiatry rotations. As a result, he referred Dhruv to Dr. Isabel Clark, a university psychiatrist in October 2024 who became and remains his only psychiatrist.

23. On October 15, 2024, Mr. Nandakumar was diagnosed with General Anxiety Disorder("GAD") by Dr. Clark and began medicated treatment on campus. No accommodations were suggested. On December 13, 2024, Mr. Nandakumar was diagnosed with insomnia due to another mental disorder and adjustment disorder and was medicated and began treatment. On April 12, 2025, Mr. Nandakumar was diagnosed with ADHD and impulse-control disorder and was medicated as well as receiving treatment. Medication treatment began upon each diagnosis. Despite the proximity of these diagnoses to events at UTSW, no accommodations were recommended, thus overlooking his condition and its nexus to educational learning and manner of conduct, resulting in negative sanctions instead. These conditions materially affected his functioning under stress, including executive functioning, judgment, information processing, and regulation during high-pressure academic and professional circumstances. The need for accommodation, structured intervention, or medical leave in addition to the two weeks was apparent well before UTSW raised accommodations near his dismissal.

24. The second and more severe injury occurred in March 2025, during Mr. Nandakumar's trauma rotation surgery. After experiencing six consecutive days of insomnia, panic

attacks, and physical illness, including fever, chills, and myalgias, he notified his team on his off day that he thought he had contracted Covid-19 and sent a stock image of a positive test. He then informed Dr. Shoultz that he had Covid-19 and would not be able to come in the next day. After initially agreeing, Dr. Shoultz proceeded to ask Mr. Nandakumar to obtain a test from occupational health and, after finding out they were closed, suggested an urgent care test the same evening while he was sick and mentally impaired. Mr. Nandakumar was unable to be tested that evening due to illness, so he sent the stock photo again. Furthermore, Dr. Shoultz directly stated in an email that this was to be in compliance with the absence policy, which in fact states that:

25. "When the unanticipated absence is due to a medical illness, the student is not required to complete the absence request form or provide specifics regarding the nature of the medical illness. He/she may simply state that the absence is related to personal health. A doctor's verification may be requested by the Clerkship Director for absences exceeding 2 days, or frequent recurrent absences, and should only verify the absences were necessary and not the nature of the absences."

26. After feeling pressured and mentally/physically unable to comply with the requests, he submitted the same previous stock image of a positive test. He then came into work on an overnight shift after a week of insomnia and panic attacks, during which faculty later alleged "erratic behavior," including loud cursing and disparaging comments about attendings and patients, touching an endoscopy with patient secretions without PPE, erratic behavior in the OR nearly contaminating the sterile field, napping on duty, and insisting on going to his car to change clothes for unclear reasons. Plaintiff's treating psychiatrist, Dr. Clark, explicitly described these events as occurring during a "decompensated psychiatric state that certainly contributed to his impaired judgment and impulsivity."

27. The med school drug tested him and referred him to urgent psychiatric care and

therapy. He was given a second professionalism citation as a deliberate act of dishonesty and a leave of two to three weeks during which he started ADHD medication and was cleared for return. No disability review was initiated despite the ADHD diagnosis and previous GAD diagnosis.

28. His school-mandated psychiatric leave lasted three weeks. During the second week, Plaintiff was hospitalized for cellulitis, of which Dr. Sarah Baker was aware; she told him she "had his back no matter what." He was hospitalized for cellulitis in the 2nd week prior to returning, of which Dr. Sarah Baker was made aware and called him telling him that she "had has back no matter what." Upon returning to the shift, he received a Teams call from Dr. Rohit Sharma, the surgery clerkship director. He informed him that in a meeting between himself, Dr. Thomas Shoultz, and Dr. Angela Mihalic, he had been given a plan for making up the course that included a "clean slate" with "no grade limitations" and "opportunity to make up his trauma shifts through extra shifts." He would also be given "ample time and support" for his recovery from cellulitis.

29. During the next few weeks, he had multiple meetings with Dr. Mihalic and Dr. Baker, where they labeled him as dishonest and told him that there was "no mental illness for lying" and that the committee would likely not rule favorably. Dr. Baker additionally called his psychiatrist Dr Clark, telling her that he was "too anxious" and that she should speak to him. These meetings led to further exacerbation of his underlying anxiety, resulting in heartburn and panic attacks witnessed by residents and faculty on his rotation, including Dr. Sneha Bhat, which resulted in him having to leave the OR and shifts. Despite this, he went into further extra trauma shifts overseen by Dr. Sneha Bhat to try to make up the further time missed. Furthermore, as he completed the mandated make-up trauma shifts assigned by Dr. Rohit Sharma, he received nothing but positive feedback.

30. The conduct for which Plaintiff was disciplined, including the submission of a stock COVID test image, impaired judgment during the trauma rotation, and difficulty complying with

last-minute directives, occurred during periods of documented psychiatric decompensation directly caused by Generalized Anxiety Disorder, ADHD, insomnia, and adjustment disorder. Defendants were aware, or reasonably should have been aware, that Plaintiff's symptoms materially impaired his executive functioning, judgment, and stress regulation, and that the alleged misconduct was disability-related behavior requiring accommodation rather than punishment.

31. Mr. Nandakumar submitted his committee letter to Dr. Mihalic on May 5th. He was soon after called by the surgery clerkship director Dr Sharma, around 7 in the evening. Dr. Sharma said they had decided to "fail me after all" but that Mr. Nandakumar still finish out the rotation so it "looked good to the committee." On May 7th, he was informed of his dismissal while driving via phone call by Dr. Baker, who asked if he was having suicidal thoughts and told him to finish out the rotation and clerkship exam regardless. Mr. Nandakumar took the final clerkship exam on May 9th, passing with a diminished performance.

32. Mr. Nandakumar continued to attend clinical duties, including a subsequent rotation, while he was actively going through the appeals process and having his words used against him at every level, painting him as a dishonest and unprofessional individual despite ample evidence to the contrary. Despite Mr. Nandakumar repeatedly referencing and providing exculpatory evidence at every level of appeal, they refused to acknowledge or consider it any point during the appeals process. Instead, faculty, including Dr. Renee Abraham, who was directly involved in administrative failures affecting Plaintiff's Internal Medicine grade, used Plaintiff's positive evaluations as "evidence of dishonesty." Dr. Abraham failed to recuse herself despite this conflict. The committee used backdated documents, suppressed a personal hearing by claiming "enough paperwork existed," refused to allow witness statements, and treated Plaintiff's attempts to defend himself as further dishonesty, directly contributing to his unwarranted dismissal.

33. On June 16th, 2025, the Office for Access & Title IX (OATIX) sent Plaintiff an

email stating they had "received his completed submission" requesting accommodations. While Mr. Nandakumar was taking some time to study the situation, Dr. Scott recommended his final decision to dismiss Mr. Nandakumar to Dr Lee on June 23, 2025. 3 days later, on June 26th, the OATIX asked him whether he was "available for a short Teams meeting." On June 26th at around 2:00 pm, Plaintiff asked for more details about a proposed Teams meeting. At 3:27 pm, OATIX asked whether he was interested in accommodations; at 3:39 pm, before he could respond, OATIX stated they would "close out your file as withdrawn." Plaintiff replied on June 27th stating he had not submitted any request and asked "who did?", explaining he was "in the midst of the administrative process." OATIX did not answer this question and instead falsely claimed Plaintiff had not demonstrated interest. OATIX initiated this process after the dismissal recommendation had already been made.

