# UNITED STATES DISTRICT COURT
for the
Northern District of Texas
Dallas Division

| | |
|---|---|
| DHRUV NANDAKUMAR<br>*Plaintiff,*<br><br>**-v-**<br><br>UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER; UNIVERSITY OF TEXAS SYSTEM; W. P. ANDREW LEE, M.D., in his official capacity; KEVIN KLEIN, M.D., in his official capacity; and ANGELA MIHALIC, M.D., in her official capacity,<br>*Defendants.* | Case No. 3:26-cv-02535-B-BW<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND** |

**CIVIL ACTION**

*This action alleges, inter alia, violations of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Title VI of the Civil Rights Act of 1964, and the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983, arising from the University of Texas Southwestern Medical Center's failure to recognize, accommodate, or appropriately respond to Plaintiff's documented psychiatric disabilities and its subsequent imposition of punitive disciplinary measures culminating in his dismissal from medical school without fair process, thereby depriving him of federally protected rights to disability accommodation, equal protection, and procedural due process.*

Plaintiff DHRUV NANDAKUMAR, by way of First Amended Complaint against the Defendants, UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER, UNIVERSITY OF TEXAS SYSTEM, and W. P. ANDREW LEE, M.D., KEVIN KLEIN, M.D., and ANGELA MIHALIC, M.D., each in their official capacity, hereby states as follows:

## INTRODUCTION

1. This is a civil rights and disability-discrimination action brought under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Title VI and Title VII of

the Civil Rights Act of 1964, and the Fourteenth Amendment, seeking redress for the unlawful dismissal of Plaintiff, a medical student at the University of Texas Southwestern Medical Center ("UTSW"), following disability-related conduct that the institution improperly treated as intentional misconduct.

2. Beginning October 15, 2024, Dr. Isabel Clark, a UTSW psychiatrist, diagnosed and treated Plaintiff for generalized anxiety disorder, adjustment disorder, and insomnia, and, from March 2025, treated him for ADHD, hyperactive-impulsive type. Plaintiff had symptoms before then. Rather than initiating an accommodation process or providing required disability support, Defendants issued professionalism citations, imposed punitive measures, and escalated disciplinary action in violation of federal law and institutional policy.

3. The disciplinary process culminating in Plaintiff's dismissal was procedurally defective, biased, and inconsistent with due process. Defendants disregarded medical evidence, relied on selective and retroactive negative evaluations, denied Plaintiff a meaningful opportunity to be heard, and initiated a belated and irregular "accommodations" inquiry only after the dismissal decision had effectively been made. The day before Plaintiff's appeal meeting, Defendants revised UTSW's equal opportunity policy to remove its references to the student catalogs' discrimination-complaint process, and UTSW's next catalog dropped the promise that students would not be penalized in any way for bringing complaints of discrimination.

4. Plaintiff seeks declaratory and injunctive relief, including reinstatement; compensatory damages; and attorney's fees and costs. Plaintiff will move separately under Federal Rule of Civil Procedure 65 for a temporary restraining order and preliminary injunction.

## <u>JURISDICTION AND VENUE</u>

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including federal civil-rights

and anti-discrimination statutes. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3)–(4) for claims seeking redress for the deprivation of constitutional rights under color of state law.

6. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims, arising from a common nucleus of operative fact involving his dismissal from the medical program and Defendants' related conduct.

7. Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendant UTSW's principal place of business is located in Dallas, Texas.

## PARTIES

8. From August 2022 until July 7, 2025, Plaintiff DHRUV NANDAKUMAR was a medical student enrolled in UTSW's M.D. program and, upon information and belief, is an adult resident citizen of Collin County, Texas, with a residential address at 3021 Dove Creek Lane, Richardson, Texas 75082.

9. At all times relevant hereto, Defendant UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER ("UTSW") was and is a public institution of higher education located in Dallas County, Texas, with a principal business and mailing address at: UT Southwestern Medical Center, 5323 Harry Hines Blvd., Dallas, Texas 75390-9003. UTSW is a state actor for purposes of 42 U.S.C. § 1983 and is subject to federal civil-rights and anti-discrimination statutes.

10. At all times relevant hereto, Defendant UNIVERSITY OF TEXAS SYSTEM ("UT System") was and is a public university system and the governing entity responsible for oversight, administration, and policy enforcement at UTSW. UT System maintains its principal offices at: 210 West 7th Street, Austin, Texas 78701. UT System is likewise a state actor for purposes of 42

U.S.C. § 1983 and is subject to federal civil-rights and anti-discrimination statutes.

11. Defendant W. P. ANDREW LEE, M.D. ("Provost Lee"), signed the July 7, 2025 final decision upholding Plaintiff's dismissal as Executive Vice President for Academic Affairs and Provost and Dean, UT Southwestern Medical School. The decision states: "In accordance with EDU-402, my decision is final in all respects." He is sued in his official capacity only, for prospective declaratory and injunctive relief. If another person holds his office, that person is substituted under Federal Rule of Civil Procedure 25(d). Provost Lee is an individual residing in Texas and was employed as a physician at UTSW during the relevant time period. Service of process may be made at 5323 Harry Hines Blvd., Dallas, Texas 75390-9003.

12. Defendant KEVIN KLEIN, M.D. ("Dr. Klein"), signed the Student Promotions Committee's May 9, 2025 letter informing Plaintiff that the Committee had voted to dismiss Plaintiff and its May 29, 2025 letter denying Plaintiff's appeal, as Professor of Anesthesiology and Distinguished Teaching Professor and Chair, Student Promotions Committee. He is sued in his official capacity only, for prospective declaratory and injunctive relief. If another person holds his office, that person is substituted under Rule 25(d). Dr. Klein is an individual residing in Texas and was employed as a physician at UTSW during the relevant time period. Service of process may be made at 5323 Harry Hines Blvd., Dallas, Texas 75390-9003.

13. Defendant ANGELA MIHALIC, M.D. ("Dean Mihalic"), signed the March 24, 2025 letter that removed Plaintiff from all UTSW activities under UTSW's policy EDU-117, "Fitness for Participation in UT Southwestern Activities." The Committee's May 9 and May 29, 2025 letters identify her as Dean of Medical Students and Associate Dean for Student Affairs. Under UTSW's policy EDU-402, an instructor may recommend an incomplete, subject to the approval of the Associate Deans for Student Affairs. She is sued in her official capacity only, for prospective declaratory and injunctive relief. If another person holds her office, that person is

substituted under Rule 25(d). Dean Mihalic is an individual residing in Texas and was employed as a physician at UTSW during the relevant time period. Service of process may be made at 5323 Harry Hines Blvd., Dallas, Texas 75390-9003.

14. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave from the court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

15. All of Plaintiff's claims stated herein are asserted against UTSW and any of its owners, predecessors, successors, subsidiaries, agents, and/or assigns.

## FACTUAL BACKGROUND

16. Defendant UTSW is a public institution that functions as both an educational institution and a clinical institution where the medical school programs are administered.

17. Defendant University of Texas System is the owner and managing entity that oversees UTSW.

18. Plaintiff matriculated at UTSW in August 2022 (Class of 2026), where he established a strong record of dedication and academic performance. Plaintiff began third-year clerkships in 2024 and remained enrolled until the final decision on July 7, 2025. Before March 2025, Plaintiff had no course failures.

19. The escalating injuries, both psychological and professional, arose from Defendants' failure to recognize, accommodate, and appropriately respond to Plaintiff's disabilities, first diagnosed and treated at UTSW beginning October 15, 2024. That failure led to the Student Promotions Committee's May 7, 2025 vote to dismiss Plaintiff from the medical program, which became final on July 7, 2025, when Provost Lee upheld it. The institution's continued exclusion of Plaintiff since July 7, 2025, despite clear evidence of medical stabilization,

compounded his injuries.

20. On August 9, 2023, Plaintiff was told by email that he had not been hired as a teaching assistant for the fall course. As a general rule, only students taking the anatomy course and its teaching assistants could enter the anatomy lab. Two first-year students asked Plaintiff for help, and on August 18, 2023, Plaintiff entered the teaching assistants' prep room in the Willed Body corridor. Plaintiff did not enter the dissection lab. Plaintiff's anxiety rose sharply once he was inside. Rather than recognizing Plaintiff's conduct that day as a manifestation of a disability, Defendants issued a professionalism citation: Dr. Rinaldi completed a Physicianship Evaluation Form dated September 6, 2023, and Dean Mihalic reviewed it with Plaintiff on September 11, 2023. Before the dismissal became final, Dr. Clark had identified an untreated anxiety disorder and impulsivity issues, UTSW's clinic had recorded ADHD, hyperactive-impulsive type, and Dr. Scott's memo recounted Plaintiff's statement describing impulsivity in the 2023 incident. Nothing in the form or her notes refers Plaintiff for medical or psychological evaluation. This omission marks the beginning of a pattern of institutional negligence regarding disability-related conduct.

21. Between May and June 2024, Plaintiff underwent his Internal Medicine clinical rotation. Due to what Plaintiff's supervising physician, Dr. Anne Brancaccio, described as "administrative issues completely beyond his control ( or mine)," there was no final review, and her evaluation for Plaintiff's 1-month rotation at the Dallas Veterans Affairs Hospital, which gave Plaintiff honors, was not calculated into Plaintiff's final grade, and Plaintiff received a pass. Dr. Brancaccio learned of the omission from Plaintiff. She wrote that Plaintiff "was told there was nothing neither he nor I could do about it," and that "[u]pon calling the leadership in IM, I was told the same thing."

22. Over the rotations that followed, Plaintiff's anxiety became much worse: he had panic attacks and severe reflux, lost about 30 pounds, and usually slept three to four hours a night.

Plaintiff underwent an endoscopy in 2024. Dr. Norberto Rodriguez-Baez, an associate dean for student affairs and Plaintiff's advisor in UTSW's PACE advising program, met with Plaintiff several times in 2024; Plaintiff described Plaintiff's symptoms, and Dr. Rodriguez-Baez told Plaintiff it was anxiety and that Plaintiff needed to see a psychiatrist. Dr. Isabel Clark, a UTSW psychiatrist, was Plaintiff's treating psychiatrist from October 15, 2024 through June 3, 2026.

23. In October 2024, Plaintiff was diagnosed with Generalized Anxiety Disorder ("GAD") by Dr. Clark and began medicated treatment on campus. No accommodations were suggested. Dr. Clark also diagnosed adjustment disorder and treated Plaintiff's insomnia, increasing his medication in November 2024 and January 2025. Despite the proximity of these diagnoses to events at UTSW, no accommodations were recommended; Plaintiff's condition and its nexus to educational learning and conduct were overlooked, and negative sanctions were imposed instead. Plaintiff's psychiatrist has described anxiety, insomnia, hyperactivity, and impulsivity, and wrote that during the events on his surgery rotation, he was in a decompensated psychiatric state. The need for accommodation, structured intervention, or medical leave was apparent well before the Committee's May 7, 2025 vote.

24. In Plaintiff's clinical rotations after Internal Medicine, he displayed continued improvement and academic prowess. Plaintiff earned four honors (Psychiatry, Pediatrics, Neurology, Family Medicine) and two near-honors (Ambulatory, OBGYN). Plaintiff earned honors on the first portion of his surgical rotation before the events discussed occurred.