34. They did not respond to this question, instead choosing to instead state that Mr. Nandakumar had not demonstrated interest. They sent Plaintiff an official communication on June 27th stating that:

35. "On June 12, 2025, OATIX received information that you may be interested in seeking accommodations for a potential disability. Our office subsequently reached out to you on several occasions, providing you with the accommodation request process and forms required for evaluation. Additionally, sufficient time was extended to submit a formal request for accommodations and the required documentation. To date, our office has not received your completed accommodation request packet. As such, your file with our office is closed, and no further action will be taken."

36. They only attempted to conduct a disability review months after deciding to dismiss him and after he had submitted his final and 3rd level of appeal to Dr. Andrew Lee on June 9th, 2025. They initiated this after receiving an indication on June 12th, 2025 (undisclosed who sent it) and stating that they had received a form from him on June 16th, 2025 (he did not send it).

When asked who sent it, they then backtracked, stating that they had not received his formal request and were closing out his file as withdrawn.

37. Defendants acted with deliberate indifference to Plaintiff's federally protected rights. Despite repeated notice of Plaintiff's psychiatric disabilities, documented diagnoses, and ongoing treatment, Defendants failed to initiate any timely disability review, failed to provide reasonable accommodations, ignored exculpatory medical evidence, and continued to escalate punitive measures. Defendants' failure to act, despite actual knowledge of a substantial risk of violating Plaintiff's rights, constitutes deliberate indifference under the ADA, Section 504, and Title VI.

38. Mr. Nandakumar sent a follow-up email to Dr. Andrew Lee on June 30, 2025, clarifying that he had not submitted an accommodations request. However, he "emphasized that this was not a refusal of support, but rather a request for clarity during a period of uncertainty." He then provided further indication that he was committed to the medical profession and improvement and offered to meet for further clarification/information. On July 6th, 2025, he sent an email to Dr. Blake Barker asking to take a research year.

39. On June 23, 2025, Dr. Scott recommended Plaintiff's final dismissal to Dr. Andrew Lee. On July 7, 2025, Dr. Lee adopted the recommendation, stating that a meeting with Plaintiff was "not necessary" due to "comprehensive written material," despite the fact that OATIX's communications about accommodations occurred after the dismissal recommendation.

40. On July 7th, 2025, Dr. Blake Barker sent Dhruv an email expressing his sadness of the decision and asked him to a setup a meeting to determine next best steps now that the decision was final. However, the UTSWMC deleted Mr. Nandakumar's email account before Dr. Barker could follow up on his own email that offered a meeting for next steps. Furthermore, they deleted all his performance evaluations and access to any further medical school information within 24

hours of final dismissal.

41. Despite the circumstances, the UTSWMC proceeded to expel Mr. Nandakumar for alleged professional dishonesty. The UTSWMC did so without a fair hearing, without a meaningful opportunity to be heard, without a meaningful opportunity to present medical evidence, and without a fair opportunity to challenge the factual basis for the charge or the proportionality of the sanction.

42. The UTSWMC's handling of this matter appears to have treated a disability-impacted situation as a purely punitive professionalism matter, off-putting the procedural and accommodation safeguards required by law and by basic institutional fairness. UTSWMC failed to provide a procedurally fair mechanism for Mr. Nandakumar to present evidence that the charged conduct occurred in the context of documented psychiatric conditions and that accommodation, treatment-based intervention, or structured leave should have been considered before imposing expulsion. Suggesting accommodations only at the end of the matter is not a substitute for timely engagement in an accommodation process before a career-ending sanction is imposed.

43. The consequences of UTSWMC's actions are severe and ongoing. The findings of dishonesty and professional misconduct have effectively foreclosed Mr. Nandakumar's ability to pursue residency placement, require disclosure to licensing and credentialing bodies, and impose a continuing professional stigma that will follow him indefinitely. These are not speculative harms; they are immediate, foreseeable, and irreparable absent corrective action.

44. From the laboratory incident in August 2023 to the dismissal in May 2025, the record demonstrates a consistent pattern of procedural irregularities-including an absence of proper due process and selective recordkeeping-as well as inconsistent, retroactive negative evaluations that sharply contradicted earlier affirmations of good standing through academic performance.

45. No action was taken by the Defendants, their agents, or employees, to correct the

procedural issues, the discriminatory nature of the accusations and disciplinary process, the improper notices, the disproportionate disciplinary action, or the retaliatory nature of the disciplinary actions.

46. Plaintiff suffered severe emotional distress as a result of multiple retaliatory and abusive incidents. These included requiring clinical performance while Plaintiff was sick, thus pushing him unreasonably and with willful disregard for his health and patient safety. Plaintiff was sent to a psychiatrist for care and put on a three-week leave. This public humiliation and hostile treatment, compounded by the abrupt and unexplained dismissal on May 7, 2025, immediately following his engaged commitment in the program upon return from leave, created a sustained period of emotional trauma, anxiety, and professional deterioration.

47. Plaintiff, as a student and resident of the University of Texas Southwestern Medical Center, reasonably relied (directly or indirectly) on this sophisticated higher education institution to comply with the policies and procedures outlined in their multiple policy manuals.

48. UTSWMC's duty to comply with their disciplinary policies and procedures arose as a result of the special relationship that existed between UTSWMC, on the one hand, and Plaintiff, on the other hand. The special relationship arose because Plaintiff entrusted UTSWMC to comply with and follow the policies and procedures outlined in the policy manual which were implemented as a condition of receiving educational services for himself when he applied and was accepted to the medical program.

49. UTSWMC had the resources necessary to prevent the breach of contract, but neglected to follow the policies and procedures as outlined in the policy Handbook. UTSWMC also intentionally and negligently refused to allow the Plaintiff to submit supporting and controverting evidence and witness statements in his defense. Accordingly, UTSWMC breached its common law, statutory, and other duties owed to Plaintiff.

## COUNT I
## DISCRIMINATION UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964
***(Against All Defendants)***

50. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

51. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

52. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education, capable, honest, and knowledgeable enough to provide proper and professional educational services and residency programs to the public and in compliance with Title VI of the Civil Rights Act of 1964.

53. Upon information and belief, Defendants accept and receive financial aid from government treasuries, including but not limited to scholarships, fellowships, grants from the National Institutes of Health, and federal student loans. Defendants also receive indirect governmental financial aid in the form of tax exemptions and the use or loan of public land.

54. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance. As a public institution receiving federal funding, Defendants are required to ensure that all residents, including Plaintiff, are treated equitably and without racial bias.

55. Plaintiff, as a person with Indian heritage, is a member of a protected class as defined under Title VI and Title VII of the Civil Rights Act of 1964.

56. Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race,

color, or national origin in programs or activities that receive federal financial assistance by recipients of federal funds. This includes the existence of a hostile environment based on race, color, or national origin that is created, encouraged, accepted, tolerated, or left uncorrected by a school, which can constitute discrimination in violation of Title VI.

57. Upon information and belief, Plaintiff was targeted by Dr. Shoultz, Dr. Mihalic, and Dr. Abraham on different occasions, including through discriminatory treatment based on his mental health, perceived disability, and national heritage. As stated, in March 2025 he fell out of rotation and was sent to psychiatry for three weeks off from school. After being treated, diagnosed, and cleared, he was told he could proceed with a "clean slate and to make up" per Dr. Sharma on April 14, 2025.

58. This was followed by Dr. Mihalic and Dr. Baker stating discriminatorily that "there is no mental health disease for dishonesty; the committee hates dishonesty." On May 5, 2025, Plaintiff submitted a letter to Dr. Mihalic. That same day, Dr. Sharma stated they were going to "fail him anyway." Rather than addressing these concerns, Defendants and their agents escalated disproportionate and retaliatory action against Plaintiff.

59. The disciplinary measures were not based on legitimate performance concerns on the surgery rotation but were tainted by discriminatory animus directed at Plaintiff's protected status just before test time.

60. Similarly situated non-Indian students who experienced academic difficulty, professionalism concerns, or health-related impairments were not subjected to the same level of punitive escalation, hostile treatment, or dismissal. Plaintiff was treated more harshly than peers outside his protected class, and derogatory statements by faculty, including assertions that "there is no mental illness for lying" and dismissive comments regarding his cultural background, demonstrate discriminatory animus motivating the disciplinary outcome.

61. The close proximity in timing between Plaintiff's remarks in his May 5, 2025, letter and the onset of punitive measures strongly indicates that the disciplinary action was not based on legitimate performance concerns. Rather, Defendants' actions were retaliatory, aimed at penalizing Plaintiff for voicing concerns within the surgical rotation program. This sequence of events underscores that the disciplinary process was used as a tool of retribution and discrimination rather than a means of upholding academic standards.

62. Defendants used exculpatory evidence submitted by Plaintiff as "evidence of further dishonesty" because it offered positive evaluations, and used this as a reason to uphold his dismissal, severely compromising his ability to defend himself. Dr. Renee Abraham, who was directly involved in administrative failures adversely impacting Plaintiff's Internal Medicine grade (as documented in Dr. Anne Brancaccio's letter of support), failed to recuse herself and led the discriminatory effort in a hostile manner, labeling Plaintiff's inclusion of documented high evaluations as an attempt to hide full transparency and further branding him as dishonest. This breach of due-process rights contributed directly to his unwarranted dismissal from the medical program.

63. Defendants denied Plaintiff access to the minimum procedural protections before issuing significant disciplinary decisions, which adversely affected his ability to defend himself during the disciplinary hearing and resulted in his dismissal from the UTSWMC rotation program.

64. Defendants denied Plaintiff access to fair hearing procedures by failing to provide unbiased decision makers and by refusing to recognize exculpatory evidence. They suppressed a further hearing by claiming that "enough paperwork existed" and that no personal meeting was necessary. Defendants, directly and through their agents or employees, retaliated against Plaintiff by making unsupported accusations, using backdated documents, failing to provide unbiased decision makers, refusing to allow the fair presentation of positive evidence or witness statements,

and issuing a disciplinary action inconsistent with the alleged conduct violations.

65. By failing to recognize, address, or remedy the systemic barriers embedded in their disciplinary policies, and by initiating discriminatory allegations in close proximity to Plaintiff's May 5 letter, Defendants exacerbated Plaintiffs injuries. Specifically, Defendants deprived Plaintiff, an Indian male student, of the opportunity to fully understand, engage in, and protect his due process rights throughout the disciplinary process.

66. Moreover, Defendants' failure to account for the detrimental impact of unsubstantiated allegations, along with their improper notice of disciplinary actions leading to Plaintiffs unwarranted dismissal from the medical program, compounded his injuries. These discriminatory practices subjected Plaintiff to emotional distress, public humiliation, and significant harm to his academic and professional prospects, leaving him without adequate recourse against unjust treatment.

67. As a direct and proximate result of the discriminatory conduct and retaliatory disciplinary measures, Plaintiff has suffered severe harm. These injuries include, but are not limited to, public humiliation, significant emotional distress, and irreparable damage to his academic and professional career. Plaintiff's prospects for future professional advancement have been adversely impacted, and his reputation has been unjustly tarnished as a result of the discriminatory actions taken against him.

**COUNT II**
**DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
***(Against All Defendants)***

68. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

69. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and

knowledgeable enough to provide proper and professional educational and medical services to the public.

70. At all times relevant hereto, Defendants held themselves out to the public as licensed and professional institute of higher education, capable, honest, and knowledgeable enough to provide proper and professional educational services and residency programs to the public and in compliance with Title VII of the Civil Rights Act of 1964.

71. Upon information and belief, Defendants accept and receive financial aid from government treasuries including but not limited to scholarships, fellowships, grants from the National Institutes of Health, and federal student loans. Defendants also receive indirect governmental financial aid in the form of tax exemptions and the use or loan of public land.

72. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. As a public institution receiving federal funding, Defendants are required to ensure that all employees, including Plaintiff, are treated equitably and without racial bias.

73. Plaintiff, as an Indian male, is a member of a protected class as defined under Title VII of the Civil Rights Act of 1964.

74. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. This includes the existence of a hostile work environment based on race, color, religion, sex, or national origin that is created, encouraged, accepted, tolerated, or left uncorrected by an employer, which can constitute discrimination in violation of Title VII.

75. Upon information and belief, Plaintiff was targeted by Dr. Shoultz, a UTSWMC employee and program instructor, and by other faculty involved in the disciplinary process. Defendants, and their agents and/or employees, took disproportionate and retaliatory action against

Plaintiff. The disciplinary measures were not solely based on legitimate performance concerns but were tainted by discriminatory animus directed at Plaintiff's protected status.

76. Plaintiff publicly expressed his concerns in an open forum regarding the complaints in his May 5, 2025, letter, including that Dr. Shoultz had deliberately misrepresented UTSW policy concerning student absences, coerced him to obtain multiple tests late in the evening while sick, and required him to report to shift the next day while severely physically and mentally impaired.

77. Shortly thereafter, Defendants initiated disciplinary proceedings against him, called him, and dismissed him from the program, omitting the personal meeting due to Plaintiff under the Student Handbook. The close proximity in timing between Plaintiff's remarks and the onset of punitive measures strongly indicates that the disciplinary action was not based on legitimate performance concerns.

78. Rather, Defendants' actions were retaliatory in nature, aimed at penalizing Plaintiff for voicing concerns about the fairness of the rotation program. This sequence of events underscores that the disciplinary process was used as a tool of retribution and discrimination rather than as a means to uphold academic standards.

79. Defendants failed to allow Plaintiff the opportunity to submit exculpatory evidence for evaluation during the omitted disciplinary meeting, thereby severely compromising his ability to defend himself. This included treating Plaintiff's positive evaluations as "evidence of dishonesty," failing to recuse conflicted faculty, and disregarding documented high evaluations that should have supported his defense. This breach of due-process rights contributed directly to his unwarranted dismissal from the medical program.