25. The second and more severe injury occurred in March 2025, during the trauma portion of Plaintiff's surgery clerkship. On Friday, March 21, Plaintiff's designated day off, after three nights with little or no sleep, serious family emergencies, and a 24-hour call shift, with chills since March 20 and fever and muscle aches that morning, he told his team he had COVID and sent them an image of a positive test. At 2:14 PM, Plaintiff emailed Dr. Thomas Shoultz, the surgery

clerkship co-director, that Plaintiff had tested positive and might miss one or two days. At 4:23 PM Dr. Shoultz thanked Plaintiff, said he was letting the education office know, and asked Plaintiff to alert Student Affairs and keep the team posted daily. At 5:09 PM, he asked Plaintiff to get a COVID test from Student Health or Occupational Health and send the results and any clearance documentation to keep everyone safe and to comply with the absence policy. At 6:44 PM, he suggested urgent care. At 7:04 PM, Plaintiff replied that Plaintiff had taken a home test that was positive, attached the image Plaintiff had sent Plaintiff's team that morning, and offered to wear an N95 and work Plaintiff's call shift the next day. The attendance guidelines state:

26. "When the unanticipated absence is due to a medical illness, the student is not required to complete the absence request form or provide specifics regarding the nature of the medical illness. He/she may simply state that the absence is related to personal health. A doctor's verification may be requested by the Clerkship Director for absences exceeding 2 days, or frequent recurrent absences, and should only verify the absences were necessary and not the nature of the absences."

27. On Saturday, March 22, still ill and after four nights with little or no sleep, Plaintiff worked his scheduled 24-hour trauma call in an N95. Dean Mihalic's March 24 letter states that there were reports about Plaintiff's behavior.

28. At 7:30 AM on March 24, 2025, Dr. Shoultz completed a second Physicianship Evaluation Form. Later that day, the deans told Plaintiff that they had scheduled a meeting for him with the Student Assistance Committee, a drug test, and an appointment with his psychiatrist, Dr. Clark, who had treated him since October 15, 2024. That evening Plaintiff had his first therapy session, which he had arranged before March 24. Within a few days, Plaintiff was drug-tested; the result was negative. Dean Mihalic's March 24 letter begins: "Your recent behavior suggests you may be impaired and unable to participate in UT Southwestern-related activities in a fit and safe

manner." The letter required Plaintiff to meet UTSW's Student Assistance Committee, not the Student Promotions Committee, and to obtain a medical release before returning. On March 28, 2025, Dr. Clark's visit summary listed ADHD, hyperactive-impulsive type, and Plaintiff started ADHD medication that day. No disability review was initiated despite the ADHD diagnosis and previous GAD diagnosis. Plaintiff was removed from all UTSW activities under EDU-117 from March 24 until he was cleared to return on April 11, 2025. To the extent Defendants contend that this removal was an accommodation, it was not. EDU-117 requires the Dean, after concluding there is a reasonable basis to believe a learner is impaired, to remove the learner immediately. Dr. Daniel Scott's June 23, 2025 memo to Provost Lee states: "He was referred for a Fitness for Duty evaluation and placed on a leave of absence as required by policy until he was cleared to return to medical school by his health care provider and the Student Assistance Committee on April 11, 2025." When Plaintiff was cleared, no one discussed academic accommodations or an incomplete with Plaintiff. On June 3, 2025, after the Committee had voted to dismiss Plaintiff and denied Plaintiff's appeal, the Office for Access and Title IX ("OATIX") first emailed Plaintiff about accommodations and asked Plaintiff to submit a formal request.

29. The March 2025 conduct for which Plaintiff was disciplined, including sending an image of a positive COVID test, occurred during what his psychiatrist described as a decompensated psychiatric state. Defendants were aware, or reasonably should have been aware, that Plaintiff's symptoms contributed to the March 2025 events, and that the alleged misconduct was disability-related behavior requiring accommodation rather than punishment.

30. On April 13, two days after Plaintiff was cleared to return, he was hospitalized for cellulitis; he was discharged April 15. Plaintiff emailed the surgery clerkship that he was in the hospital, and on the evening of April 13 he spoke with Dean Sarah Baker. Dr. Rohit Sharma, the surgery clerkship director, called Plaintiff on April 15. In a Microsoft Teams meeting about April

17, he told Plaintiff that he, Dr. Shoultz, and Dean Mihalic had agreed on a plan for Plaintiff to make up surgery: Plaintiff would have a "blank slate," with "no limitation on the grade" Plaintiff could earn, and was required to make up Plaintiff's missed trauma shifts on weekends, in addition to Plaintiff's weekday surgery rotation. The plan did not extend the rotation.

31. During the next few weeks, Plaintiff had multiple calls and meetings with Dean Mihalic and Dean S. Baker, in which Dean Mihalic told him that the 2023 and March 2025 incidents together established a pattern of dishonesty, and both told him that there was "no mental illness for lying" and that the committee would likely not rule favorably. Plaintiff believes these meetings worsened his anxiety. In April and May, Plaintiff's health worsened: esophagitis, panic attacks, and episodes of dizziness and blurry vision. Plaintiff stepped out of the call room when panic attacks came, and chest pain made him step out of patient rooms and once out of the operating room. Dr. Bhat suggested that Plaintiff come in evenings and weekends during the rotation to observe and make up time lost to chest pain, and Plaintiff did so. Plaintiff completed make-up trauma call shifts on April 20 and 27 and May 4, 2025. The supervising physician signed Plaintiff's Trauma/EGS Call Passport after each of those shifts.

32. On April 24, 2025, Harvard Medical School conditionally offered Plaintiff its PM&R visiting rotation.

33. Plaintiff submitted his committee letter to Dean Mihalic on May 5. On the evening of May 5, Dr. Sharma told Plaintiff, for the first time, that Plaintiff would fail both the trauma portion and the general surgery block, and that Dr. Shoultz had decided a couple of hours earlier to fail Plaintiff on trauma. Asked why, Dr. Sharma said, "Dr. Shoultz's reasons are his own." Dr. Sharma told Plaintiff to finish the rotation because it would "look good to the committee," said he had heard an incomplete was an option, and said Plaintiff should "consider asking a dean." Plaintiff was told he could not attend the Committee's May 7 meeting. On May 7, Dean S. Baker called

Plaintiff while he was driving, told him the Committee had voted to dismiss him, and asked whether he was having suicidal thoughts; later that day she emailed him that he should continue with his clerkships. On May 9, two days after the vote, Plaintiff took the NBME surgery subject examination and scored 78; the comparison-group average was 74.

34. Until May 27, Dr. Sharma texted with Plaintiff; after the vote, he said he would keep Plaintiff updated on Plaintiff's grades, and a few days before May 27 he told Plaintiff they would meet soon to discuss Plaintiff's grade status. By May 27, the trauma portion had been entered as a fail, 0%, with no evaluation. That day, Plaintiff called Dr. Sharma to ask about the grade; Dr. Sharma did not pick up, and he did not respond when Plaintiff tried again.

35. Plaintiff continued to attend clinical duties, including a PM&R sub-internship, while he was actively going through the appeals process and having his words used against him at every level, painting him as a dishonest and unprofessional individual despite ample evidence to the contrary. At the May 28 meeting, Dr. Reeni Abraham, one of the internal medicine clerkship directors in the year Dr. Brancaccio's honors evaluation was not counted, laughed, said Plaintiff's summary of positive feedback did not "paint the whole picture," and said it was further evidence of dishonesty. The Committee treated Plaintiff's attempts to defend himself as further dishonesty, directly contributing to his unwarranted dismissal.

36. On June 2, 2025, Plaintiff told Dean Blake Barker by phone that Plaintiff's health was getting worse, that Plaintiff was losing sleep and having chest pain and panic attacks again, and that Plaintiff needed to take some time off and pull out of Plaintiff's sub-internship. Dean B. Barker told Plaintiff to reach out to OATIX when Plaintiff was ready. That day Plaintiff stepped back from his sub-internship. The next morning, June 3, at 9:58 AM, OATIX emailed Plaintiff for the first time. By then, the Committee had voted to dismiss Plaintiff (May 7) and denied his appeal (May 28). OATIX wrote: "We recently received information that you may be interested in

accommodations due to a potential disability." Its June 27 closure letter gives a different date: "On June 12, 2025, OATIX received information that you may be interested in seeking accommodations for a potential disability." June 12 was the deadline for Plaintiff's appeal to the Provost.

37. OATIX's description of Plaintiff's file changed. On June 10 at 1:02 PM, it sent a follow-up email. On June 16 at 2:41 PM, with no reply from Plaintiff to either email, OATIX wrote: "We have received your formal request for accommodations submitted via our Maxient portal." Plaintiff had not submitted an accommodation request form. Plaintiff did not answer the June 3 or June 10 emails because he was in the middle of the appeal process and was uncertain how a request for accommodations might affect the appeal decision. On June 23, Dr. Daniel Scott recommended to Provost Lee that the dismissal be upheld. On June 26 at 2:02 PM, OATIX asked whether Plaintiff was available for a short Teams call. Plaintiff's 3:01 PM reply was his first email to OATIX: "Can you please clarify the purpose of the short meeting and if there is a deadline associated with it?" At 3:27 PM, OATIX asked, "Hi. Are you interested in pursuing accommodations?" At 3:39 PM, it wrote: "If you are not interested in pursuing accommodations through our office, please let us know by responding to this email." On June 27, before 2:18 PM, Plaintiff wrote: "I was unaware that this action was taken and am seeking clarification on this request for accommodation that was submitted on my behalf. Would it be possible to let me know who submitted the request, as well as when it was submitted? I am currently in the midst of an administrative process, so this information would be helpful in determining my next steps." At 2:18 PM, OATIX replied: "At this time, your file remains incomplete. Additionally, there appears to be no indication that you are interested in pursuing accommodations. As such, I will close your file as withdrawn at this time." At 4:11 PM, it emailed Plaintiff its closure letter, which states:

38. "On June 12, 2025, OATIX received information that you may be interested in

seeking accommodations for a potential disability. Our office subsequently reached out to you on several occasions, providing you with the accommodation request process and forms required for evaluation. Additionally, sufficient time was extended to submit a formal request for accommodations and the required documentation. To date, our office has not received your completed accommodation request packet. As such, your file with our office is closed, and no further action will be taken."

39. Plaintiff never asked for his file to be closed. OATIX contacted Plaintiff three times in under two hours on June 26 and closed the file the next day. OATIX's June 26 replies did not state whether there was a deadline, and its June 27 reply did not state who submitted the request or when. OATIX's June 16 email stated that it had received Plaintiff's formal request through its Maxient portal; its closure letter instead states that on June 12, 2025, it received information that Plaintiff may be interested in seeking accommodations. On any account UTSW gives, OATIX did not follow its own policy. If, as OATIX wrote on June 16, it had received Plaintiff's formal request and needed more documentation, the request was incomplete, and EDU-103 provides: "If the request is incomplete, the Office for Access & Title IX will work with the accepted applicant or learner to obtain additional information or forms, as necessary." Instead, OATIX closed Plaintiff's file during the final appeal without answering Plaintiff's question about who submitted the request and when. If UTSW instead contends that it owed nothing without Plaintiff's own request, EDU-103 allows a request to be submitted on behalf of a learner who is unable to submit one due to unexpected illness or incapacity, and UTSW's decision-makers already knew of Plaintiff's diagnoses, Dr. Clark's letter and Plaintiff's leave plan.

40. On June 30, 2025, while Plaintiff's appeal was pending, Plaintiff wrote to Provost Lee that Plaintiff had not submitted a request for accommodations and had asked OATIX for clarification. Plaintiff wrote: "I want to emphasize that this was not a refusal of support, but rather

a request for clarity during a period of uncertainty." Plaintiff asked Provost Lee to "please let me know if any additional clarification or information is needed to support my appeal." On July 6, 2025, the day before the Provost's decision, Plaintiff emailed Dean B. Barker asking to take a research year.