80. Defendants denied Plaintiff access to the minimum procedural protections before issuing significant disciplinary decisions which adversely affected his ability to defend himself during the omitted disciplinary hearing and resulted in his dismissal from the UTSWMC rotation

and medical school program.

81. During a prior hearing of the student promotions committee, Defendants denied Plaintiff access to fair hearing procedures by failing to provide unbiased decision makers and by restricting the presentation of evidence, which adversely affected his ability to defend himself and resulted in his dismissal from UTSWMC.

82. Defendants, directly and through their agents or employees, retaliated against Plaintiff by making unsupported accusations, using backdated documents, failing to provide unbiased decision makers, failing to allow the presentation of evidence during the disciplinary meeting, and issuing a disciplinary action inconsistent with the alleged conduct violations.

**COUNT III**
**DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT (ADA)**
***(Against All Defendants)***

83. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

84. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

85. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education, capable, honest, and knowledgeable enough to provide proper and professional educational services and rotation programs to the public and in compliance with the Americans with Disabilities Act (ADA).

86. Upon information and belief, Defendants accept and receive financial aid from government treasuries, including but not limited to scholarships, fellowships, grants from the National Institutes of Health, and federal student loans. Defendants also receive indirect

governmental financial aid in the form of tax exemptions and the use or loan of public land.

87. The ADA, 42 U.S.C. § 12102(3)(A), protects individuals from discrimination based on actual or perceived disabilities. This includes individuals who are regarded as having a physical or mental impairment, even if they do not have such an impairment.

88. Plaintiff was a qualified individual with a disability within the meaning of the ADA and Section 504. Plaintiff consistently met the essential academic and clinical requirements of the medical program, earning honors and near-honors evaluations, and remained capable of performing all essential functions of a medical student with reasonable accommodations, which Defendants failed to provide.

89. Upon information and belief, Plaintiff was targeted by Dr. Shoultz, a UTSWMC employee and rotation program instructor, on the basis of his disability. Plaintiff received his first professionalism citation in August 2023 for entering the anatomy lab, an act later understood to be impulsive behavior connected to untreated ADHD, Generalized Anxiety Disorder, and adjustment disorder. These symptoms were present and observable at the time but were overlooked by faculty, who failed to recognize the disability-related nature of the conduct.

90. After Plaintiff twice submitted a stock COVID-positive image during a period of psychiatric decompensation, and after faculty alleged erratic behavior during the trauma rotation, UTSWMC sent him to emergency psychiatric care and placed him on a three-week leave. He returned with diagnoses, treatment, and medication, placing faculty on clear notice that Plaintiff had a mental-health disability requiring accommodation. Despite this, no accommodations were initiated, and faculty continued to treat disability-related conduct as intentional misconduct.

91. Dr. Shoultz's mischaracterization of Plaintiff's disability-related conduct, combined with his failure to initiate or recommend reasonable accommodations, constituted discrimination under the ADA. His actions contributed to the escalation of punitive measures

rather than the implementation of required disability-related supports.

92. Defendants further failed to implement corrective measures or adjust the rotation program to accommodate Plaintiff's disability, despite clear medical documentation and repeated notice. Their deliberate avoidance of Plaintiff's disabilities, refusal to initiate the accommodation process, and institutional failure to remedy discriminatory treatment constitute violations of Plaintiff's rights under the ADA and Section 504.

93. As a direct and proximate result of the discriminatory conduct and retaliatory disciplinary measures, Plaintiff has suffered severe harm. These injuries include, but are not limited to, public humiliation, significant emotional distress, and irreparable damage to his academic and professional career. Plaintiff's prospects for future professional advancement have been adversely impacted, and his reputation has been unjustly tarnished, all as a result of the discriminatory actions taken against him.

**COUNT IV**
**DUE PROCESS VIOLATIONS UNDER THE TEXAS CONSTITUTION AND OTHER SOURCES**
***(Against All Defendants)***

94. Plaintiff hereby repeats all the allegations and exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

95. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

96. Upon information and belief, Defendants accept and receive financial aid from government treasuries including, but not limited to, scholarships, fellowships, grants from the National Institutes of Health, and federal student loans. Defendants also receive indirect governmental financial aid in the form of tax-exemptions and the use or loan of public land.

97. Article I, Section 19 of the Texas Constitution provides that: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by due course of the law of the land."

98. Plaintiff possessed constitutionally protected liberty and property interests in his continued enrollment, academic standing, and professional reputation. Dismissal from medical school, accompanied by findings of dishonesty and professional misconduct, constitutes a stigma-plus deprivation that forecloses future educational, licensing, and residency opportunities. Defendants' actions therefore implicated protected interests requiring robust procedural safeguards.

99. The violations of Plaintiff's due process rights were undertaken pursuant to official policies, customs, or practices of UTSWMC and the UT System, including: (a) treating disability-related conduct as misconduct; (b) denying hearings and withholding evidence; and (c) permitting biased decisionmakers to participate in disciplinary decisions. These policies and customs were ratified by final policymakers, including the Dean and the Student Promotions Committee.

100. This provision guarantees individuals the right to procedural and substantive due process before being deprived of a recognized legal interest, including the right to education, career progression, and fair disciplinary proceedings in an academic setting. In reviewing due process violations, Texas courts consider whether the governmental entity or public institution provided adequate procedural safeguards before imposing disciplinary or adverse actions upon the affected individual.

101. Defendants, the University of Texas Southwestern Medical Center ("UTSWMC") and the University of Texas System, as state actors, are constitutionally obligated to follow fair and established disciplinary procedures, provide adequate notice, and ensure that Plaintiff had a

meaningful opportunity to respond before imposing academic sanctions or dismissal. Their failure to uphold these principles constitutes a violation of Article I, Section 19 of the Texas Constitution.

102. Plaintiff entered into contractual agreements with Defendants upon enrolling in the UTSWMC medical school. As a condition of admission, Plaintiff accepted the program's policy handbook which sets forth the rules, disciplinary processes, and standards required for participation, thereby establishing an express contract between the parties. In exchange for Plaintiffs commitment, including fulfilling all program requirements and paying the requisite tuition and fees, Defendants undertook to provide a safe, supportive, and comprehensive educational and clinical training environment designed to prepare Plaintiff for board certification and licensure as a physician.

103. Moreover, because the rotation program qualifies as both an academic curriculum and a pseudo-employment relationship, Defendants were further obligated to ensure that Plaintiff received not only a robust education but also the employment protections inherent in such a dual-status setting, including the provision of a non-discriminatory and secure work environment.

104. Defendants established extensive investigative, hearing, and disciplinary procedures, among other policies and codes of conduct, which are outlined in detail in the policy handbook.

105. The policy handbook acts as a regulatory document that requires compliance by faculty, staff, residents, students, and visitors. Noncompliance or violations of the policy handbook can result in disciplinary action that can result in sanctions, suspension, or termination from the UTSWMC educational and/or residency programs. The policy handbook was presented to Plaintiff during the admission process, and his acceptance of its contents was required as a condition of enrollment. As such, the policy handbook acts as a contract between UTSWMC and the Plaintiff.