41. On July 7, 2025, Provost Lee accepted Dr. Scott's recommendation, stating that his decision is final in all respects. Despite Plaintiff repeatedly referencing and providing exculpatory evidence at every level of appeal, none of the Committee's May 29 letter, Dr. Scott's memo, or the Provost's decision mentions Dr. Clark's letter or Plaintiff's diagnoses. At the Provost level, Dr. Scott wrote: "Because the written material was comprehensive, I determined a meeting with Dhruv Nandakumar to discuss the appeal was not necessary." OATIX's three June 26 contacts and its June 27 closure of Plaintiff's file came after Dr. Scott's June 23 recommendation and before the Provost's July 7 decision.

42. On July 7, 2025, Dean B. Barker emailed Plaintiff asking Plaintiff to set up a meeting about next steps. On July 9, 2025, two days after the final decision and before Plaintiff had replied, UTSW deleted his email account and shut off his access to MedHub, where his evaluations were kept.

43. On July 23, 2025, UTSW's Office of Legal Affairs emailed Plaintiff about his profile on Doximity, an online professional network. The email states: "Falsely holding oneself out publicly as an MD is a serious matter, and potentially reportable to the Texas Medical Board." It also states: "Former students are only permitted to list accurate information about their affiliation, if any." And it states: "To avoid further action, please immediately remove inaccurate information regarding UT Southwestern from Doximity and any other website, CV, social media, LinkedIn, email signature, or any other location."

44. Plaintiff's Doximity profile showed "MD" because he had entered 2025 instead of

2026 as his class year, and Doximity's Help Center states that it "will automatically update your status from Med Student to Resident Physician in May" based on the graduation year. Plaintiff did not add "MD." Plaintiff saw "MD" on other students' Doximity profiles as well. Plaintiff first saw the email on August 9, 2025, and on August 9 and 11, 2025, he asked Doximity to remove it. No one at UTSW has withdrawn the July 23 email. On May 18, 2025, in reply to Plaintiff's question about withdrawing, Dean B. Barker wrote about later applications to other graduate programs: "If they request more information or educational records from UT Southwestern, accurate information will be provided, which could include the SPC's decision letter and appeal documents."

45. Plaintiff has continued his research. On June 3, 2026, the American Academy of Physical Medicine and Rehabilitation ("AAPM&R") accepted Plaintiff's abstract as a podium presentation, and his talk is scheduled for November 12, 2026, at its Annual Assembly in Orlando. Plaintiff's public listing names him as "Dhruv Nandakumar, BA," with Myositis Support and Understanding, and lists a UTSW co-author. Plaintiff describes his status accurately.

46. AAPM&R's badges display each registrant's category, and each category has its own color. AAPM&R's November 11 Medical Student Orientation, which is also a residency fair attended by residency program directors, is only for registrants with a Medical Student badge; AAPM&R staff check badges. Without student status, Plaintiff is barred from attending the orientation, and Plaintiff's badge will display a category other than Medical Student, in a different color. A registrant who returns to active medical student status before the meeting, including on a non-medical leave of absence, can switch to the Medical Student category by sending AAPM&R's Medical Student Application with a medical student ID or transcript. Only UTSW can issue Plaintiff a medical student ID, transcript or enrollment verification. Dr. Surendra Barshikar, a UTSW physician, is scheduled to present in the same session and room as Plaintiff's talk. Plaintiff's title slide lists UTSW among his affiliations; the affiliations on the slide are the author

affiliations printed in Plaintiff's published article on the same study. AAPM&R lists its 2027 Annual Assembly for November 10 to 13, 2027.

47. Without student status, Plaintiff could not apply in the residency cycle that opened in September 2026. Applications for away rotations in the next cycle come about February and March 2027 and require Plaintiff's school to verify that Plaintiff is a current student. Residency applications for the March 2028 Match open about September 2027 and require a Medical Student Performance Evaluation ("MSPE") and school verification. UTSW's current Medical School catalog lists among the requirements for the Doctor of Medicine degree: "Successful completion of all curricular requirements - required courses, clerkships and electives/achievement of the Medical School Educational Program objectives within 7 years." Plaintiff first enrolled in August 2022; seven years from his enrollment is August 2029.

48. Defendants acted with deliberate indifference to Plaintiff's federally protected rights. Despite repeated notice of Plaintiff's psychiatric disabilities, documented diagnoses, limitations, and ongoing treatment, Defendants failed to initiate any timely disability review, failed to provide reasonable accommodations, issued decisions that do not mention Dr. Clark's letter, his diagnoses or impairment, and continued to escalate punitive measures. Defendants' failure to act, despite actual knowledge of a substantial risk of violating Plaintiff's rights, constitutes deliberate indifference under the ADA and Section 504.

49. Despite the circumstances, Defendants proceeded to dismiss Plaintiff for alleged professional dishonesty. Defendants did so without a fair hearing, without a meaningful opportunity to be heard, and without a fair opportunity to challenge the factual basis for the charge or the proportionality of the sanction.

50. Defendants' handling of this matter appears to have treated a disability-impacted situation as a purely punitive professionalism matter, bypassing the procedural and

accommodation safeguards required by law and by basic institutional fairness. Defendants failed to provide a procedurally fair mechanism for Plaintiff to present evidence that the charged conduct occurred in the context of documented psychiatric conditions and that accommodation, treatment-based intervention, or structured leave should have been considered before imposing dismissal. OATIX first contacted Plaintiff on June 3, 2025, after the Committee had voted to dismiss him and denied his appeal. That is not a substitute for timely engagement in an accommodation process before a career-ending sanction is imposed.

51. The consequences of Defendants' actions are severe and ongoing. The findings of dishonesty and professional misconduct have effectively foreclosed Plaintiff's ability to pursue residency placement and impose a continuing professional stigma that will follow him indefinitely. These are not speculative harms; they are immediate, foreseeable, and irreparable absent corrective action.

52. From the August 2023 anatomy-corridor incident to the May 2025 dismissal vote, the record shows a consistent pattern of procedural irregularities, including a lack of proper due process. By May 27, the trauma portion was entered as a fail (0%) with no evaluation, and on May 30, after the dismissal vote, the general surgery grade was entered as a fail. Classmates on Plaintiff's rotation told him they had received their surgery grades several weeks before his were entered.

53. No action was taken by the Defendants, their agents, or employees, to correct the procedural issues, the discriminatory nature of the accusations and disciplinary process, the disproportionate disciplinary action, or the retaliatory nature of the disciplinary actions.

54. Plaintiff suffered severe emotional distress as a result of multiple retaliatory and abusive incidents. In May, after Plaintiff was told Plaintiff would fail, Dr. Sharma, Dean S. Baker, and Dean B. Barker told Plaintiff to finish the surgery rotation, which Plaintiff did while Plaintiff's

health was worsening. This hostile treatment, compounded by the Committee's May 7, 2025 vote to dismiss Plaintiff, immediately following his engaged commitment in the program upon his return on April 11, 2025, created a sustained period of emotional trauma, anxiety, and deterioration.

55. Plaintiff, as a student of UTSW, reasonably relied (directly or indirectly) on this sophisticated higher education institution to comply with the policies and procedures outlined in their multiple policy manuals.

56. UTSW's duty to comply with its disciplinary policies and procedures arose from the special relationship between UTSW, on the one hand, and Plaintiff, on the other hand. The special relationship arose because Plaintiff entrusted UTSW to follow the policies and procedures outlined in the policy manual, which UTSW implemented as a condition of providing him with educational services when he applied and was accepted to the medical program.

57. Defendants had the resources to prevent the breach of contract but failed to follow the policies and procedures outlined in the policy Handbook. Defendants also did not allow a support person to attend Plaintiff's May 28 appeal meeting. Accordingly, Defendants breached their common law, statutory, and other duties owed to Plaintiff.

**FACTS CONCERNING DEFENDANTS MIHALIC, KLEIN AND LEE**

58. On September 11, 2023, Dean Mihalic reviewed with Plaintiff the Physicianship Evaluation Form dated September 6, 2023. Her notes on the form do not mention dishonesty. Plaintiff was not referred to the Student Promotions Committee.

59. Dean Mihalic's March 24, 2025 letter removed Plaintiff from all UTSW activities under EDU-117. The letter begins: "Your recent behavior suggests you may be impaired and unable to participate in UT Southwestern-related activities in a fit and safe manner." Under EDU-117, the Dean removes a learner from UTSW activities when the Dean concludes there is a

reasonable basis to believe the learner is impaired. Dean Mihalic and Dean S. Baker scheduled a meeting for Plaintiff with the Student Assistance Committee, a drug test, and an appointment with Dr. Clark in Student Wellness and Counseling.

60. After Plaintiff returned on April 11, 2025, Dean Mihalic and Dean S. Baker each spoke with him about the Committee. When Plaintiff tried to explain his condition, each told him there is "no mental illness for lying." Dean Mihalic told Plaintiff that the 2023 incident and the March 2025 incident together established a pattern of dishonesty.

61. On May 5, 2025, Plaintiff sent Dean Mihalic his written response for the Student Promotions Committee. It disclosed Plaintiff's diagnoses of generalized anxiety disorder and adjustment disorder, his treatment, and that he had started treatment for ADHD.

62. Dr. Klein chaired the Student Promotions Committee. His May 9, 2025 letter states: "The Student Promotions Committee ('Committee') met on Wednesday, May 7, 2025, to consider your professionalism deficiencies, as outlined in the Physicianship Evaluation Forms you received in September 2023 and March 2025." It also states: "The Committee also considered notes and comments regarding your professional behavior from your supervising faculty in clinical rotations over your clerkship period, as well as your recent letter in response to the Committee." The letter states: "After a thorough discussion of your lapses in professionalism and your inability to improve despite multiple counselling and warnings, the Committee voted unanimously to dismiss you from UT Southwestern Medical School." It does not mention impairment, Plaintiff's diagnoses, his treatment, or Dr. Clark. Plaintiff had been told he could not attend the May 7 meeting.

63. Plaintiff's written appeal to the Committee included Dr. Clark's May 21, 2025 letter, which states: "From my perspective as one of his mental health providers, I have experienced Dhruv to be psychiatrically stable, reliable and with sound judgement since he has been on his current medication regimen."

64. Dr. Klein's May 29, 2025 letter states: "The Committee was sympathetic to the stressful conditions you state you were undergoing but in their academic judgment, stress does not excuse your pattern of professionalism lapses, especially your unethical response when confronted with concerns about your behavior." The letter does not mention Dr. Clark's letter, Plaintiff's diagnoses, or impairment. After the May 28, 2025 meeting, Dr. Klein and Dean Mihalic told Plaintiff that the Committee had upheld Plaintiff's dismissal.

65. On June 9, 2025, Plaintiff appealed to Provost Lee, enclosing Dr. Clark's letter. Plaintiff told Provost Lee that, if reinstated, Plaintiff planned to take a leave of absence before returning to Plaintiff's surgical clerkship and fourth year, to stabilize Plaintiff's health. Provost Lee designated Dr. Daniel Scott to review the appeal and recommend a course of action.

66. On June 30, 2025, while Plaintiff's appeal was pending, Plaintiff emailed Provost Lee that OATIX had contacted Plaintiff and stated that Plaintiff had submitted a completed form for accommodations, although Plaintiff had not done so, and that Plaintiff had then been told Plaintiff's file would be withdrawn. Plaintiff wrote that he had been seeking "reassurance or guidance about how accommodations could be pursued during the appeal process." Plaintiff received no reply before the decision.