106. UTSWMC's policy handbook details the student's due process rights which include

but are not limited to proper notice, hearings, post-hearing notices, disciplinary actions, and appeals.

107. Defendants engaged in numerous procedural irregularities that deprived Plaintiff of a fair disciplinary review and ultimately led to an unjust dismissal. One of the fundamental violations was the failure to provide Plaintiff with adequate notice of the allegations and supporting evidence.

108. On May 28, 2025, Plaintiff was summoned to a meeting before the Student Promotions Committee ("SPC") to discuss his status. Despite the significance of this meeting, Plaintiff was not provided with essential evaluative documents, including records from his prior penalty period, nor was he given an opportunity to prepare. He was denied access to materials necessary to understand the allegations or respond meaningfully.

109. Without access to these materials, Plaintiff was unable to meaningfully review the claims against him, prepare a defense, or challenge the accusations in an informed manner. This lack of disclosure violated basic tenets of due process, which require that an individual facing adverse action must have an opportunity to access relevant information and respond accordingly.

110. In addition to withholding crucial documents, Defendants engaged in arbitrary decision-making that contradicted previously established evaluations of Plaintiff's progress. On April 14, 2025, Plaintiff was welcomed back from leave with an encouraging "clean slate" and had earned approximately four honors and two near-honors grades during the 2024–25 academic year. Less than three weeks later, however, Plaintiff was abruptly dismissed on May 7, 2025, without any specific evidence or substantive justification, and without the personal meeting required under the disciplinary process.

111. This sudden reversal of status, without new documented deficiencies or meaningful discussion, constitutes an arbitrary and capricious deprivation of Plaintiff's academic and

professional rights. The inconsistency between Defendants' previous affirmations of Plaintiff's standing after two brief periods of leave, and the subsequent dismissal suggests a lack of procedural integrity and fairness.

112. Furthermore, Defendants denied Plaintiff the opportunity to present evidence and witness testimony in his defense. Not only was Plaintiff penalized for submitting supporting documentation, but he also discovered that the institution closed his email and database account within 24 hours of his final dismissal on July 7, 2025, raising concerns that the institution was hiding records or had selectively altered records to justify a predetermined dismissal.

113. The failure to preserve and provide these reports further underscores the lack of transparency in the disciplinary process and suggests a deliberate effort to obscure evidence that may have supported Plaintiff's continuation in the program. Due process protections require institutions to maintain and disclose relevant records, ensuring disciplinary decisions are based on a complete and accurate assessment of the individual's performance.

114. Defendants breached their due-process obligations by failing to properly notify Plaintiff of pending disciplinary actions and by denying him a meaningful opportunity to defend himself against false allegations. Instead of affording Plaintiff the opportunity to present and have exculpatory evidence evaluated, a key component of the due-process protections promised under the policy handbook, Defendants proceeded with disciplinary measures without proper notice or review of Plaintiff's rebuttal evidence.

115. The Plaintiff was denied due process, which requires that an investigation and hearing take place before disciplinary actions are enforced. Due process also mandates that any evidence submitted in defense of the accused student be reviewed and fairly evaluated in determining their right to defense and proof against the allegations.

116. Collectively, these procedural failures, including the lack of notice, the arbitrary

and inconsistent dismissal, the refusal to allow Plaintiff to present exculpatory evidence, and the selective recordkeeping, constitute clear violations of Plaintiffs procedural due process rights.

117. As a direct result of these irregularities, Plaintiff was deprived of a fair opportunity to defend himself, suffered reputational harm, and was unjustly removed from the program without a legitimate basis. Accordingly, Defendants' actions amount to a violation of Article I, Section 19 of the Texas Constitution, necessitating judicial intervention and appropriate remedial relief.

118. As a direct and proximate result of these due process violations, Plaintiff has suffered significant harm. The lack of a fair disciplinary process not only resulted in damaging false allegations but also inflicted public humiliation, emotional trauma, and irreparable harm to Plaintiff's academic and professional reputation. Additionally, Plaintiff has incurred and will continue to incur damages as a result of Defendants' reckless disregard for the procedural safeguards set forth in both the policy handbook and the implied contractual obligations.

119. Upon information and belief, Plaintiff was targeted by Dr. Renee Abraham, a UTSWMC employee and medical program instructor, on the basis of his mental-health disabilities. Plaintiff asserts that UTSWMC violated his due-process rights by failing to provide proper notice of disciplinary proceedings and by denying him the opportunity to submit evidence, offer witness testimony, and mount a full defense. These actions not only breached the procedural safeguards set forth in the policy handbook but also perpetuated retaliatory and discriminatory treatment rooted in his Indian heritage and disability.

120. Defendants had a contractual and implied duty of good faith to ensure that Plaintiff's due process rights were protected and provided in accordance with its contractual obligations, the policy handbook, and state and federal statutes.

121. Defendants violated Plaintiff's due-process rights by failing to properly evaluate exculpatory evidence submitted in his defense and by neglecting to provide timely and adequate

notice of disciplinary proceedings preceding his first and second hearings, by omitting his third hearing entirely, and by dismissing him without a fair opportunity to contest the allegations. Due process mandates that individuals be granted a meaningful chance to refute charges before suffering adverse action; Defendants' failure in this regard rendered the disciplinary process inherently flawed and unjust.

122. As a direct consequence of Defendants' arbitrary and disproportionate dismissal, executed without adherence to proper procedural requirements, Plaintiff has endured severe emotional trauma, irreparable reputational harm, and lasting damage to his academic and professional career. The public and humiliating nature of Plaintiff's expulsion further exacerbates the harm suffered, warranting judicial intervention to rectify this wrongful deprivation of Plaintiff's rights.

**COUNT V**
**BREACH OF EXPRESS CONTRACT**
***(All Defendants)***

123. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

124. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and skilled medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and residency services to the public.

125. Plaintiff entered into contractual agreements with Defendants upon enrolling in the UTSWMC medical program. As a condition of admission, Plaintiff accepted the program's policy handbook which sets forth the rules, disciplinary processes, and standards required for participation, thereby establishing an express contract between the parties. In exchange for Plaintiffs commitment, including fulfilling all program requirements and paying the requisite

tuition and fees, Defendants undertook to provide a safe, supportive, and comprehensive educational and clinical training environment designed to prepare Plaintiff for board certification and licensure as a physician.

126. The Handbook functions as a regulatory document governing compliance for faculty, staff, residents, and students in the UTSWMC rotation program. It explicitly provides that any noncompliance or violation of its provisions may result in disciplinary actions, including sanctions, suspension, or termination from the program.

127. The handbook was presented to Plaintiff during the admission process, and his acceptance of its contents was a condition of his enrollment in the medical program. Accordingly, by accepting the handbook, Plaintiff entered into an express contract with UTSWMC, obligating the institution to adhere to their own policies and procedures in any disciplinary actions taken against him.