67. On July 7, 2025, Provost Lee accepted Dr. Scott's recommendation and upheld the dismissal. His letter states: "However, I agree with the SPC and Dr. Scott that your persistent pattern professionalism deficiencies over an extended period does not meet the academic standards required of UT Southwestern medical students." It does not mention Plaintiff's disability, Dr. Clark's letter, his plan to take a leave of absence, his June 30 email, or his July 6 research-year request. It was copied to the Registrar, Dr. Klein and Dean Mihalic.

68. Upon information and belief, Provost Lee, whose decision on Plaintiff's appeal was final under EDU-402, Dr. Klein, as Chair of the Student Promotions Committee, and Dean

Mihalic, as Dean of Medical Students and Associate Dean for Student Affairs, each has authority to carry out the relief Plaintiff seeks, including reinstating Plaintiff, placing Plaintiff on a non-medical leave of absence for research and directing what the Medical School reports about Plaintiff's status. Under UTSW's description of its Physicianship Evaluation Form, the physicianship evaluations of a student referred to the Student Promotions Committee are mentioned in the MSPE unless the Committee deems otherwise.

**COUNT I**
**DISCRIMINATION UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
***(Against All Defendants)***

69. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

70. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

71. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education, capable, honest, and knowledgeable enough to provide proper and professional educational services and residency programs to the public and in compliance with Title VI of the Civil Rights Act of 1964.

72. Upon information and belief, Defendants accept and receive financial aid from government treasuries, including but not limited to scholarships, fellowships, grants from the National Institutes of Health, and federal student loans. Defendants also receive indirect governmental financial aid in the form of tax exemptions and the use or loan of public land.

73. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits discrimination based on race, color, or national origin in programs and activities receiving federal

financial assistance. As a public institution receiving federal funding, Defendants are required to ensure that all students, including Plaintiff, are treated equitably and without racial bias.

74. Plaintiff, as a person with Indian heritage, is a member of a protected class as defined under Title VI and Title VII of the Civil Rights Act of 1964.

75. Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs or activities that receive federal financial assistance by recipients of federal funds. This includes the existence of a hostile environment based on race, color, or national origin that is created, encouraged, accepted, tolerated, or left uncorrected by a school, which can constitute discrimination in violation of Title VI.

76. Upon information and belief, Plaintiff was targeted by Dr. Shoultz, Dean Mihalic, and Dr. Abraham on different occasions, including through discriminatory treatment based on Plaintiff's mental health, perceived disability, and national heritage. As stated, from March 24 until Plaintiff was cleared to return on April 11, 2025, UTSW removed him from activities under policy EDU-117. After Plaintiff's return, in a Microsoft Teams meeting about April 17, 2025, Dr. Sharma told Plaintiff that Plaintiff would have a "blank slate," with "no limitation on the grade" Plaintiff could earn, and that Plaintiff was required to make up Plaintiff's missed trauma shifts on weekends.

77. After Plaintiff's return, Dean Mihalic and Dean S. Baker stated discriminatorily that there is "no mental illness for lying" and that the Committee "hated dishonesty." On May 5, 2025, Plaintiff submitted a letter to Dean Mihalic. That evening Dr. Sharma told Plaintiff, for the first time, that Plaintiff would fail both the trauma portion and the general surgery block. Rather than addressing the concerns in Plaintiff's May 5 letter, Defendants and their agents escalated disproportionate and retaliatory action against him.

78. The disciplinary measures were not based on legitimate performance concerns on

the surgery rotation but were tainted by discriminatory animus directed at Plaintiff's protected status just before test time.

79. Upon information and belief, similarly situated non-Indian students who experienced academic difficulty, professionalism concerns, or health-related impairments were not subjected to the same level of punitive escalation, hostile treatment, or dismissal. Plaintiff was treated more harshly than peers outside his protected class, and derogatory statements by faculty, including assertions that there is "no mental illness for lying," demonstrate discriminatory animus motivating the disciplinary outcome.

80. The proximity in timing between Plaintiff's remarks in his May 5, 2025, letter and the escalation of punitive measures strongly indicates that the disciplinary action was not based on legitimate performance concerns. Instead, Defendants' actions were retaliatory, aimed at penalizing Plaintiff for raising concerns about the surgical rotation program. This sequence of events underscores that the disciplinary process was used as a tool of retribution and discrimination rather than a means of upholding academic standards.

81. Defendants used exculpatory evidence submitted by Plaintiff as further evidence of dishonesty, and used this as a reason to uphold his dismissal, severely compromising his ability to defend himself. Dr. Reeni Abraham, one of the internal medicine clerkship directors in the year Dr. Brancaccio's honors evaluation was not counted, sat on the panel. During the meeting, she laughed, said Plaintiff's summary of positive feedback did not "paint the whole picture," and said it further evidenced dishonesty. This breach of due-process rights contributed directly to Plaintiff's unwarranted dismissal from the medical program.

82. Defendants denied Plaintiff access to the minimum procedural protections before issuing significant disciplinary decisions, which adversely affected his ability to defend himself during the disciplinary hearing and resulted in his dismissal from UTSW Medical School.

83. Defendants denied Plaintiff access to fair hearing procedures by failing to provide unbiased decision makers and by refusing to recognize exculpatory evidence. At the Provost level, Dr. Scott wrote: "Because the written material was comprehensive, I determined a meeting with Dhruv Nandakumar to discuss the appeal was not necessary." Defendants, directly and through their agents or employees, retaliated against Plaintiff by falsely accusing him of a persistent pattern of dishonesty, failing to provide unbiased decision makers, and issuing a disciplinary action inconsistent with the alleged conduct violations.

84. By failing to recognize, address, or remedy the systemic barriers embedded in their disciplinary policies, and by escalating discriminatory allegations in proximity to Plaintiff's May 5 letter, Defendants exacerbated his injuries. Specifically, Defendants deprived Plaintiff, an Indian male student, of the opportunity to fully understand, engage in, and protect Plaintiff's due process rights throughout the disciplinary process.

85. Moreover, Defendants' failure to account for the detrimental impact of the allegations, leading to Plaintiff's unwarranted dismissal from the medical program, compounded his injuries. These discriminatory practices subjected Plaintiff to emotional distress, public humiliation, and significant harm to his academic and professional prospects, leaving him without adequate recourse against unjust treatment.

86. As a direct and proximate result of the discriminatory conduct and retaliatory disciplinary measures, Plaintiff has suffered severe harm. These injuries include, but are not limited to, public humiliation, significant emotional distress, and irreparable damage to Plaintiff's academic and professional career. Plaintiff's prospects for future professional advancement have been adversely affected, and his reputation has been unjustly tarnished as a result of Defendants' discriminatory actions.

**COUNT II**
**DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
***(Against All Defendants)***

87. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

88. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

89. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education, capable, honest, and knowledgeable enough to provide proper and professional educational services and residency programs to the public and in compliance with Title VII of the Civil Rights Act of 1964.

90. Upon information and belief, Defendants accept and receive financial aid from government treasuries including but not limited to scholarships, fellowships, grants from the National Institutes of Health, and federal student loans. Defendants also receive indirect governmental financial aid in the form of tax exemptions and the use or loan of public land.

91. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. As a public institution receiving federal funding, Defendants are required to ensure that all employees, including Plaintiff, are treated equitably and without racial bias.

92. Plaintiff, as an Indian male, is a member of a protected class as defined under Title VII of the Civil Rights Act of 1964.

93. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. This includes the existence of a hostile work

environment based on race, color, religion, sex, or national origin that is created, encouraged, accepted, tolerated, or left uncorrected by an employer, which can constitute discrimination in violation of Title VII.

94. Upon information and belief, Plaintiff was targeted by Dr. Thomas Shoultz, an Associate Professor of Surgery and co-director of the surgery clerkship, and by other faculty involved in the disciplinary process. Defendants, and their agents and/or employees, took disproportionate and retaliatory action against Plaintiff. The disciplinary measures were tainted by discriminatory animus directed at Plaintiff's protected status.

95. In Plaintiff's May 5, 2025 written response to the Committee, sent to Dean Mihalic, Plaintiff wrote that, under the absence policy, he should not have been required to provide the documentation he had been asked to provide. On March 21, 2025, Plaintiff's designated day off, Dr. Shoultz invoked the absence policy to direct Plaintiff, who was sick and had already reported a positive test, to get a COVID test at Student Health or Occupational Health and send him the results and any clearance documentation, and he later suggested urgent care. UTSW's attendance guidelines provide that a student absent for illness need not provide specifics about the illness, and that a doctor's verification may be requested for absences exceeding two days or frequent recurrent absences and should verify only that the absences were necessary. Upon information and belief, Dr. Shoultz deliberately misrepresented the absence policy and coerced Plaintiff, while sick, to obtain more than one test that the policy does not require. At 7:49 PM, Dr. Shoultz wrote: "If you feel ill, you do not need to risk others' health by going to the hospital tomorrow. However, your photo appears to be a stock image easily found online. That is enough for me to suspect misuse of the absence policy." Dr. Shoultz did not reply to Plaintiff's next two emails before Plaintiff's shift. With that accusation unresolved and his emails unanswered, Plaintiff felt he had no real choice but to work his scheduled 24-hour trauma call the next day, still ill and without sleep.

96. On the evening of May 5, 2025, Dr. Sharma told Plaintiff, for the first time, that Plaintiff would fail the trauma portion and the general surgery block, and two days later the Committee voted to dismiss Plaintiff; Plaintiff was told Plaintiff could not attend that meeting. The proximity in timing between Plaintiff's remarks and the escalation of punitive measures strongly indicates that the disciplinary action was not based on legitimate performance concerns.

97. Rather, Defendants' actions were retaliatory, aimed at penalizing Plaintiff for voicing concerns about the fairness of the rotation program. This sequence of events underscores that the disciplinary process served as a tool of retribution and discrimination rather than a means to uphold academic standards.

98. In Plaintiff's June 9, 2025 appeal to Provost Lee, Plaintiff again wrote about the attendance policy, stating that Plaintiff's attending had cited it incorrectly and that it does not require a student to document the nature of an illness, only the need for missed time when an absence exceeds two days. Provost Lee's July 7, 2025 decision letter does not mention the attendance policy.

99. Between Plaintiff's May 5 and June 9 submissions, on May 27, 2025, the day before Plaintiff's Committee appeal meeting, UTSW revised its equal opportunity policy, ETH-151. Its policy history states that the revision removed references to the student discrimination complaints process in the student catalogs because students would follow the same procedures as employees. UTSW's 2024–25 General Catalog set out a separate procedure for student discrimination complaints, under which a student could appeal the outcome of a formal investigation to the Executive Vice President for Academic Affairs, Provost Lee's title. That catalog stated: "Students will not be penalized in any way for bringing complaints of discrimination or for participating in an investigation." UTSW's 2025–26 General Catalog does not contain that statement.

100. UTSW's current complaint procedure, ETH-151P-01, states: "Equal opportunity

complaints regarding issues covered by these policies are not properly raised or considered in any appeal of disciplinary action, corrective action, or academic decision, or any grievance." Before UTSW moved students into that procedure, the procedure did not apply to complaints brought by students, and the 2024–25 catalog procedure for student complaints contained no such restriction.

101. On July 7, 2025, the day Provost Lee issued his final decision, UTSW revised EDU-103, its accommodation policy for learners, of which the Provost is the Executive Sponsor. The policy's history entry for that date states: "Completed scheduled review; added references to EDU-109 Learner Pregnancy and Parenting Nondiscrimination; updated to indicate the procedure for claims of discrimination under this policy will follow the same procedure as the employee policy, which is ETH-151 Equal Opportunity." The document information of the policy file UTSW publishes shows a creation date of July 3, 2025, and a modification date of July 7, 2025, at 4:05 PM Central time, about 20 minutes after Plaintiff received the Provost's decision by email at 3:45 PM.