128. The policy handbook expressly promises: (a) timely written notice of allegations; (b) an opportunity to review and respond to evidence; (c) a fair and impartial hearing before adverse action; (d) preservation of academic records; and (e) access to appeal procedures. Defendants breached each of these specific contractual obligations by withholding evidence, canceling required meetings, deleting Plaintiff's records, denying him a hearing, and imposing dismissal without following mandated procedures.

129. Upon information and belief, the contracts at issue-including the rotation program enrollment agreement and the accompanying policy handbook-were entered into with the primary intent of benefiting Plaintiff by providing essential education and training services. In exchange for receiving this training, which qualified Plaintiff for program completion and subsequent residency program, Defendants expressly promised to maintain a safe, supportive learning and clinical environment.

130. Additionally, Defendants undertook to adhere to the rules, regulations, and policies set forth in the contract and policy handbook, thereby ensuring fair treatment and due process throughout Plaintiffs program.

131. Upon information and belief, Defendants' representations required Plaintiff and Defendants to comply with policies, procedures, and code of conduct as outlined in the policy handbook.

132. The express contractual terms required that any adverse evaluations or disciplinary measures be supported by proper notice, complete documentation, and an opportunity for Plaintiff to respond or remediate any deficiencies. Plaintiff was assured that his performance would be fairly and consistently evaluated and that any deviations from established procedures would be corrected.

133. Upon information and belief, Defendants materially breached their contractual obligation to provide a safe and respectful educational environment by subjecting Plaintiff, an enrolled medical student, to publicly humiliating and punitive disciplinary actions without proper notice or adherence to established due process. Defendants' actions, which included degrading verbal reprimands and an intimidating atmosphere during critical clinical events, incited fear and contributed to Plaintiff's emotional distress, thereby violating the safety provisions expressly incorporated into the medical program agreement and policy handbook.

134. Upon information and belief, Defendants materially breached their contractual obligation by failing to comply with the disciplinary process as outlined in the policy handbook. Despite a preliminary meeting intended to address the allegations informally and provide an opportunity for restoration and resolution, a standard practice at USWMC, the allegations against Plaintiff were neither amended nor resolved through such informal means. Instead, the process escalated without adherence to the established procedures, thereby depriving Plaintiff of due

process and the benefits of a fair remedial mechanism.

135. Upon information and belief, Defendants materially breached their contractual obligation by failing to comply with the disciplinary process outlined in the policy handbook. Defendants intentionally or negligently failed to allow the submission of evidence and testimony that substantiated Plaintiff's innocence and would have refuted the allegations against him.

136. Moreover, defendants refused to acknowledge critical exculpatory evidence in university psychiatrist Dr. Isabel Clark's letter dated May 21, 2025, submitted to and highlighted by Mr. Nandakumar multiple times at the hearing on May 28, 2025, and submitted again to Dr. Lee on June 3, 2025. Said letter explicitly assigns the events prior to and during the surgical overnight rotation as due to a "decompensated psychiatric state that certainly contributed to his impaired judgement and impulsivity." Furthermore, defendants used positive feedback evaluations as further evidence for his dismissal. This flagrant failure to adhere to the established procedures not only violates the UTSWMC handbook and code of conduct but also demonstrates an unlawful retaliation against the Plaintiff for exercising his protected rights.

137. Defendants introduced new information and justification for dismissal in Dr. Scotts final decision letter. Said information included concerns never previously mentioned in the appeals process such as "lacking insight on social ques" and "calling the psychiatry clerkship director" that were explicitly stated as "not prompting a professionalism form" and that were manifestations of his untreated psychiatric disorders in mid 2024 that led directly to his referral by Dr. Rodriguez-Baez to Dr. Clark.

138. Furthermore, the letter admits that Dr. Shoultz acted off a text message containing an image he sent to a student to intentionally misquote absence policy to try and bait Mr. Nandakumar to send him said photo. He did so by asking him to get "tested by occupational health, and since it was after hours, a local urgent care" while Mr. Nandakumar was very ill, as evidenced

by his actions on shift the next day. Said actions not only blatantly violate established procedures and due process rights but placed the defendant and patients in dangerous positions that could have resulted in severe harm.

139. Upon information and belief, the breaches were reasonably foreseeable consequences of Defendants' actions in breach of these contracts and the UTSWMC policy handbook.

140. As a direct and proximate result of Defendants' breaches set forth above, Plaintiff has suffered and will continue to suffer actual damages. These damages include, without limitation, harm to Plaintiff's academic and professional career, loss of monetary opportunities, impairment of future employment prospects, damage to his good name and reputation, and significant emotional distress.

**COUNT VI**
**BREACH OF IMPLIED CONTRACT**
***(Against All Defendants)***

141. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

142. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

143. Plaintiff entered into contractual agreements with Defendants upon enrolling in the UTSWMC medical program. As a condition of admission, Plaintiff accepted the program's policy handbook, which sets forth the rules, disciplinary processes, and standards required for participation, thereby establishing a contract between the parties. In exchange for Plaintiffs commitment, including fulfilling all program requirements and paying the requisite tuition and

fees, Defendants undertook to provide a safe, supportive, and comprehensive educational and clinical training environment designed to prepare Plaintiff for board certification and licensure as a physician.

144. The policy handbook governs the conduct of all members of the UTSWMC medical community, including faculty, staff, residents, and medical students, and mandates strict adherence to its provisions. Violations of its guidelines may result in disciplinary actions such as sanctions, suspension, or termination from the medical program. The handbook was provided to Plaintiff during the admission process, and his acceptance of its terms was a condition of enrollment. Consequently, the policy handbook constitutes an express contract between UTSWMC and Plaintiff.

145. Separate from the express contractual terms set forth in the policy handbook, Defendants entered into implied contracts with Plaintiff governing the disciplinary process. These implied agreements required Defendants to adhere to the handbook's outlined procedures, including providing timely and proper notice, conducting fair hearings, and ensuring that all relevant evidence, especially evidence contradicting adverse evaluations, was considered before any disciplinary disposition was made. Accordingly, Defendants were obligated to take all reasonable steps to safeguard Plaintiff's due process rights throughout the disciplinary proceedings.

146. Separate from the express terms contained in the policy handbook, Defendants entered into implied contractual obligations to administer disciplinary procedures in a fair and unbiased manner that protected Plaintiff from retaliation and discrimination. This duty was especially critical given Plaintiff's mental health challenges.

147. Defendants breached these obligations by failing to provide proper notice for hearings, neglecting to consider exculpatory evidence, and escalating adverse disciplinary actions.

Plaintiff was subjected to retaliatory and discriminatory treatment, including the suppression of positive evaluations, the refusal to allow witness testimony, and the use of backdated documents to justify predetermined outcomes. These actions significantly harmed Plaintiff's professional career and personal well-being.

148. Defendants had an implied duty of good faith to ensure that Plaintiff's due process rights were protected and provided in accordance with their contractual obligations and the policy handbook. This duty required that all disciplinary procedures be conducted fairly and impartially and allow for adequate due process.