102. The July 7, 2025 version also differs from the January 23, 2023 version in other respects, including these. Its definition of a health care professional now refers to a physical or mental impairment that substantially limits one or more major life activities. Its sentence on academic and licensing requirements was reworded. Learners returning from leave must now comply with all requirements related to their return. A sentence stating that the resources of Student Academic Support Services and the Office of Institutional Equity & Access were available to learners and applicants with disability-related concerns was removed. The provision allowing a request to be submitted on a learner's behalf is unchanged.

103. Plaintiff was told Plaintiff could not attend the Committee's May 7 meeting, and at the Provost level Dr. Scott wrote that a meeting with Plaintiff was not necessary, thereby severely compromising Plaintiff's ability to defend Plaintiff. This included treating Plaintiff's summary of

positive feedback as further evidence of dishonesty, allowing Dr. Abraham to sit on the panel, and disregarding documented high evaluations that should have supported his defense. This breach of due-process rights contributed directly to Plaintiff's unwarranted dismissal from the medical program.

104. Defendants denied Plaintiff access to the minimum procedural protections before issuing significant disciplinary decisions which adversely affected his ability to defend himself and resulted in his dismissal from UTSW Medical School.

105. Defendants denied Plaintiff access to fair hearing procedures by failing to provide unbiased decision makers, which adversely affected his ability to defend himself and resulted in his dismissal from UTSW.

106. Defendants, directly and through their agents or employees, retaliated against Plaintiff by falsely accusing him of a persistent pattern of dishonesty, failing to provide unbiased decision makers, and issuing a disciplinary action inconsistent with the alleged conduct violations.

**COUNT III**

**DISCRIMINATION UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. § 12132, AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794: FAILURE TO ACCOMMODATE AND INTENTIONAL DISCRIMINATION**

***(Against* UTSW, *and Against* Provost *Lee,* Dr. *Klein and* Dean *Mihalic in Their Official Capacities)***

107. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

108. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

109. At all times relevant hereto, Defendants held themselves out to the public as a

licensed and professional institute of higher education, capable, honest, and knowledgeable enough to provide proper and professional educational services and rotation programs to the public and in compliance with the Americans with Disabilities Act (ADA).

110. Upon information and belief, Defendants accept and receive financial aid from government treasuries, including but not limited to scholarships, fellowships, grants from the National Institutes of Health, and federal student loans. Defendants also receive indirect governmental financial aid in the form of tax exemptions and the use or loan of public land.

111. The ADA, 42 U.S.C. § 12102(1), (3)(A), protects individuals from discrimination based on actual or perceived disabilities. This includes individuals who are regarded as having a physical or mental impairment, even if they do not have such an impairment. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. UTSW is a public entity. 42 U.S.C. § 12131(1)(B).

112. Plaintiff was a qualified individual with a disability within the meaning of the ADA and Section 504. Before March 2025, Plaintiff had no course failures and earned honors in four clerkships and near honors in two, and remained capable of performing all essential functions of a medical student with reasonable accommodations, which Defendants failed to provide.

113. On information and belief, Dr. Thomas Shoultz, an Associate Professor of Surgery and co-director of the surgery clerkship, targeted Plaintiff based on Plaintiff's disability.

114. After Plaintiff sent an image of a positive COVID test to Plaintiff's team and then to Dr. Shoultz during a period of psychiatric decompensation, Defendants scheduled an appointment for Plaintiff with Dr. Clark, Plaintiff's treating psychiatrist since October 2024, and removed Plaintiff from UTSW activities under EDU-117 from March 24 until Plaintiff was cleared

to return on April 11, 2025. Plaintiff returned with diagnoses, treatment, and medication, placing faculty on clear notice that he had a mental-health disability requiring accommodation. Despite this, no accommodations were initiated, and faculty continued to treat disability-related conduct as intentional misconduct.

115. Dr. Shoultz's mischaracterization of Plaintiff's disability-related conduct, combined with his failure to initiate or recommend reasonable accommodations, constituted discrimination under the ADA. His actions contributed to the escalation of punitive measures rather than the implementation of required disability-related supports.

116. Defendants further failed to implement corrective measures or adjust the rotation program to accommodate Plaintiff's disability, despite clear medical documentation and repeated notice. Their deliberate avoidance of Plaintiff's disabilities, failure to begin any accommodation process before the Committee voted to dismiss him, and institutional failure to remedy discriminatory treatment constitute violations of his rights under the ADA and Section 504.

117. As a direct and proximate result of the discriminatory conduct and retaliatory disciplinary measures, Plaintiff has suffered severe harm. These injuries include, but are not limited to, public humiliation, significant emotional distress, and irreparable damage to Plaintiff's academic and professional career. Plaintiff's prospects for future professional advancement have been adversely impacted, and his reputation has been unjustly tarnished, all as a result of the discriminatory actions taken against him.

118. Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a). A "program or activity" includes all of the operations of a college, university, or other postsecondary institution, or a public system

of higher education, any part of which is extended federal financial assistance. 29 U.S.C. § 794(b)(2)(A).

119. On information and belief, UTSW receives federal financial assistance, including federal student loans and National Institutes of Health grants. By accepting federal financial assistance, UTSW waived its Eleventh Amendment immunity from suit under Section 504, for remedies both at law and in equity. 42 U.S.C. § 2000d-7(a)(1)–(2).

120. Plaintiff is an individual with a disability. 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1)–(3). Beginning October 15, 2024, Dr. Clark, a UTSW psychiatrist, diagnosed and treated Plaintiff for generalized anxiety disorder, adjustment disorder, and insomnia, and from March 2025 she treated him for ADHD, hyperactive-impulsive type. These conditions substantially limit major life activities, including sleeping, concentrating, and thinking. Before treatment, Plaintiff usually slept three to four hours a night and had panic attacks. UTSW also regarded Plaintiff as having an impairment: Dean Mihalic's March 24, 2025 letter begins, "Your recent behavior suggests you may be impaired and unable to participate in UT Southwestern-related activities in a fit and safe manner," and removed him under UTSW's fitness-for-participation policy.

121. Plaintiff is otherwise qualified. Before March 2025, Plaintiff had no course failures, he had passed USMLE Step 1 and scored 256 on USMLE Step 2 CK, and he had earned honors in four clerkships and near honors in two. On April 11, 2025, UTSW's Student Assistance Committee and Dr. Clark cleared Plaintiff to return. In an October 15, 2026 letter, Dr. Clark wrote of Plaintiff's last visit, on June 3, 2026: "At that time, based on my clinical assessment, Dhruv was psychiatrically stable, and his mental health conditions would not have precluded him from participating in medical education and training." With reasonable accommodations, such as a leave of absence or a research year with conditions including continued treatment, monitoring, and a fitness evaluation, Plaintiff can meet the medical program's essential requirements.

122. Failure to accommodate. Defendants knew of Plaintiff's disabilities and their limitations. UTSW's own psychiatrist diagnosed and treated Plaintiff. Dean Mihalic removed Plaintiff under its fitness-for-participation policy on March 24, 2025. Plaintiff's May 5, 2025 written response to the Committee disclosed his diagnoses and treatment. Dr. Clark's May 21, 2025 letter accompanied Plaintiff's appeal to the Committee and Plaintiff's appeal to Provost Lee. On June 2, 2025, Plaintiff told Dean B. Barker that Plaintiff's health was worsening and that Plaintiff needed time off and to withdraw from Plaintiff's sub-internship, and Dean B. Barker told Plaintiff to contact OATIX when Plaintiff was ready.

123. Plaintiff raised accommodations in specific terms. On May 6, 2025, Plaintiff asked Dean B. Barker whether Plaintiff could take an incomplete for health reasons; Dean B. Barker told Plaintiff that an incomplete was only for current health issues, that the failing grade would stand, and that Plaintiff should finish the rotation. On May 13, 2025, Plaintiff asked whether Plaintiff could bring a support person to Plaintiff's appeal meeting because it would help with the stress and anxiety of the meeting; Dean B. Barker replied that additional individuals were not allowed to join. On June 9, 2025, Plaintiff told Provost Lee that, if reinstated, Plaintiff planned to take a leave of absence to stabilize Plaintiff's health. On June 30, 2025, Plaintiff told Provost Lee that Plaintiff had not refused support and had been seeking guidance on how to pursue accommodations during the appeal. On July 6, 2025, Plaintiff asked Dean B. Barker to let Plaintiff take the next year to do research and to complete Plaintiff's final clerkship early the next year.

124. No one engaged with Plaintiff in an interactive process. OATIX first emailed Plaintiff on June 3, 2025, after the Committee had voted to dismiss Plaintiff and denied Plaintiff's appeal, and it closed Plaintiff's file on June 27, 2025, while Plaintiff's appeal to Provost Lee was pending. The Committee's May 29 letter, Dr. Scott's memo, and Provost Lee's decision do not mention Dr. Clark's letter or Plaintiff's diagnoses. Defendants provided no reasonable

accommodation, such as an incomplete, a leave of absence, or a research year with conditions, and instead dismissed Plaintiff. Where an accommodation is required, a recipient is liable for denying it. Bennett-Nelson v. La. Bd. of Regents, 431 F.3d 448, 454–55 (5th Cir. 2005).

125. Intentional discrimination. Defendants' discrimination was intentional. Compensatory damages require intentional discrimination, "something more than 'deliberate indifference.'" Cadena v. El Paso Cnty., 946 F.3d 717, 724 (5th Cir. 2020) (quoting Miraglia v. Bd. of Supervisors of La. State Museum, 901 F.3d 565, 575 (5th Cir. 2018)). In failure-to-accommodate cases, this "requires at least actual knowledge that an accommodation is necessary." Smith v. Harris Cnty., 956 F.3d 311, 319 (5th Cir. 2020). Intentional discrimination may be found where officials continue refusing an accommodation despite indications that further accommodation is necessary. Cadena, 946 F.3d at 724–26; see id. at 726 (jury could find the County's "ongoing refusal to let her use a wheelchair or to otherwise modify its policies was intentional").

126. Each decision-maker had actual knowledge of Plaintiff's disabilities and their impact on his coursework. In 2024, Dr. Rodriguez-Baez, an associate dean for student affairs, heard Plaintiff describe Plaintiff's symptoms, told Plaintiff it was anxiety, and told Plaintiff that Plaintiff needed to see a psychiatrist. On March 24, 2025, Plaintiff told Dean Mihalic and Dean S. Baker about the emergencies in Plaintiff's family, Plaintiff's physical and mental health, and how little Plaintiff had slept; they had scheduled an appointment for Plaintiff with Dr. Clark. On March 28, 2025, UTSW's clinic recorded insomnia due to other mental disorder, generalized anxiety disorder, and ADHD, hyperactive-impulsive type. Dean Mihalic received Plaintiff's May 5 written response disclosing Plaintiff's diagnoses and treatment, and the Committee, chaired by Dr. Klein, considered that response. On May 6, Dean B. Barker refused Plaintiff's request for an incomplete for health reasons; on May 13, he refused Plaintiff's request to bring a support person

to help with the stress and anxiety of the appeal meeting, without referring Plaintiff to OATIX. The Committee considered Plaintiff's appeal with Dr. Clark's letter, and at its May 28 meeting, with Deans Mihalic, S. Baker, B. Barker and Rodriguez-Baez present, Plaintiff described Plaintiff's illness. On June 2, Plaintiff told Dean B. Barker that Plaintiff's health was getting worse and that Plaintiff needed time off. Dr. Scott reviewed, and Provost Lee received, Plaintiff's June 9 appeal with Dr. Clark's letter and Plaintiff's plan to take a leave of absence if reinstated; Provost Lee also received Plaintiff's June 30 email. Dean B. Barker received Plaintiff's July 6 research-year request and did not respond before the decision. Provost Lee's July 7 decision does not mention Plaintiff's disability, Dr. Clark's letter, his plan to take a leave of absence, his June 30 email, or his research-year request.