149. Defendants had an implied duty of good faith to ensure that Plaintiff's due-process rights were rigorously upheld in accordance with their contractual obligations and the policy handbook. This duty required that all disciplinary procedures be conducted fairly and impartially, free from retaliation or discriminatory bias, including bias related to Plaintiff's Indian heritage and mental-health disabilities.

150. Upon information and belief, the breaches were reasonably foreseeable consequences of Defendants' actions in breach of these contracts and of the UTSWMC policy handbook.

151. By failing to allow Plaintiff to submit evidence in his defense and neglecting to provide timely notice of disciplinary proceedings, Defendants deprived Plaintiff of the opportunity to defend himself against false allegations and mitigate resulting harm. Defendants' disproportionate and retaliatory dismissal, which appeared motivated more by discriminatory animus toward Plaintiff's Indian heritage and mental-health disability than by any legitimate concerns regarding his performance, led to public humiliation, irreparable harm to Plaintiff's academic and professional career, and significant emotional trauma.

**COUNT VII**
**NEGLIGENCE**
***(Against All Defendants)***

152. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

153. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

154. Plaintiff entered into contractual agreements with Defendants upon enrolling in the UTSWMC medical program. As a condition of admission, Plaintiff accepted the program's policy handbook which sets forth the rules, disciplinary processes, and standards required for participation, thereby establishing an express contract between the parties. In exchange for Plaintiff's commitment, including fulfilling all program requirements and paying the requisite tuition and fees, Defendants undertook to provide a safe, supportive, and comprehensive educational and clinical training environment designed to prepare Plaintiff for board certification and licensure as a physician.

155. Moreover, because the rotation program qualified as both an academic curriculum and a pseudo-employment relationship, Defendants were further obligated to ensure that Plaintiff received not only a robust education but also the employment protections inherent in such a dual-status setting, including a non-discriminatory and secure work environment.

156. Defendants, as an academic institution and employer that provides the UTSWMC medical rotation program, owed Plaintiff a duty to exercise reasonable care in maintaining a safe and non-discriminatory environment. This duty included administering disciplined proceedings in accordance with the policy handbook and ensuring that all disciplinary actions were conducted

with proper notice, a fair hearing, and an objective evaluation of all submitted evidence.

157. Defendants owed a duty of care to Plaintiff because it was foreseeable that Defendants' failure to adequately safeguard the Plaintiff's due process rights and academic success in accordance with the policy handbook, contracts, assignments, and state and federal statutes would compromise the Plaintiff's personal reputation, academic success, and ability to properly defend himself during the disciplinary process.

158. Defendants refused to acknowledge the multiple-times submitted psychiatrist letter explaining the actions on the surgical rotation and used positive evidence as further reason to dismiss him. Furthermore, they introduced new information at the final level of appeal without giving Mr. Nandakumar a chance to address or refute said claims. By doing so, defendants acted with wanton and reckless disregard for the due process and fair hearing rights of Plaintiff. This duty is required and necessary for Plaintiff to take appropriate measures to protect his due process rights, to protect his reputation and good name, to protect his academic career, to protect his future employment prospects, and to take other necessary steps to mitigate the harm caused by the false allegations and dismissal from the medical school program.

159. Defendants owed a duty to Plaintiff to timely and accurately conduct an impartial investigation and hearing before the disciplinary dismissal of Plaintiff from his academic and professional pursuit. This duty is required and necessary for Plaintiff to take appropriate measures to protect his due process rights, to protect his reputation and good name, to protect his academic career, to protect his future employment prospects, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the allegations and unwarranted dismissal from the medical rotation program.

160. Defendants owed a duty to Plaintiff to protect his due process rights, including providing proper notice and conducting a hearing before implementing disciplinary action. This

duty is required and necessary for Plaintiff to take appropriate measures to protect his safety and security, to protect his reputation and good name, to protect his academic career, to protect his future employment prospects, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the allegations and deleterious actions of Defendants.

161. Defendants owed a duty to Plaintiff and knew or should have known Plaintiff would suffer injury-in-fact from Defendants' reckless and wanton disregard for Plaintiff's due process rights and personal safety and security. Plaintiff was coerced to attend an overnight shift and placed in a high-acuity surgical environment while obviously ill, as evidenced by his multiple-times documented erratic behavior by Dr. Mihalic and by Dr. Scott. Defendants' actions put the defendant, other trauma staff, and all patients at serious risk of injury.

162. Defendants breached their duty of care by negligently failing to provide Plaintiff with timely notice of disciplinary proceedings, inadequately evaluating exculpatory evidence, and canceling the second personal hearing. Moreover, Defendants' actions, marked by a disproportionate and retaliatory disciplinary dismissal, appear motivated by discriminatory animus toward Plaintiff's Indian heritage and mental-health disabilities, rather than any legitimate concerns regarding his rotation performance. This failure to adhere to established procedural safeguards constitutes a clear breach of duty.

163. As a direct and proximate result of Defendants' negligent conduct, Plaintiff was deprived of the opportunity to mount a proper defense against false allegations. This failure materially contributed to the imposition of a punitive disciplinary action that left Plaintiff dismissed from the medical rotation program, damaging his academic progress and professional reputation, and inflicting severe emotional distress, public humiliation, and long-lasting personal harm.

164. Defendants' breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff actual, tangible, injury-in-fact and damages, including, without limitation, lost benefit of his bargain, lost reputation, lost benefit from academic advancement and future employment, emotional distress and anguish, and lost time and money incurred to mitigate and remediate the effects of the denial of due process and the unwarranted dismissal from the medical program were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which he continues to face.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
***(All Defendants)***

165. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

166. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

167. Defendants intentionally and/or recklessly inflicted emotional distress upon the Plaintiff by purposefully interfering with the Plaintiff's due process rights and by purposefully and intentionally failing to rectify the many problems associated with the disciplinary notice and hearing process conducted by the Defendants and their agents and employees.

168. Defendants intentionally and/or recklessly inflicted emotional distress upon Plaintiff. In clear retaliation for Plaintiff's challenge to the system, Defendants initiated a disciplinary process that was overtly discriminatory and procedurally flawed, failing to adhere to established safeguards and escalating punitive measures immediately after Plaintiff's protected speech in his May 5 letter.

169. Specifically, Defendants neglected to provide Plaintiff with proper notice of the proceedings or an opportunity to submit exculpatory evidence and witness testimony, underscoring a deliberate disregard of Plaintiff's rights. Furthermore, UTSWMC required Plaintiff to work in surgery while he was sick, sleepless, mentally impaired, and had requested time off, exposing him to dangerous conditions and exposing patients to serious risks. Such conduct, undertaken with intent or reckless disregard for Plaintiff's well-being and in retaliation for his protected speech, constitutes extreme and outrageous behavior that inflicted severe emotional distress, public humiliation, and significant harm to his academic and professional career.

170. Defendants intentionally and/or recklessly inflicted emotional distress on Plaintiff by refusing to allow the submission of evidence contradicting faculty accusations, failing to conduct any meaningful investigation into such evidence, and deliberately neglecting to rectify numerous deficiencies in their disciplinary notice and process. These actions were undertaken despite clear medical documentation of Plaintiff's disabilities and the institution's knowledge of his vulnerability.