127. In 2023, Dr. Rinaldi's form described the corridor incident as dishonesty at worst and poor judgment at best; Dean Mihalic's review notes record that she and Plaintiff reviewed responsibility, communication, and sound judgment and do not mention dishonesty; and Plaintiff had no Committee referral. In March 2025, when Plaintiff reported that he had tested positive for COVID and might miss one or two days, Dr. Shoultz first replied, "Thanks for letting me know," and later wrote that he suspected misuse of the absence policy. The same March 22, 2025 conduct that Dean Mihalic's letter gave as reasons Plaintiff may be impaired was later listed in Dr. Scott's memo as professionalism deficiencies.

128. Dean Mihalic and Dean S. Baker told Plaintiff there is "no mental illness for lying." Before the Committee met on May 7, Dean Mihalic told Plaintiff that the 2023 incident and the March 2025 incident together established a pattern of dishonesty, although her own 2023 review notes do not mention dishonesty and her own March 24 letter gave the March 22 conduct as reasons Plaintiff may be impaired. The Committee's May 9 letter, copied to Dean Mihalic, then called the 2023 and March 2025 incidents a persistent pattern of dishonesty; its May 29 letter cited repeated

instances of unprofessional and in some instances dishonest behavior; and Dr. Scott's recommendation and Provost Lee's decision cited a persistent pattern of professionalism deficiencies. Dr. Rinaldi's form and Dr. Scott's memo each placed Plaintiff in the teaching assistants' prep room within the Willed Body corridor and described his knowledge as what video footage suggested; the May 9 letter instead described the incident as knowingly accessing the anatomy lab without authorization. Dr. Scott's memo recounted Plaintiff's statement describing impulsivity in the 2023 incident, and UTSW's fitness policy lists poor impulse control among the behaviors that might indicate a need to evaluate a learner for potential impairment. The Committee's letters do not mention Plaintiff's diagnoses or Dr. Clark, and neither Dr. Scott's memo nor Provost Lee's decision mentions Dr. Clark's letter, Plaintiff's diagnoses, or Plaintiff's leave plan. Plaintiff's disabilities and their effect on him were open and obvious to Defendants: UTSW's own clinic diagnosed and treated them, and Dean Mihalic's March 24 letter stated that his behavior suggested he may be impaired.

129. On grading, Dr. Sharma told Plaintiff that Plaintiff would have a "blank slate," with "no limitation on the grade" Plaintiff could earn; on May 5, the day Plaintiff sent Dean Mihalic Plaintiff's written response disclosing Plaintiff's diagnoses, Dr. Sharma told Plaintiff that Dr. Shoultz had decided a couple of hours earlier to fail Plaintiff on trauma; UTSW then entered failing grades for the trauma portion and the general surgery block.

130. Defendants refused or did not address each accommodation Plaintiff raised and dismissed Plaintiff without addressing Plaintiff's disability. Rather than addressing accommodations for Plaintiff, UTSW went so far as to revise its own published policies the day before Plaintiff's Committee appeal meeting and on the day of Provost Lee's final decision, as alleged in paragraphs 99 through 102. On May 27, 2025, it moved students into the complaint procedure it used for employees, which in its 2022 version kept employees' equal opportunity

complaints out of appeals of disciplinary action, and UTSW's 2025–26 General Catalog no longer contains the 2024–25 catalog's student appeal to the Executive Vice President for Academic Affairs or its statement that students will not be penalized for bringing complaints of discrimination. Thus, the day before Plaintiff's appeal meeting, UTSW removed from its equal opportunity policy its references to the student catalog procedure, its next catalog no longer promised that students would not be penalized in any way for bringing complaints of discrimination, and students were placed under a procedure whose current version states that such complaints are not properly raised or considered in any appeal of an academic decision. EDU-103, whose Executive Sponsor is the Provost, records a revision dated July 7, 2025, the day Provost Lee upheld Plaintiff's dismissal without mentioning Plaintiff's disability. Neither the July 7, 2025 version of EDU-103 nor the January 23, 2023 version states the federal rules that disability be construed broadly and without regard to mitigating measures, so UTSW's own policy did not tell the officials applying it that Plaintiff's stability on treatment did not end Plaintiff's disability. 42 U.S.C. § 12102(4)(A), (E)(i); 28 C.F.R. § 35.108(a)(2)(i), (d)(1)(viii). At the appeal and final-decision stages, UTSW revised its policies to route discrimination complaints into its employee procedure, rather than addressing Plaintiff's disability. An earlier version of that procedure kept employees' discrimination complaints out of appeals of disciplinary action; its current version applies to students and expands the bar to appeals of academic decisions. That sequence supports a finding of intentional discrimination. Cadena, 946 F.3d at 724–26.

131. Plaintiff is entitled to compensatory damages from UTSW for intentional discrimination. Delano-Pyle v. Victoria Cnty., 302 F.3d 567, 574–75 (5th Cir. 2002); Cadena, 946 F.3d at 724.

132. As a direct result, Plaintiff was dismissed, lost his Harvard visiting rotation and his fourth-year electives, and could not apply in the residency cycle that opened in September 2026.

133. Plaintiff is entitled to prospective declaratory and injunctive relief under Title II and Section 504 against UTSW and against Defendants Lee, Klein and Mihalic in their official capacities, including reinstatement on a non-medical leave of absence for research; compensatory damages against UTSW; and reasonable attorney's fees and costs under 29 U.S.C. § 794a(b).

**COUNT IV**
**DUE PROCESS VIOLATIONS UNDER THE TEXAS CONSTITUTION AND OTHER SOURCES**
***(Against All Defendants)***

134. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

135. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

136. Upon information and belief, Defendants accept and receive financial aid from government treasuries including, but not limited to, scholarships, fellowships, grants from the National Institutes of Health, and federal student loans. Defendants also receive indirect governmental financial aid in the form of tax exemptions and the use or loan of public land.

137. Article I, Section 19 of the Texas Constitution provides that: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

138. Plaintiff possessed constitutionally protected liberty and property interests in his continued enrollment, academic standing, and professional reputation. Dismissal from medical school, accompanied by findings of dishonesty and professional misconduct, constitutes a stigma-plus deprivation that forecloses future educational, licensing, and residency opportunities. Defendants' actions therefore implicated protected interests requiring robust procedural

safeguards.

139. The violations of Plaintiff's due process rights were undertaken pursuant to official policies, customs, or practices of UTSW and the UT System, including: (a) treating disability-related conduct as misconduct; (b) denying hearings and withholding evidence; and (c) permitting biased decisionmakers to participate in disciplinary decisions.

140. Article I, Section 19 of the Texas Constitution guarantees individuals the right to procedural and substantive due process before the state deprives them of a recognized legal interest, including the right to education, career progression, and fair disciplinary proceedings in an academic setting. In reviewing due process violations, Texas courts consider whether the governmental entity or public institution provided adequate procedural safeguards before imposing disciplinary or adverse actions upon the affected individual.

141. Defendants UTSW and the University of Texas System, as state actors, are constitutionally obligated to follow fair and established disciplinary procedures, provide adequate notice, and ensure that Plaintiff had a meaningful opportunity to respond before imposing academic sanctions or dismissal. Their failure to uphold these principles violates Article I, Section 19 of the Texas Constitution.

142. Plaintiff entered into contractual agreements with Defendants upon enrolling in UTSW's medical school. As a condition of admission, Plaintiff accepted the program's policy handbook, which sets forth the rules, disciplinary processes, and standards required for participation, thereby establishing an express contract between the parties. In exchange for Plaintiff's commitment, including fulfilling all program requirements and paying the requisite tuition and fees, Defendants undertook to provide a safe, supportive, and comprehensive educational and clinical training environment designed to prepare him for board certification and licensure as a physician.

143. Moreover, because the rotation program qualifies as both an academic curriculum and a pseudo-employment relationship, Defendants were further obligated to ensure that Plaintiff received not only a robust education but also the employment protections inherent in such a dual-status setting, including the provision of a non-discriminatory and secure work environment.

144. Defendants established extensive investigative, hearing, and disciplinary procedures, among other policies and codes of conduct, which are outlined in detail in the policy handbook.

145. The policy handbook serves as a regulatory document that faculty, staff, residents, students, and visitors must follow. Noncompliance or violations of the policy handbook can result in disciplinary action, including sanctions, suspension, or termination from the UTSW educational and/or residency programs. The policy handbook was presented to Plaintiff during the admission process, and his acceptance of its contents was required as a condition of enrollment. As such, the policy handbook acts as a contract between UTSW and the Plaintiff.

146. UTSW's policy handbook details the student's due process rights, including but not limited to proper notice, hearings, post-hearing notices, disciplinary actions, and appeals.

147. Defendants engaged in numerous procedural irregularities that deprived Plaintiff of a fair disciplinary review and ultimately led to an unjust dismissal. One of the fundamental violations was the failure to provide Plaintiff with adequate notice of the allegations and supporting evidence.

148. Without access to these materials, Plaintiff could not meaningfully review the claims against him, prepare a defense, or challenge the accusations in an informed manner. This lack of disclosure violated basic tenets of due process, which require that an individual facing adverse action must have an opportunity to access relevant information and respond accordingly.

149. In addition to withholding crucial documents, Defendants made arbitrary decisions

that contradicted previously established evaluations of Plaintiff's progress. Through February 2025, Plaintiff had earned honors in four clerkships and near honors in two. In a Microsoft Teams meeting about April 17, 2025, after Plaintiff's return, Dr. Sharma told Plaintiff that Plaintiff would have a "blank slate," with "no limitation on the grade" Plaintiff could earn. About three weeks later, on May 7, 2025, the Committee voted to dismiss Plaintiff; he was told he could not attend that meeting. The Committee's May 9 letter does not mention impairment, Plaintiff's diagnoses, his treatment, or Dr. Clark.

150. This sudden reversal of status constitutes an arbitrary and capricious deprivation of Plaintiff's academic and professional rights. The inconsistency between Defendants' previous affirmations of Plaintiff's standing after his April 11, 2025 return, and the subsequent dismissal suggests a lack of procedural integrity and fairness.

151. Furthermore, on July 9, 2025, two days after the final decision, Defendants deleted Plaintiff's email account and shut off his access to MedHub, where his evaluations were kept, so he could no longer access them.

152. Shutting off Plaintiff's access to his evaluations further underscores the lack of transparency in the disciplinary process. It suggests a deliberate effort to obscure evidence that may have supported Plaintiff's continuation in the program. Due process protections require institutions to maintain and disclose relevant records, ensuring disciplinary decisions are based on a complete and accurate assessment of the individual's performance.

153. Defendants breached their due-process obligations by failing to properly notify Plaintiff of pending disciplinary actions and by denying him a meaningful opportunity to defend himself against allegations. Instead of allowing Plaintiff to present and have exculpatory evidence evaluated, a key component of the due-process protections promised under the policy handbook, Defendants proceeded with disciplinary measures without proper notice or review of his rebuttal

evidence.

154. Plaintiff was denied due process, which requires an investigation and hearing before disciplinary actions are enforced. Due process also requires that any evidence submitted in defense of the accused student be reviewed and fairly evaluated in determining the student's right to a defense and proof against the allegations.

155. Collectively, these procedural failures, including the arbitrary and inconsistent dismissal, clearly violate Plaintiff's procedural due process rights.