171. These actions, culminating in Plaintiff's dismissal from the program and the flawed hearing process overseen by Defendants and their agents, including the cancellation of the next hearing, demonstrate a willful disregard for Plaintiff's due-process rights and safety. As a direct result, Plaintiff suffered severe emotional distress, public humiliation, and significant harm to his academic and professional career.

172. Defendants intentionally and/or recklessly inflicted emotional distress upon Plaintiff by deliberately targeting and retaliating against him because of his Indian heritage and mental-health disabilities. Defendants purposefully failed to address or rectify numerous deficiencies in the disciplinary process, including discriminatory treatment, wrongful dismissal, and flawed hearing procedures. Defendants imposed an extremely unsafe work environment,

demonstrating deliberate disregard for Plaintiff's rights and well-being. These actions, motivated by discriminatory animus, resulted in severe emotional distress, public humiliation, and significant harm to Plaintiff's academic and professional career.

173. The infliction of emotional distress was preventable had the Defendants lived up to their duty of care as arising under their policies and procedures, the policy handbook, and under common law, statue, and rule, as previously mentioned.

174. Defendants, as a reputed professional institute of higher learning entrusted with providing exemplary educational and medical services to the public, knew, or reasonably should have known, that their diverse customer base includes individuals of various races. Despite this awareness, Defendants engaged in conduct so extreme and outrageous that it transcends all accepted bounds of decency in a civilized community.

175. By deliberately interfering with Plaintiff's right to due process through their discriminatory disciplinary proceedings, imposed extremely unsafe work conditions, Defendants' actions not only violated procedural guarantees but also inflicted severe mental anguish. Such egregious behavior renders the resulting mental distress presumed, as any competent institution entrusted with the welfare of their constituents would be expected to adhere to fair and non-discriminatory practices.

176. Defendants' acts as alleged herein were committed either with actual malice and intent to inflict on Plaintiff the very harm he suffered as a result of these acts by Defendants, or with reckless, wanton, and willful disregard of the possibility of inflicting on Plaintiff the very harm he suffered as a result of these acts by the Defendants.

177. As a direct and proximate result of Defendants' intentional and/or reckless conduct as previously mentioned, Plaintiff was caused to sustain damages of no less than $8 million, including, but not limited to, emotional distress and anguish so severe that no reasonable person

could be expected to endure it.

## APPLICATION FOR TEMPORARY INJUNCTION - IMMINENT HARM

178. Plaintiff hereby repeats all of the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

179. Plaintiff respectfully submits this Application for a Temporary Injunction to enjoin Defendants and their agents from releasing, disseminating, or otherwise publicizing any school records, disciplinary records, or information regarding Plaintiff's dismissal from the medical pending resolution of the underlying litigation. Defendants' disclosure of these materials would irreparably harm Plaintiff's reputation, hinder his future academic and professional opportunities, and prejudice the fair adjudication of his claims of discrimination, retaliatory conduct, and violation of due process.

180. The unauthorized release of school and disciplinary records will cause irreparable harm by permanently tarnishing Plaintiff's reputation and undermining his future academic and professional pursuits. Unlike monetary damages, the harm resulting from public disclosure cannot be adequately remedied by an award of money.

181. Plaintiff has suffered financially from Defendants' conduct and fears future similar conduct from Defendants, which would cause irreparable harm to Plaintiff.

182. Plaintiff's claims, asserting retaliatory and discriminatory conduct as well as violations of due process, are supported by clear factual allegations. The proximate timing between Plaintiff's protected expression and Defendants' retaliatory actions strongly supports Plaintiff's position. Plaintiff is likely to recover at the trial on the merits, given the nature of Defendants' conduct, and the strength of Plaintiffs' proof.

183. Plaintiff is entitled to an injunction pursuant to Tex. Civ. Prac. & Rem. Code §65.011(1) in that:

a. The applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant;

b. A party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual; or

c. The applicant is entitled to a writ of injunction under the principles of equity and the statutes of this state relating to injunctions.

184. No remedy at law is sufficiently clear, adequate, and efficient to protect Plaintiff against Defendants' conduct, and to deter Defendants from future illegal conduct. Under the foregoing, injunctive relief is an appropriate and proper remedy by this court.[1]

185. Plaintiff respectfully requests a $100.00 bond.

## PRAYER FOR RELIEF

186. **WHEREFORE, PREMISES CONSIDERED,** Plaintiff respectfully requests that the court grant this application for a temporary injunction and set the bond at $100.00.

187. **WHEREFORE**, for the foregoing reasons and pursuant to the Counts above, Plaintiff, DHRUV NANDAKUMAR, demands judgment against the Defendants, UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER and UNIVERSITY OF TEXAS SYSTEM, for general, compensatory, and punitive damages, reasonable attorney's fees and costs of suit with interest, and any further relief which the court may deem equitable and just. and in the alternative, for alternative, a return plan of reinstatement with complete clearance of any disciplinary proceedings or dismissal from record that may include, if medically and educationally appropriate: treating-provider clearance; ongoing treatment compliance; academic or clinical remediation

[1] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198 (Tex. 2002)

tailored to essential program requirements; renegotiation of two grades – surgery and internal medicine; periodic meetings with academic support; executive function or communication supports; any reasonable accommodations approved through the formal process; support for residency including objective MSPE letter; non-retaliation and short-term medical leave if clinically indicated and mutually agreed.

**JURY DEMAND**

188. Plaintiff demands a trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**CERTIFICATION**

189. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully Submitted,

**LLG NATIONAL LAW GROUP**

Dated: July 20, 2026

*/s/ Renee Walker*

Renee Walker, ESQUIRE
State Bar No.: 027051988
Phoenix Corporate Tower
3003 N Central Avenue - Suite 685
Phoenix, AZ 85012
Phone: 602.960.9400
Fax: 707.215.3600
Renee.walker@llgnational.com
*Attorney for Plaintiff*

Sender: You must seal flap before shipping

FedEx

Press here to seal. Press here to seal. Press here to seal.

RECEIVED
JUL 30 2026
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

ORIGIN ID:WWDA (856) 652-2000
LLG NATIONAL LAW GROUP

1814 MARLTON PIKE E

CHERRY HILL, NJ 08003
UNITED STATES US

SHIP DATE: 28JUL26
ACTWGT: 2.00 LB
CAD: 266500294/INET4535

BILL SENDER

TO DALLAS OFF. CLERK OF NORTHERN DIV
U.S. DISTRICT COURT
1100 COMMERCE STREET
ROOM 1452
DALLAS TX 75242

(214) 753-2200 REF:
INV:
PO: DEPT:

58KJ7/E3E4/484B

FedEx Express

E

THU - 30 JUL 5:00P
** 2DAY **

75242
TX-US DFW

8750 0090 3265

SS KIPA

58KJ7/E3E4/484B

X-RAY

U.S. DISTRICT COURT
U.S. COMMERCE ST
1100 1452
STE 1452
DALLAS TX
75242-1001-00
267-7028
SP:PD:100:Y
ETP: 1
1001901724220007524200875000903265

Part # 156297-435 RRDB EXP 06/27