156. As a direct result of these irregularities, Plaintiff was deprived of a fair opportunity to defend himself, suffered reputational harm, and was unjustly removed from the program without a legitimate basis. Accordingly, Defendants' actions amount to a violation of Article I, Section 19 of the Texas Constitution, necessitating judicial intervention and appropriate remedial relief.

157. As a direct and proximate result of these due process violations, Plaintiff has suffered significant harm. The lack of a fair disciplinary process not only resulted in damaging allegations but also inflicted public humiliation, emotional trauma, and irreparable harm to Plaintiff's academic and professional reputation. Additionally, Plaintiff has incurred and will continue to incur damages because of Defendants' reckless disregard for the procedural safeguards outlined in both the policy handbook and the implied contractual obligations.

158. Upon information and belief, Plaintiff was targeted by Dr. Reeni Abraham, a member of the Student Promotions Committee panel at the May 28, 2025 meeting, based on his mental-health disabilities. Plaintiff asserts that Defendants violated his due-process rights by failing to provide proper notice of disciplinary proceedings. These actions not only breached the procedural safeguards outlined in the policy handbook but also perpetuated retaliatory and discriminatory treatment rooted in Plaintiff's Indian heritage and disability.

159. Defendants had a contractual and implied duty of good faith to ensure that

Plaintiff's due process rights were protected and provided in accordance with its contractual obligations, the policy handbook, and state and federal statutes.

160. Defendants violated Plaintiff's due-process rights by failing to properly evaluate exculpatory evidence submitted in his defense and by dismissing him without a fair opportunity to contest the allegations. Due process requires that individuals have a meaningful chance to refute charges before suffering adverse action; Defendants' failure to do so rendered the disciplinary process inherently flawed and unjust.

161. As a direct consequence of Defendants' arbitrary and disproportionate dismissal, executed without adherence to proper procedural requirements, Plaintiff has endured severe emotional trauma, irreparable reputational harm, and lasting damage to his academic and professional career. The public and humiliating nature of Plaintiff's dismissal further exacerbates the harm suffered, warranting judicial intervention to rectify this wrongful deprivation of his rights.

**COUNT V**
**BREACH OF EXPRESS CONTRACT**
***(All Defendants)***

162. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

163. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and skilled medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and residency services to the public.

164. Plaintiff entered into contractual agreements with Defendants upon enrolling in the UTSW medical program. As a condition of admission, Plaintiff accepted the program's policy handbook, which sets forth the rules, disciplinary processes, and standards required for participation, thereby establishing an express contract between the parties. In exchange for

Plaintiff's commitment, including fulfilling all program requirements and paying the requisite tuition and fees, Defendants undertook to provide a safe, supportive, and comprehensive educational and clinical training environment designed to prepare him for board certification and licensure as a physician.

165. The Handbook functions as a regulatory document governing compliance for faculty, staff, residents, and students in the UTSW rotation program. It explicitly provides that any noncompliance or violation of its provisions may result in disciplinary actions, including sanctions, suspension, or termination from the program.

166. The handbook was presented to Plaintiff during the admission process, and his acceptance of its contents was a condition of his enrollment in the medical program. Accordingly, by accepting the handbook, Plaintiff entered into an express contract with UTSW, obligating the institution to adhere to their own policies and procedures in any disciplinary actions taken against him.

167. The Medical School Catalog provides an appeal process for academic decisions of the Student Promotions Committee: a written appeal to the Committee's Chair, review and a meeting with the student when the Committee may reconsider, written decisions within 10 business days, and a further written appeal to the Dean, whose decision is final. (2024–25 Medical School Catalog, Student Information, "Appealing Academic Decisions by the Student Promotions Committee"; EDU-402.) Defendants breached their obligations under the catalog and policy handbook by withholding evidence, deleting Plaintiff's email account and shutting off his MedHub access on July 9, 2025, and imposing dismissal without following their own procedures.

168. Upon information and belief, the contracts at issue—including the rotation program enrollment agreement and the accompanying policy handbook—were entered into with the primary intent of benefiting Plaintiff by providing essential education and training services. In

exchange for receiving this training, which qualified Plaintiff for program completion and subsequent residency program, Defendants expressly promised to maintain a safe, supportive learning and clinical environment.

169. Additionally, Defendants undertook to adhere to the rules, regulations, and policies outlined in the contract and policy handbook, thereby ensuring fair treatment and due process throughout Plaintiff's program. (2024–25 Medical School Catalog, "Medical School Catalog" and "Degree of Doctor of Medicine.")

170. Upon information and belief, Defendants' representations required Plaintiff and Defendants to comply with policies, procedures, and code of conduct as outlined in the policy handbook.

171. The express contractual terms required that any adverse evaluations or disciplinary measures be supported by proper notice, complete documentation, and an opportunity for Plaintiff to respond or remediate any deficiencies. Plaintiff was assured that his performance would be fairly and consistently evaluated and that any deviations from established procedures would be corrected.

172. Upon information and belief, Defendants materially breached their contractual obligation to provide a safe and respectful educational environment by subjecting Plaintiff, an enrolled medical student, to publicly humiliating and punitive disciplinary actions without proper notice or adherence to established due process. Defendants' actions incited fear and contributed to Plaintiff's emotional distress, thereby violating the safety provisions expressly incorporated into the medical program agreement and policy handbook.

173. Upon information and belief, Defendants materially breached their contractual obligation by failing to comply with the disciplinary process as outlined in the policy handbook. On Monday, March 24, 2025, at 7:30 AM, Dr. Shoultz met with Plaintiff, as he had arranged by

email. At that meeting, he completed a second Physicianship Evaluation Form, had Plaintiff sign it, and told Plaintiff it would be "the start of a long and hard process." From there, events escalated without following established procedures, depriving Plaintiff of due process and the benefits of a fair remedial mechanism.

174. Upon information and belief, Defendants materially breached their contractual obligation by failing to comply with the disciplinary process outlined in the policy handbook.

175. Moreover, Plaintiff submitted university psychiatrist Dr. Isabel Clark's letter dated May 21, 2025, with Plaintiff's written appeal to the Committee, referred to it at the May 28, 2025 meeting, and submitted it again with Plaintiff's June 9, 2025 appeal to Provost Lee. None of the Committee's letters, Dr. Scott's memo, or the Provost's decision mentions it. Furthermore, the Committee wrote: "The Committee also noted that your summation of your evaluations was incomplete, inaccurate, and misleading, further confirming the Committee's concerns about your deficiencies." This flagrant failure to follow established procedures not only violates the UTSW handbook and code of conduct but also demonstrates unlawful retaliation against the Plaintiff for exercising his protected rights.

176. Dr. Scott's June 23, 2025 recommendation memo includes matters the Committee's May 9 and May 29 letters do not mention, including concerns from Plaintiff's Psychiatry clerkship in 2024 that, according to the memo, did not prompt a professionalism form. Plaintiff had no opportunity to respond to the memo before the final decision.

177. Dr. Scott's memo states: "Due to concerns that he was lying about the COVID-19 test, Dhruv was asked to get tested by Occupational Health and, since it was after hours, a local urgent care." At 5:09 PM, Dr. Shoultz had asked Plaintiff for a COVID test and any clearance documentation. The attendance guidelines on medical absences are quoted in ¶26. Plaintiff felt extremely unwell at the time, but felt he had no real choice and worked his scheduled 24-hour

trauma call the next day. The Committee's May 9 letter describes the March 21 absence as unexcused, but March 21 was Plaintiff's designated day off, and he missed no scheduled clinical day from March 21 through March 24. Defendants' actions blatantly violate established procedures and due process rights.

178. Upon information and belief, the breaches were reasonably foreseeable consequences of Defendants' actions in breach of these contracts and the UTSW policy handbook.

179. As a direct and proximate result of Defendants' breaches set forth above, Plaintiff has suffered and will continue to suffer actual damages. These damages include, without limitation, harm to Plaintiff's academic and professional career, loss of monetary opportunities, impairment of future employment prospects, damage to his good name and reputation, and significant emotional distress.

**COUNT VI**
**BREACH OF IMPLIED CONTRACT**
***(Against All Defendants)***

180. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

181. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

182. Plaintiff entered into contractual agreements with Defendants upon enrolling in the UTSW medical program. As a condition of admission, Plaintiff accepted the program's policy handbook, which sets forth the rules, disciplinary processes, and standards required for participation, thereby establishing a contract between the parties. In exchange for Plaintiff's commitment, including fulfilling all program requirements and paying the requisite tuition and

fees, Defendants undertook to provide a safe, supportive, and comprehensive educational and clinical training environment designed to prepare him for board certification and licensure as a physician.

183. The policy handbook governs the conduct of all members of the UTSW medical community, including faculty, staff, residents, and medical students, and mandates strict adherence to its provisions. Violations of its guidelines may result in disciplinary actions such as sanctions, suspension, or termination from the medical program. The handbook was provided to Plaintiff during the admission process, and his acceptance of its terms was a condition of enrollment. Consequently, the policy handbook constitutes an express contract between UTSW and Plaintiff.

184. Separate from the express contractual terms outlined in the policy handbook, Defendants entered into implied contracts with Plaintiff governing the disciplinary process. These implied agreements required Defendants to follow the handbook's procedures, including providing timely and proper notice, conducting fair hearings, and ensuring that all relevant evidence, especially evidence contradicting adverse evaluations, was considered before making any disciplinary disposition. Accordingly, Defendants were obligated to take all reasonable steps to safeguard Plaintiff's due process rights throughout the disciplinary proceedings.

185. Separate from the express terms contained in the policy handbook, Defendants entered into implied contractual obligations to administer disciplinary procedures in a fair and unbiased manner that protected Plaintiff from retaliation and discrimination. This duty was especially critical given Plaintiff's mental health challenges.

186. Defendants breached these obligations by failing to provide proper notice for hearings, neglecting to consider exculpatory evidence, and escalating adverse disciplinary actions. Plaintiff was subjected to retaliatory and discriminatory treatment. These actions significantly harmed Plaintiff's professional career and personal well-being.

187. Defendants had an implied duty of good faith to ensure that Plaintiff's due process rights were protected and provided in accordance with their contractual obligations and the policy handbook. This duty required that Defendants conduct all disciplinary procedures fairly and impartially and allow adequate due process.

188. Defendants had an implied duty of good faith to ensure that Plaintiff's due-process rights were rigorously upheld in accordance with their contractual obligations and the policy handbook. This duty required that all disciplinary procedures be conducted fairly and impartially, free from retaliation or discriminatory bias, including bias related to Plaintiff's Indian heritage and mental-health disabilities.

189. Upon information and belief, the breaches were reasonably foreseeable consequences of Defendants' actions in breach of these contracts and of the UTSW policy handbook.

190. By deciding Plaintiff's final appeal without meeting Plaintiff and without giving Plaintiff a chance to answer the new matters in Dr. Scott's memo, Defendants deprived Plaintiff of the opportunity to defend Plaintiff against allegations and mitigate resulting harm. Defendants' disproportionate and retaliatory dismissal, which appeared motivated by discriminatory animus toward Plaintiff's Indian heritage and mental-health disability, led to public humiliation, irreparable harm to his academic and professional career, and significant emotional trauma.

## COUNT VII
## <u>NEGLIGENCE</u>
***(Against All Defendants)***

191. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

192. At all times relevant hereto, Defendants held themselves out to the public as a

licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

193. Plaintiff entered into contractual agreements with Defendants upon enrolling in the UTSW medical program. As a condition of admission, Plaintiff accepted the program's policy handbook, which sets forth the rules, disciplinary processes, and standards required for participation, thereby establishing an express contract between the parties. In exchange for Plaintiff's commitment, including fulfilling all program requirements and paying the requisite tuition and fees, Defendants undertook to provide a safe, supportive, and comprehensive educational and clinical training environment designed to prepare him for board certification and licensure as a physician.

194. Moreover, because the rotation program qualified as both an academic curriculum and a pseudo-employment relationship, Defendants were further obligated to ensure that Plaintiff received not only a robust education but also the employment protections inherent in such a dual-status setting, including a non-discriminatory and secure work environment.

195. Defendants, as an academic institution and employer that provides the UTSW medical rotation program, owed Plaintiff a duty to exercise reasonable care in maintaining a safe and non-discriminatory environment. This duty included administering disciplinary proceedings in accordance with the policy handbook and ensuring that all disciplinary actions were conducted with proper notice, a fair hearing, and an objective evaluation of all submitted evidence.

196. Defendants owed a duty of care to Plaintiff because it was foreseeable that Defendants' failure to adequately safeguard the Plaintiff's due process rights and academic success in accordance with the policy handbook, contracts, assignments, and state and federal statutes would compromise the Plaintiff's personal reputation, academic success, and ability to properly

defend himself during the disciplinary process.

197. Plaintiff submitted Dr. Clark's letter with Plaintiff's written appeal to the Committee and Plaintiff's June 9 appeal and referred to it at the May 28 meeting; none of the Committee's letters, Dr. Scott's memo, or the Provost's decision mentions it. Furthermore, Dr. Scott's memo introduced new information at the final level of appeal without giving Plaintiff a chance to address or refute that information. By doing so, Defendants acted with wanton and reckless disregard for the due process and fair hearing rights of Plaintiff.

198. Defendants owed a duty to Plaintiff to timely and accurately conduct an impartial investigation and hearing before the disciplinary dismissal of Plaintiff from his academic and professional pursuit. This duty is required and necessary for Plaintiff to take appropriate measures to protect his due process rights, to protect his reputation and good name, to protect his academic career, to protect his future employment prospects, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the allegations and unwarranted dismissal from UTSW Medical School.

199. Defendants owed a duty to Plaintiff to protect his due process rights, including providing proper notice and conducting a hearing before implementing disciplinary action. This duty is required and necessary for Plaintiff to take appropriate measures to protect his safety and security, to protect his reputation and good name, to protect his academic career, to protect his future employment prospects, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the allegations and deleterious actions of Defendants.

200. Defendants owed a duty to Plaintiff and knew or should have known he would suffer injury-in-fact from Defendants' reckless and wanton disregard for his due process rights and personal safety and security. On March 21, Dr. Shoultz wrote that he suspected misuse of the

absence policy, then left that accusation unresolved and did not respond to Plaintiff's two later emails before the shift. Still ill and without sleep, and feeling he had no real choice, Plaintiff worked his scheduled 24-hour trauma call on March 22. Two days later, Dean Mihalic's letter stated: "Your recent behavior suggests you may be impaired and unable to participate in UT Southwestern-related activities in a fit and safe manner." Defendants thus pressured Plaintiff into working while ill and without sleep, in the condition UTSW itself then described as possible impairment, and Dr. Scott's memo later listed the conduct from that shift as professionalism deficiencies.

201. Defendants breached their duty of care by negligently failing to provide Plaintiff with timely notice of disciplinary proceedings, inadequately evaluating exculpatory evidence, and deciding his final appeal without meeting him. Moreover, Defendants' actions, marked by a disproportionate and retaliatory disciplinary dismissal, appear motivated by discriminatory animus toward Plaintiff's Indian heritage and mental-health disabilities, rather than any legitimate concerns regarding his rotation performance. This failure to follow established procedural safeguards was a clear breach of duty.

202. As a direct and proximate result of Defendants' negligent conduct, Plaintiff was deprived of the opportunity to mount a proper defense against allegations. This failure materially contributed to the imposition of a punitive disciplinary action that left Plaintiff dismissed from UTSW Medical School, damaging his academic progress and professional reputation, and inflicting severe emotional distress, public humiliation, and long-lasting personal harm.

203. Defendants' breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff actual, tangible, injury-in-fact and damages, including, without limitation, lost benefit of his bargain, lost reputation, lost benefit from academic advancement and future employment, emotional distress and anguish, and lost time

and money incurred to mitigate and remediate the effects of the denial of due process and the unwarranted dismissal from the medical program, all caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which he continues to face.

**COUNT VIII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
***(All Defendants)***

204. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

205. At all times relevant hereto, Defendants held themselves out to the public as a licensed and professional institute of higher education and medical services, capable, honest, and knowledgeable enough to provide proper and professional educational and medical services to the public.

206. Defendants intentionally and/or recklessly inflicted emotional distress upon the Plaintiff by purposefully interfering with the Plaintiff's due process rights and by purposefully and intentionally failing to rectify the many problems associated with the disciplinary notice and hearing process conducted by the Defendants and their agents and employees.

207. Defendants intentionally and/or recklessly inflicted emotional distress upon Plaintiff. In clear retaliation for Plaintiff's challenge to the system, Defendants pursued a disciplinary process that was overtly discriminatory and procedurally flawed, failing to adhere to established safeguards and escalating punitive measures immediately after his protected speech in his May 5 letter.

208. Among other things, Defendants did not give Plaintiff the complete material the Committee considered and did not allow a support person at the May 28 appeal meeting. Dr. Shoultz wrote: "If you feel ill, you do not need to risk others' health by going to the hospital tomorrow. However, your photo appears to be a stock image easily found online. That is enough

for me to suspect misuse of the absence policy." He then left that accusation unresolved and did not respond to Plaintiff's emails before the shift. Sick and without sleep, Plaintiff felt he had no real choice but to work his scheduled 24-hour trauma call. Pressing a sick, sleep-deprived student into a 24-hour trauma call exposed Plaintiff to dangerous conditions and put him and his patients at risk. Defendants then treated the reported conduct from that shift as professionalism deficiencies, and the March 21 absence as unexcused. Defendants' conduct, undertaken with intent or reckless disregard for Plaintiff's well-being and in retaliation for his protected speech, constitutes extreme and outrageous behavior that inflicted severe emotional distress, public humiliation, and significant harm to his academic and professional career.

209. Defendants intentionally and/or recklessly inflicted emotional distress on Plaintiff by failing to conduct any meaningful investigation into the evidence he submitted, and deliberately neglecting to rectify numerous deficiencies in their disciplinary notice and process. These actions were undertaken despite clear medical documentation of Plaintiff's disabilities and the institution's knowledge of his vulnerability.

210. These actions, culminating in Plaintiff's dismissal from the program and the flawed hearing process overseen by Defendants and their agents, demonstrate a willful disregard for his due-process rights and safety. As a direct result, Plaintiff suffered severe emotional distress, public humiliation, and significant harm to his academic and professional career.

211. Defendants intentionally and/or recklessly inflicted emotional distress upon Plaintiff by deliberately targeting and retaliating against him because of his Indian heritage and mental-health disabilities. Defendants purposefully failed to address or rectify numerous deficiencies in the disciplinary process, including discriminatory treatment, wrongful dismissal, and flawed hearing procedures. These actions, motivated by discriminatory animus, resulted in severe emotional distress, public humiliation, and significant harm to Plaintiff's academic and

professional career.

212. The emotional distress was preventable had the Defendants lived up to their duty of care arising under their policies and procedures, the policy handbook, and common law, statute, and rule, as previously mentioned.

213. Defendants, as a reputed professional institute of higher learning entrusted with providing exemplary educational and medical services to the public, knew, or reasonably should have known, that their diverse customer base includes individuals of various races. Despite this awareness, Defendants engaged in conduct so extreme and outrageous that it transcends all accepted bounds of decency in a civilized community.

214. By deliberately interfering with Plaintiff's right to due process through their discriminatory disciplinary proceedings, Defendants' actions not only violated procedural guarantees but also inflicted severe mental anguish. Such egregious behavior renders the resulting mental distress presumed, as any competent institution entrusted with the welfare of its constituents would be expected to adhere to fair and non-discriminatory practices.

215. Defendants' acts as alleged herein were committed either with actual malice and intent to inflict on Plaintiff the very harm he suffered as a result of these acts by Defendants, or with reckless, wanton, and willful disregard of the possibility of inflicting on him the very harm he suffered as a result of these acts by the Defendants.

216. As a direct and proximate result of Defendants' intentional and/or reckless conduct as previously mentioned, Plaintiff was caused to sustain damages of no less than $8 million, including, but not limited to, emotional distress and anguish so severe that no reasonable person could be expected to endure it.

**PRELIMINARY RELIEF**

217. Plaintiff will move separately under Federal Rule of Civil Procedure 65 for a

temporary restraining order and preliminary injunction. The relief Plaintiff will request is the preliminary form of the injunctive relief requested below.

## PRAYER FOR RELIEF

218. WHEREFORE, Plaintiff DHRUV NANDAKUMAR requests that the Court enter judgment in his favor against Defendants and:

(a) declare that Defendants violated Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act;

(b) order UTSW, and Defendants Lee, Klein and Mihalic in their official capacities, to reinstate Plaintiff on a non-medical leave of absence for research, under conditions that are accommodations for Plaintiff's disability, proposed by Plaintiff's treating providers and set with OATIX, and to provide Plaintiff a current medical student identification card and, on request, a transcript or enrollment verification reflecting that status;

(c) order UTSW, and Defendants Lee, Klein and Mihalic in their official capacities, to restore Plaintiff's status as an enrolled student; verify that he is a current student for away-rotation applications through the Visiting Student Learning Opportunities (VSLO) system and in response to any other request to verify his status; record his surgery clerkship grade as incomplete, while keeping his honors evaluation for its first two weeks, until that grade is recalculated; recalculate his surgery clerkship grade based on his honors evaluation for its first two weeks, before his March 2025 illness, his honors in four prior clerkships, and his completion of the missed trauma shifts, documented in his signed trauma call passport; recalculate his internal medicine clerkship grade based on Dr. Anne Brancaccio's honors evaluation; and order a return plan that may include, if medically and educationally appropriate: treating-provider clearance; ongoing treatment compliance; academic or clinical remediation tailored to essential program requirements; renegotiation of two grades

– surgery and internal medicine; periodic meetings with academic support; executive function or communication supports; any reasonable accommodations approved through the formal process; support for residency including objective MSPE letter; non-retaliation and short-term medical leave if clinically indicated and mutually agreed;

(d) order complete clearance of any disciplinary proceedings or dismissal from Plaintiff's record, including the dismissal, the Physicianship Evaluation Forms, and the Student Promotions Committee's letters;

(e) enjoin Defendants from reporting or disseminating Plaintiff's dismissal, the Student Promotions Committee's decision letters and appeal documents, the Physicianship Evaluation Forms, Dr. Scott's June 23, 2025 memo, or Provost Lee's July 7, 2025 decision;

(f) enjoin Defendants from treating an accurate description of Plaintiff's status as misrepresentation, reporting him to the Texas Medical Board, or contacting AAPM&R about him;

(g) award compensatory damages against UTSW on Plaintiff's Section 504 claim, and general and compensatory damages on his other claims as the law allows;

(h) award reasonable attorney's fees and costs, including under 29 U.S.C. § 794a(b) and 42 U.S.C. § 12205, with interest; and

(i) grant any further relief the Court deems equitable and just.

## JURY DEMAND

219. Plaintiff demands a trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## CERTIFICATION

220. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an

improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully Submitted,

**LLG NATIONAL LAW GROUP**

Dated: October 26, 2026

*/s/ Renee Walker*

Renee Walker, ESQUIRE
Bar Card Number: 16958480
539 W. Commerce St. Ste. 4233
Dallas, TX 75208
(915) 206-3510
Renee.walker@llgnational.com
*Attorney for Plaintiff*