**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| DHRUV NANDAKUMAR,<br>Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF SOUTHWESTERN MEDICAL CENTER; UNIVERSITY OF TEXAS SYSTEM; W.P. ANDREW LEE, M.D., in his official capacity; KEVIN KLEIN, M.D., in his official capacity; and ANGELA MIHALIC, M.D., in her official capacity,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.: 3:26-cv-02535-B-BW |

---

**DEFENDANTS' RESPONSE TO PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**

---

TO THE HONORABLE JUDGE BRANTLEY STARR:

COME NOW Defendants The University of Texas Southwestern Medical Center ("UT Southwestern") and The University of Texas System ("UT System"), W.P. Andrew Lee, in his official capacity, Kevin Lein, M.D., in his official capacity, and Andela Mihalic, M.D., in her official capacity (together, "Defendants") and respond to Plaintiff Dhruv Nandakumar's ("Plaintiff") request for a temporary restraining order (TRO). Defendants would show as follows:

**INTRODUCTION**

Plaintiff's Ex Parte Motion for a Temporary Restraining Order (Doc. 24) against Defendants should be denied. In order to receive a temporary restraining order, Plaintiff is required to show: (i) a substantial likelihood of success on the merits; (ii) a substantial threat of immediate and irreparable harm, for which he has no adequate remedy at law; (iii) that greater injury will

result from denying the temporary restraining order than from its being granted; and (iv) that a temporary restraining order will not disserve the public interest. *Smith v. Tarrant Cnty. Coll. Dist.*, 670 F. Supp. 2d 534, 537 (N.D. Tex. 2009). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order can be granted. *Id*. Injunctive relief is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors. *Id*.

Plaintiff's application for restraining order fails to meet the four required elements and should therefore be denied. Importantly, Plaintiff admits to all of the dishonesty and unprofessionalism that caused him to be academically dismissed from UT Southwestern's medical program, but despite that admission, Plaintiff asks the Court to give him a second chance.

## BACKGROUND FACTS

Plaintiff began medical school at UT Southwestern in 2022. UT Southwestern academically dismissed Plaintiff during his third year of medical school due to repeated professionalism concerns. Notably, Plaintiff showed a persistent pattern of dishonesty, as detailed below.

Early in his enrollment, Plaintiff was notified of UT Southwestern's strict policy against unauthorized access to the corridor housing the cadaver lab. However, despite this instruction Plaintiff entered the lab area without permission. Plaintiff's Amended Complaint, ¶ 20; *see also* **Exhibit A**, Plaintiff's Appeal Letter. Plaintiff admits that he was not authorized to enter the lab area, but that he ignored those instructions. *Id*. Plaintiff received a Physicianship Evaluation Form documenting concerns about his professionalism as a result of this incident. *See* **Exhibit B**, Physicianship Evaluation Form, dated September 6, 2023. As outlined in the form, Plaintiff told a faculty member that he did not realize he was not authorized to be in the lab area, even though he

knocked on the door due to lack of badge access, avoided nearby faculty, and got another student to open the door. *Id.*

In March 2025, Plaintiff lied to faculty during a clinical rotation and stated that he had COVID-19, when he did not. *See* Exhibit A. When asked to show proof that he tested positive for COVID-19, Plaintiff sent a faculty member a stock photo of a positive COVID-19 test to avoid an unexcused absence. See Exhibit A; **Exhibit C**, Email string regarding COVID-19 test. Plaintiff admits to lying about his illness and sending the stock photo of the positive COVID-19 test. *See* Exhibit A. Plaintiff received another Physicianship Evaluation Form to document his unprofessionalism during this incident. *See* **Exhibit D**, Physicianship Evaluation Form, dated March 24, 2025.

During his clinical rotations, Plaintiff engaged in erratic behavior, including loud cursing, making disparaging comments about other attending and patients, touching medical equipment contaminated with patient secretions without proper protective equipment, nearly contaminating a sterile field in the operating room, and insisting on going to his car to change clothes for unclear reasons. Plaintiff's Original Complaint, ¶ 26. Plaintiff admits that he engaged in this behavior. *Id*. Plaintiff also admits that he had impaired judgment during a trauma rotation and difficulty complying with last minute directives. Plaintiff's Original Complaint, ¶ 30.

UT Southwestern's policy states that receiving a Physicianship Evaluation Form may result in the student going before the Student Promotions Committee (SPC), which is the committee that reviews medical students' academic progress. *See* Exhibit B; **Exhibit E**, Policy EDU-402. Plaintiff was referred to the SPC, which met to review his professionalism deficiencies on May 7, 2025. The SPC considered faculty input regarding Plaintiff's unprofessionalism and a letter that Plaintiff submitted to the SPC. *See* **Exhibit F**, SPC letter to Plaintiff dated May 9, 2025.

The SPC voted unanimously to academically dismiss Plaintiff from the University due to his consistent failure to meet the professionalism standards required of a medical student, including during the incidents documented in the Physicianship Evaluation Forms. *Id*. Plaintiff appealed the dismissal decision to the SPC. *See* **Exhibit G**, Plaintiff's appeal packet. In his appeal, Plaintiff admitted to unprofessionalism and dishonesty. *Id*. The SPC upheld Plaintiff's dismissal. *See* **Exhibit H**, letter to Plaintiff, dated May 29, 2025. Plaintiff submitted a final appeal to Dr. W.P. Andrew Lee, who is the Executive Vice President for Academic Affairs, Provost, and Dean of the Medical School. *See* **Exhibit I**, letter to Plaintiff, dated July 7, 2025. Dr. Lee denied Plaintiff's appeal, and Plaintiff's academic dismissal became final on July 7, 2025.

Plaintiff was academically dismissed from UT Southwestern due to his persistent pattern of unprofessionalism, including repeated incidents of dishonesty. Exhibit F. Plaintiff does not argue that these incidents should not have amounted to his dismissal. Exhibit A. Instead, Plaintiff argues that he was having mental health episodes during the times that these incidents occurred, and that his behavior should be excused. *Id*.

Plaintiff also alleges that he should have received accommodation for his mental health. Plaintiff's Amended Complaint, ¶¶ 123 – 124. However, Plaintiff never requested accommodation despite repeated outreach from the Office for Access & Title IX, which is the office designated to receive and process those requests at UT Southwestern. *See* **Exhibit J**, Email dated June 2, 2025 and email dated June 3, 2025; **Exhibit K**, Policy EDU-103. The Office for Access & Title IX provided Plaintiff with paperwork that needed to be filled out to request accommodation. *Id*. Plaintiff never completed that paperwork. *See* **Exhibit L**, letter to Plaintiff, dated June 27, 2025.

**A. Plaintiff is unlikely to succeed on the merits.**

In the brief in support of Plaintiff's request for a TRO, Plaintiff does not even attempt to argue that he will succeed on any claim other than his claims under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. Doc. 24, at 10-21. However, Defendants address all claims outlined in Plaintiff's Amended Complaint out of an abundance of caution. Plaintiff cannot succeed on any of his claims, for the reasons outlined below.

1. *Plaintiff cannot use the ADA or Section 504 as a shield for his unprofessionalism and dishonesty, even if attributable to his alleged disability.*

Plaintiff argues that UT Southwestern discriminated against him based on disability because it held his unprofessionalism and dishonesty against him even though it was the result of mental health episodes. Plaintiff's Complaint, ¶ 2. However, the Fifth Circuit has distinguished decisions *based on a plaintiff's disability* from decisions *based on a plaintiff's conduct allegedly caused by the disability*. *See Harkey v. NextGen Healthcare, Inc.*, No. 21-50132, 2022 WL 2764870, at *4 (5th Cir. July 15, 2022) (collecting cases). An individual "cannot hide behind the ADA and avoid accountability for his actions." *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998). In other words, Plaintiff cannot erase his unprofessionalism and dishonesty by claiming that his alleged disability caused it.

Plaintiff also contends that UT Southwestern failed to provide accommodation. To succeed on a failure-to-accommodate claim, Plaintiff must show: (1) he is a qualified individual with a disability, (2) the disability and its consequential limitations were known to UT Southwestern, and (3) UT Southwestern failed to make reasonable accommodation. *See Pickett v. Tex. Tech Univ. Health Scis.* Ctr., 37 F.4th 1013, 1032 (5th Cir. 2022). The Fifth Circuit has held that "a student must bring a request for accommodation to the proper office" and rejected students' failure-to-accommodate claims when, like Plaintiff, they fail to do so. *Molosso v. Bd. of Supervisors Univ. of*

*La. Sys.*, No. 25-30362, 2026 WL 799509, at *5 (5th Cir. Mar. 23, 2026); *see also Pickett*, 37 F.4th at 1032-33. Additionally, a "second chance" or forgiveness of prior academic deficiencies otherwise warranting dismissal is not a "reasonable accommodation." *Green v. Medco Health Sols. of Tex.*, LLC, 947 F. Supp. 2d 712, 729 (N.D. Tex. 2013). "Since a reasonable accommodation is always prospective," there is no requirement to "excuse past misconduct even if it is the result of the individual's disability." *Id*.

2. *Plaintiff's claims against UT System will not succeed on the merits.*

Plaintiff's claims against UT System cannot survive dismissal pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Under 12(b)(1), the Court lacks subject matter jurisdiction for the claims made against UT System because Plaintiff lacks standing to sue UT System. A defendant may challenge jurisdiction, including standing, in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *Daily Wire, LLC v. U.S. Dep't of State*, 733 F. Supp. 3d 566, 576 (E.D. Tex. 2024). To have standing, Plaintiff must demonstrate that he (1) suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; (2) that is fairly traceable to the challenged action; and (3) redressable by a favorable ruling. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). Plaintiff must demonstrate standing for each claim brought against each defendant, and for each form of relief sought. *Id* at 61. Rather than "unadorned speculation," which "will not suffice to invoke the federal judicial power," courts look for specific factual allegations in a plaintiff's complaint that satisfy the three standing requirements. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 44 (1976). Plaintiff lacks standing to sue UT System as Plaintiff does not allege that UT System acted against him in any way.

Additionally, to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Plaintiff also fails to provide any facts supporting his claim that UT System had a hand in the allegations in the Amended Complaint.

3. *Plaintiff's Title VI and Title VII claims would not survive a motion to dismiss.*

Again, to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Plaintiff's Amended Complaint alleges race discrimination based on his Indian race. However, Plaintiff fails to plead a single fact that even suggests that he was discriminated against based on his race, so his claim cannot succeed.

Additionally, Plaintiff brings his Title VI and Title VII claims against W.P. Andrew Lee, M.D., Kevin Klien, M.D., and Angela Mihalic, M.D. However, Title VII claims can only be brought against an employer, and Title VI claims can only be made against entities. *Jones v. Katy Indep. Sch. Dist.*, No. 4:24-CV-1039, 2025 WL 816719, at *2 (S.D. Tex. Mar. 13, 2025) ("Title VI claims may only be brought against entities, not individuals…. Title VII claims likewise may not be brought against individuals."). Therefore, Plaintiff's Title VI and Title VII claims against the individuals cannot succeed.

Title VII applies to claims of employment discrimination, not students' claims against their schools. *See Diggs v. Harris Hosp.—Methodist, Inc.*, 847 F.2d 270, 272 (5th Cir. 1988) (claims of employment discrimination "must necessarily involve an employment relationship"). Additionally, Title VII requires plaintiffs to exhaust administrative remedies before filing suit. *See Ft. Bend Cnty. v. Davis*, 587 U.S. 541, 551 (2019). Plaintiff does not allege that he was a UT Southwestern employee or exhausted administrative remedies, so he cannot prevail on his Title VII claim.

*4. Plaintiff's Breach of Contract, Breach of Implied Contract, Negligence, and Intentional Infliction of Emotional Distress claims are barred by sovereign immunity.*

Fed. R. Civ. P. 12(b)(1) provides for dismissal due to the court's lack of subject matter jurisdiction. Federal court subject matter jurisdiction is limited by the Eleventh Amendment and the principle of sovereign immunity. *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002). Dismissal under Rule 12(b)(1) is appropriate if a claim is barred by state sovereign or Eleventh Amendment immunity. *Warnock v. Pecos Cty., Tex.*, 88 F.3d 341, 343 (5th Cir. 1996).

The principle of sovereign immunity bars citizens from suing a non-consenting state in federal court. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). The Eleventh Amendment operates like a jurisdictional bar, depriving federal courts of the power to adjudicate suits against a state. *Union Pac. R. Co. v. La. Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011). The Eleventh Amendment bars any claims brought against a state or state agency unless Congress has abrogated the state's immunity, or the state has expressly waived its immunity to suit in federal court. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, (1984). UT Southwestern is a state agency entitled to Eleventh immunity protection. *Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 260 (5th Cir. 2020).

Negligence and Intentional Infliction of Emotional Distress

The Texas Tort Claims Act provides that sovereign immunity exists for intentional torts. Tex. Civ. Prac. & Rem. Code § 101.057. Intentional infliction of emotional distress is an intentional tort. *Twyman v. Twyman*, 855 S.W.2d 619, 621-22 (Tex. 1993). Where a negligence claim is based on Defendants negligently ignoring policies and procedures, it is an intentional tort and is barred by sovereign immunity. *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001).

Additionally, sovereign immunity is waived on tort claims only if the claim involves: (1) the use of publicly owned automobiles, (2) premises defects, and (3) injuries arising out of conditions or use of property. Tex. Civ. Prac. & Rem. Code § 101.021. Plaintiff's intentional infliction of emotional distress and negligence claims do not allege any facts that meet the three requirements.

Breach of Contract claims

When the State contracts with a private citizen, it waives its immunity from liability, but it does not waive immunity from suit unless the private citizen obtains legislative consent to sue the State on a breach of contract claim. *Jackson v. Tex. S. Univ.*, 997 F. Supp. 2d 613, 637 (S.D. Tex. 2014) ("There is but one route to the courthouse for breach-of-contract claims against the State, and that route is through the Legislature."). Here, Plaintiff does not allege that he has sought permission from the legislature to sue UT Southwestern for breach of contract, and UT Southwestern has not waived its immunity. Plaintiff's breach of contract claims are therefore barred. *Huff v. Tex. A & M Univ.*, No. CV H-18-3531, 2020 WL 918606, at *2 (S.D. Tex. Feb. 26, 2020).

5. *Plaintiff's due process claim is without merit.*

The Amended Complaint is internally inconsistent as to what due process claim Plaintiff is bringing. Although the first page of the Amended Complaint references "the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983," Court IV discusses "Due Process Violations Under the Texas Constitution and Other"—unspecified—"Sources." Plaintiff's due process claim fails under either theory.

There is no waiver or abrogation of Texas's sovereign immunity from Section 1983 claims. It is well-established that the state is not a "person" subject to suit under Section 1983. *See Will v.*

*Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Neither are state employees acting in their official capacities. *See id.* Even setting that issue aside, any Section 1983 claim that Plaintiff is making cannot succeed on the merits.

Due process for an academic dismissal "requires only that the student have meaningful notice and an opportunity to respond." *Davis v. Mann*, 882 F.2d 967, 975 (5th Cir. 1989). Adherence to professional conduct standards is an academic issue in the higher education context. *See Perez v. Tex. A&M Univ. at Corpus Christi*, 589 F. App'x 244, 250 (5th Cir. 2014); *see also Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 227 n.13 (1985) (noting that "lack of judgment and inability to set priorities" were academic issues in the medical education context). An academic dismissal can be overturned only if the university's conduct is arbitrary and capricious, meaning that it is "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225. The Texas Supreme Court has applied the same principles to academic dismissals challenged under the Texas Constitution's due process requirements. *See Tex. S. Univ. v. Villarreal*, 620 S.W.3d 899, 909 (Tex. 2021).

Plaintiff was notified about UT Southwestern's concerns about his professionalism and dishonesty and made his case to the SPC twice. Then, Plaintiff had the opportunity to appeal again to Dr. Lee after the SPC upheld its dismissal decision. Plaintiff cannot make any credible argument that UT Southwestern did not adhere to academic norms by dismissing him for repeated incidents of unprofessionalism and dishonesty. Nor can he successfully contend that he was not afforded notice and an opportunity to respond. *See Doe v. Univ. of N. Tex. Health Sci. Ctr.*, No. 23-10764, 2024 WL 3427049, at *5 (July 16, 2024) ("We have, however, routinely affirmed academic dismissals when the student is given multiple notices and the opportunity to appeal a dismissal.").

**B. A greater injury would result from granting the TRO and would disserve the public interest.**

Plaintiff's TRO asks the Court to ignore his admitted unprofessionalism and dishonesty and reinstate him as a student so that he may wear the badge color associated with medical students, rather than researchers, at an upcoming conference. Plaintiff also asks the Court to erase information regarding his academic dismissal from his education record at UT Southwestern.

UT Southwestern dismissed Plaintiff after three levels of review of his professionalism and dishonesty, in accordance with its established policies. UT Southwestern would be harmed if it were unable to implement its procedures and enforce the academic expectations of its faculty. Allowing Plaintiff to obtain through litigation what he could not obtain under UT Southwestern's normal application of its academic requirements decreases UT Southwestern's control over the medical education it provides to students and incentivizes litigation. Plaintiff's requested TRO also works a disservice on the public, which is best served when medical educators make medical education decisions, including decisions about the professionalism required to become a practicing physician.

**C. There is no substantial threat of immediate and irreparable harm.**

Plaintiff seeks a TRO more than a year after he was academically dismissed from UT Southwestern. It has been almost four months since Plaintiff filed his suit. If such harm were immediate, Plaintiff would have filed this request for a TRO at the time of his dismissal or immediately after he filed suit. Plaintiff did neither of these things. Additionally, badge color at a conference is not the type of harm that is meant to be protected by a TRO. Plaintiff's TRO application makes clear that Plaintiff is not foreclosed from having his research reviewed at the conference: it would just be as a "researcher."

In light of the lack of irreparable harm, the injury the TRO would work on UT Southwestern, the disservice it would work on the public, and Plaintiff's low likelihood of success on the merits, all of the TRO factors weigh against granting the extraordinary remedy Plaintiff seeks.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request that Plaintiff's request for a temporary restraining order be denied.

Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**WILLIAM D. WASSDORF**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Deputy Chief, General Litigation Division

*/s/ Jordan P. Woody*
**JORDAN P. WOODY**
Assistant Attorney General
Texas Bar No. 24085665
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone (512) 463-2100
Fax: (512) 320-0667
Jordan.Woody@oag.texas.gov

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been filed via CM/ECF on this 30th day of October, 2026, which will send electronic notice of filing to Counsel for Plaintiff.

Renee Walker
Phoenix Corporate Tower
3003 N. Central Avenue, Suite 685
Phoenix, Arizona 85012
Phone: (602) 960-9400
Fax: (707) 215-3600
Renee.walker@llgnational.com

*Attorney for Plaintiff*

*/s/ Jordan P. Woody*
**JORDAN P. WOODY**
Assistant Attorney General

# EXHIBIT A

**Appeal of Dismissal – Dhruv Nandakumar, S188944**

Dear Dr. Klein and Members of the Appeals Committee,

I am writing to respectfully appeal the Student Promotions Committee's decision of May 9, 2025, to dismiss me from medical school due to lapses in professionalism. I fully accept responsibility for the actions that led to this decision, which occurred in September 2023 and March 2025. As I explained in my initial letter to the committee, I am deeply remorseful for my actions, and they do not reflect my character. I am taking this opportunity to explain how I've reflected, grown, and ***taken deliberate steps to ensure that such incidents will never be repeated.***

Upon reflection, I better understand how untreated anxiety and impulsiveness influenced my decision-making. In September 2023, I stepped into the corridor to the lab driven purely by the impulse to help other students who had reached out to me for help given I was a TA the previous summer with no malicious intent. Only once I acted on that impulse did I realize that I could have simply checked with the lab supervisor before entering. ***My overwhelming anxiety combined with my untreated impulsivity shaped my responses in moments of high pressure—not from a place of dishonesty, but from anxiety and confusion***.

In the second instance when I sent the picture of the covid test (March 2025), my overwhelming anxiety surrounding confrontation and desire to escape that anxiety combined with insomnia and illness drove me to make another impulsive decision. This context is not an excuse, but reflects the reality of the mental health challenges I was facing at the time . These incidents do not define me and have been a wake-up call, representing a pivotal turning point in my personal and professional development.

***I have made several key changes to my mental and well-being care. I am currently following an enhanced treatment plan under the care of my psychiatrist (documentation attached).*** I'm also engaged in regular therapy, where I've developed daily coping strategies including mindful meditation and yoga to reduce anxiety, journaling for self-reflection, and structured daily routines to maintain consistency and control. These tools have helped me regain clarity, reduce impulsivity, and manage stress more effectively.

Even as I navigate this difficult period, I have been able to effectively continue onto my sub-internship in a professional and thoughtful manner. My residents, some of whom have interacted with me before my therapy or medications, have remarked on how much more calm and professional I am. This can be attested to by Dr. Kasseff. I believe this demonstrates not only my readiness to continue in the program, but also my ability to professionally provide patient care while managing stress and adversity.

Over the past three years, I have worked hard—excelling academically and professionally during clinical rotations. The unfortunate incidents are stark outliers. Attached is a summary of positive feedback from faculty members that speaks to my character, integrity, and work ethic.

Since my younger days I have faced health challenges and want to connect with others who are facing similar obstacles. This experience has fueled my passion for medicine and my dedication to providing compassionate, honest, and ethical care. Becoming a physician is not simply a career choice- it is my calling.

Dr. Klein, I respectfully ask that my dismissal not be the final word in my journey. These past 3 months have been an incredibly difficult period of introspection, accountability, and healing. ***I have learned painful but invaluable lessons, and I am committed to continuing this growth. I am willing to comply with any conditions the Committee may impose, including mentorship, professionalism and ethics workshops, and/or structured oversight.***

I respectfully request that you accept my sincere apology, consider the context of my mental health challenges, and recognize the meaningful, sustained efforts I am taking to grow even under intense pressure. I hope I have demonstrated that these incidents were isolated and uncharacteristic, and that I possess the integrity and resilience to move forward successfully.

Thankyou for your time and consideration

Sincerely,
Dhruv Nandakumar
S188944
Dhruv.Nandakumar@UTSoutwestern.edu

# EXHIBIT B

**Description of the UT Southwestern Physicianship Evaluation Form for Pre-Clerkship Medical Students**

This Physicianship evaluation indicates that a student needs help developing professionalism skills. A faculty member and a course director who are concerned about a student's behavior will give feedback to the student and make suggestions for improvement. If the behavior is repeated or is initially serious enough, then a Physicianship Evaluation Form will be completed, reviewed with the student, and then forwarded to the Associate Dean for Student Affairs, MC 9006.

The following are examples of some behaviors that would warrant a Physicianship form: a student repeatedly does not show up for a patient-related activity, such as the weekly Colleges session, without appropriate communication with the mentor; a student is repeatedly tardy to small group meetings; a student fails to complete assignments; or a student demonstrates disruptive behavior in lecture. If a first or second-year student receives one or more professionalism evaluation forms, he/she meets with Associate Dean for Student Affairs for counseling and remediation. Reference to these sessions is not made in the Medical Student Performance Evaluation (MSPE). However, if a student receives two or more Physicianship evaluations in the Pre-Clerkship Period and receives a subsequent form in the Clerkship or Post Clerkship Periods, or if the unprofessional behavior is sufficiently serious or egregious, then student is referred to the Student Promotions Committee (SPC), and these evaluations and issues are mentioned in the MSPE (unless deemed otherwise by the SPC).

In all cases, the Student Promotions Committee has complete discretion to determine what constitutes a professionalism deficiency and to take appropriate action.

If you have any questions about the performance criteria, please contact Associate Dean for Student Affairs at (214) 648-2168.

# UT SOUTHWESTERN MEDICAL SCHOOL
# PHYSICIANSHIP EVALUATION FORM
# FOR PRE-CLERKSHIP STUDENTS

Dhruv Nandakumar
Student Name *(type or print legibly)*

s188944
Student I.D. Number

Caroline Rinaldi, Ph.D.
Course Director

BSF 1001
Course *(Dept. & Course No.)*

Caroline E. Rinaldi
Course Director's Signature

Fall 2023
Quarter / Year

Date this form was discussed with the student ______________

The student has exhibited one or more of the following behaviors that need improvement to meet expected standards of professionalism.

**This student needs further education or assistance with the following: (check all that apply)**

1. **Reliability and responsibility**

   ☑ a. Fulfilling responsibilities in a reliable manner.
   ☐ b. Attendance on time at required activities.
   ☐ c. Learning how to complete assigned tasks.

2. **Self-improvement and adaptability**

   ☐ a. Accepting constructive feedback
   ☐ b. Recognizing limitations and seeking help
   ☐ c. Being respectful of colleagues and patients
   ☐ d. Incorporating feedback in order to make changes in behavior
   ☐ e. Adapting to change

3. **Relationships with students, faculty, staff and patients**

   ☐ a. Establishing rapport
   ☐ b. Being sensitive to the needs of patients
   ☐ c. Establishing and maintaining appropriate boundaries in work and learning situations
   ☐ d. Relating well to fellow students in a learning environment
   ☐ e. Relating well to staff in a learning environment
   ☐ f. Relating well to faculty in a learning environment

4. **Upholding the Medical Student Statement of Principles**

   ☑ a. Maintaining honesty
   ☐ b. Contributing to an atmosphere conducive to learning
   ☐ d. Respecting the diversity of race, gender, religion, sexual orientation, age, disability or socioeconomic status
   ☐ e. Resolving conflicts in a manner that respects the dignity of every person involved
   ☐ f. Using professional language and being mindful of the environment
   ☐ g. Protecting patient confidentiality
   ☐ h. Dressing in a professional manner

*This Policy was adapted with permission from the University of California, San Francisco School of Medicine and largely based on the work of Dr. Maxine Papadakis, Associate Dean for Student Affairs*

Approved Faculty Council 5/6/2010 Revised 5/15/16 Revised 11/6/2018

Witnessed the conversation [signature]
(J. Pronge-Giel, Section Chief, Anatomy) 9/6/23

**5. Comments & Suggestions for Change:**

See Following Page

Met with Dhruv on 9/11/23 to review the Professionalism form
He admitted poor judgment and not being effective on the impact of this decisions.
We discussed the need to carefully think through each decision - is this the right thing to do??
Ask faculty if not sure.
We reviewed the Professionalism Policy and impact of future forms.
We reviewed responsibility, communication, and sound judgment.

[signature]

**6. My comments are: (optional)**

**7. I have read this evaluation and discussed it with the course director.**

[signature]
Student Signature

9/06/23
Date

*This Policy was adapted with permission from the University of California, San Francisco School of Medicine and largely based on the work of Dr. Maxine Papadakis, Associate Dean for Student Affairs*

Approved Faculty Council 5/6/2010 Revised 5/15/16 Revised 11/6/2018

Comments: As a student in Human Structure in Fall 2022, and again, as a Teaching Assistant for Human Anatomy during Summer 2023, Dhruv was made aware of UT Southwestern's strict policy against unauthorized access to the Willed Body corridor on L1 and the cadaver lab. The no-visitor rule is laid out for students in several ways: it is listed with the policies outlined in both course syllabi, it is listed as the first rule under Laboratory Rules in both course Veteran Dissectors, and it was emphasized during the course orientation. On August 9th, 2023, Dhruv received an email from Dr. Rinaldi in which he was informed that he had not been hired as a Teaching Assistant for the 2023 Human Structure course. Dhruv was no longer an employee of the Division of Anatomy, as the Health Professions course for which he was a TA ended, along with his employment, on July 28th, 2023. As a result, his badge access to the Willed Body corridor and the cadaver labs was revoked by Kennard Thomas (Director of Willed Body). On Friday, August 18th, Dhruv was observed by Dr. Rinaldi to be inside the Teaching Assistants' prep room within the Willed Body corridor. Dr. Rinaldi asked Dhruv why he was there, and he replied that he had come to help some MS1 students study in the cadaver lab. Dr. Rinaldi then informed him that he was not allowed to be there. Shortly afterwards, in a conversation with Dr. Winkler, Dhruv told her that he did not realize he was no longer authorized to be in the cadaver lab. However, video footage obtained from Willed Body suggests Dhruv knew that he no longer had access because he was seen repeatedly knocking on the door to the cadaver lab, attempting to get one of the MS1 students to let him in. The behavior alternated with him waiting several minutes in the corridor. More disturbing was that he appeared to periodically look through the door window, stepping out of view of being seen by faculty in the hallway outside the corridor. If Dhruv believed his badge was not working due to error, he could have more easily asked one of the nearby faculty to let him in instead of waiting around for a student to let him in. This incident is concerning because it demonstrated a lack of fulfilling his responsibilities as an MS2 in a reliable manner (i.e., he broke well-established and publicized rules in his attempt to help underclassmen). At worst, his behavior and comments about his behavior demonstrate dishonesty (i.e., claiming to not be aware he is unauthorized to access the cadaver lab and hiding from faculty in the hallway); at best, it demonstrates poor judgement.

Suggestions for Change: Dhruv needs to improve in his honesty / judgement regarding adherence to policies and procedures. He needs to strive to be more reliable in fulfilling his duties so that faculty and peers can trust him.

# EXHIBIT C

**Jordan Woody**

**From:** Thomas Shoultz <Thomas.Shoultz@UTSouthwestern.edu>
**Sent:** Saturday, March 22, 2025 10:11 AM
**To:** Angela Mihalic; Blake Barker; Sarah Baker; Norberto Rodriguez-Baez; Kareem Abdelfattah; Rohit Sharma
**Subject:** Fw: Covid

Sorry for the weekend email but there was some back and forth that you all should be aware of. I'm still planning on meeting with him in person on Monday. Will likely fail him for the TEGS block of the clerkship.

See below. tl;dr I called him out and he's semi-backtracking.

Tom

Thomas Shoultz, MD FACS (he/him)

Associate Professor of Surgery
Co-Director, UT Southwestern Surgery Clerkship
Director, Geriatric Acute Care Surgery, Parkland Hospital
Associate Trauma Medical Director, Parkland Hospital
Division of Burn, Trauma, Acute & Critical Care Surgery
The University of Texas Southwestern Medical Center
5323 Harry Hines Blvd, Surgery Department E6.102S
Dallas, TX 75390
Office: 214-648-5258

---

**From:** Dhruv Nandakumar
**Sent:** Friday, March 21, 2025 8:16 PM
**To:** Thomas Shoultz
**Subject:** Re: Covid
Dr Schoultz,

Sorry for the follow-up but I wanted to sincerely apologize again. I'm almost at the end of my clerkships, have taken step 2, and am hoping to have a fruitful career in pmnr.

This was an error in judgement. I'm just feeling overwhelmed right now by the combination of this respiratory issue with family problems that have been going on for the last few months that I am starting therapy for on Monday evening.

Would you be willing to give me another chance. I promise this lapse in judgement will not occur again. This is not my character or the kind of physician I want to be

Sincerely,
Dhruv Nandakumar
MS3

i

Dhruv Nandakumar, MS1
UTSouthwestern Class of 2026
Dhruv.Nandakumar@UTSouthwestern.edu

---

**From:** Dhruv Nandakumar
**Sent:** Friday, March 21, 2025 7:53:48 PM
**To:** Thomas Shoultz
**Subject:** Re: Covid
Dr. Schultz,

That was not my intention I apologize I am feeling ill but felt that I would not be believed without any legitimacy.

I am going through a lot of personal stress right now and made an error in judgement thinking I would need some sort of proof to allow me the time to rest.

I sincerely apologize as this does not reflect who I am as a person. I will wear a mask at service tommorow.

Dhruv Nandakumar, MS3
UTSouthwestern Class of 2026
Dhruv.Nandakumar@UTSouthwestern.edu

---

**From:** Thomas Shoultz
**Sent:** Friday, March 21, 2025 7:49:10 PM
**To:** Dhruv Nandakumar
**Subject:** Re: Covid
Druv,

If you feel ill, you do not need to risk others' health by going to the hospital tomorrow. However, your photo appears to be a stock image easily found online. That is enough for me to suspect misuse of the absence policy. I think it best that we meet next Monday morning. We will loop in Student Affairs as needed depending on the results of our conversation.

-Tom

Thomas Shoultz, MD FACS (he/him)

Associate Professor of Surgery
Co-Director, UT Southwestern Surgery Clerkship
Director, Geriatric Acute Care Surgery, Parkland Hospital
Associate Trauma Medical Director, Parkland Hospital
Division of Burn, Trauma, Acute & Critical Care Surgery
The University of Texas Southwestern Medical Center

5323 Harry Hines Blvd, Surgery Department E6.102S
Dallas, TX 75390
Office: 214-648-5258

---

**From:** Dhruv Nandakumar
**Sent:** Friday, March 21, 2025 7:04 PM
**To:** Thomas Shoultz
**Subject:** Re: Covid
Dr. Schoultz,
I took a home positive covid test today which I will attach below. I started having chills yesterday and have a cough and feel feverish today. Id rather not go to urgent care and have to spend money after I have symptoms and a positive rapid test from today.
I can wear an n95 and go to call tomorrow if that avoids any issues with the absence policy. I have no desire to miss any time and the need to make it up.




Dhruv Nandakumar
MS3, UT Southwestern
UT Southwestern Medical Center
5323 Harry Hines Blvd.
Dallas, TX 75390- 9006
214-648-3465

---

**From:** Thomas Shoultz
**Date:** Friday, March 21, 2025 at 6:44 PM
**To:** Dhruv Nandakumar
**Subject:** Re: Covid

Thank you. A test performed at an urgent care would be the next best approach.
Tom
Sent from my iPhone

> On Mar 21, 2025, at 5:46 PM, Dhruv Nandakumar wrote:
>
> Hi Dr. Schoultz,
> I just filled out the occupational health form but they aren’t going to get back to me until Monday. Should I get another repeat rapid test tommorow?

Dhruv Nandakumar, MS3
UTSouthwestern Class of 2026
Dhruv.Nandakumar@UTSouthwestern.edu

---

**From:** Thomas Shoultz
**Sent:** Friday, March 21, 2025 5:09:20 PM
**To:** Dhruv Nandakumar
**Subject:** Re: Covid

Druv,

Please go to Student Health/Occ Health for a covid test and send me the results and any clearance documentation they can provide. We want to make sure we keep everyone safe and also stay in compliance with our absence policy.

Thank you,
Tom

Thomas Shoultz, MD FACS (he/him)
Associate Professor of Surgery
Co-Director, UT Southwestern Surgery Clerkship
Director, Geriatric Acute Care Surgery, Parkland Hospital
Associate Trauma Medical Director, Parkland Hospital
Division of Burn, Trauma, Acute & Critical Care Surgery
The University of Texas Southwestern Medical Center
5323 Harry Hines Blvd, Surgery Department E6.102S
Dallas, TX 75390
Office: 214-648-5258

---

**From:** Dhruv Nandakumar
**Sent:** Friday, March 21, 2025 2:14 PM
**To:** Thomas Shoultz
**Cc:** Ofelia Negrete Vasquez
**Subject:** Covid

Hi Dr Shoultz,

Just tested positive for Covid on a rapid test today on my off day. I might have to miss one or 2 days depending on when I am no longer febrile.

Dhruv Nandakumar, MS3
UTSouthwestern Class of 2026
Dhruv.Nandakumar@UTSouthwestern.edu

---

UT Southwestern
Medical Center
The future of medicine, today.

# EXHIBIT D

# UT SOUTHWESTERN MEDICAL SCHOOL
## PHYSICIANSHIP EVALUATION FORM
## CLERKSHIP AND POST-CLERKSHIP

Dhruv Nandakumar
Student Name *(type or print legibly)*

188944
Student I.D. Number

Thomas Shoultz
Clerkship or Course Director

Surgery Clerkship SUR1808
Course *(Dept. & Course No.)*

[signature]
Clerkship or Site Director's Signature

Rotation 5 / 2025 / Parkland Hospital
Block / Year / Location

Date this form was discussed with the student 3/24/25

A student with a pattern of the following behavior has not sufficiently demonstrated professional and personal attributes for meeting the standards of professionalism inherent in being a physician:

**This student has not met the following core components of medical professionalism.**
*Check the appropriate categories. Comments are* ***required****.*

**1. Reliability and responsibility:**

- ☐ a. Fulfilling responsibilities to patients or to other health care professionals without the need for continual reminders.
- ☐ b. The student can be relied upon to complete tasks.
- ☐ c. The student attends all required activities and is punctual.
- ☐ d. The student maintains the highest standards of academic honesty related to assignments, examinations, and in patient care duties and documentation.

________________________________________

**2. Effort toward self-improvement and adaptability:**

- ☐ a. The student is accepting of constructive feedback.
- ☐ b. The student recognizes his/her own limitations and seeks help
- ☐ c. The student incorporates feedback in order to make changes in behavior.
- ☐ d. The student accepts blame for failure, or responsibility for errors.
- ☐ e. The student is respectful of colleagues and patients during times of stress.
- ☐ f. The student demonstrates adaptability to change.

________________________________________

**3. Relationships with patients and families as well as members of the health care team:**

- ☐ a. The student establishes rapport with patients or families.
- ☐ b. The student is sensitive to the patient's or families' feelings, needs or wishes.
- ☐ c. The student establishes and maintains appropriate boundaries in work and learning situations with patients or members of their families.

- ☐ d. The student demonstrates empathy.
- ☐ e. The student demonstrates a personal commitment to honoring the wishes of the patients.
- ☐ f. The student functions well within a health care team.
- ☐ g. The student is sensitive to the needs, feelings, and wishes of the health care team members.

**4. Upholding the Medical Student Statement of Principles**

- ☑ a. Maintaining honesty
- ☐ b. Contributing to an atmosphere conducive to learning
- ☐ c. Respecting the diversity of race, gender, religion, sexual orientation, age, disability or socioeconomic status
- ☐ d. Resolving conflicts in a manner that respects the dignity of every person involved
- ☐ e. Using professional language and being mindful of the environment
- ☐ f. Protecting patient confidentiality
- ☐ g. Dressing in a professional manner

Dhruv falsified a positive COVID test to attempt to legitimize utilizing the absence policy.

**5. Please comment on an appropriate plan of action to pursue when counseling the student.**

I will obtain feedback from supervising housestaff and faculty regarding Dhruv's performance and professionalism. I will also gain historical perspective from Dr. Sharma and Student Affairs about precedent for similar situations of dishonesty.

**This section is to be completed by the student.**

**6. My comments are: (optional)**

**7. I have read this evaluation and discussed it with the clerkship director.**

[signature] 3/24/25

Student Signature Date

Met with Dhruv on 4/15 and 3/24 regarding this form. Also discussed professionalism concerns including cursing loudly in patient care areas, [illegible] and going to car, nearly napping on duty, not reporting to [illegible], contaminating sterile field, unexplained absences from call room, erratic behavior in OR, touching endoscopy without PPE. He reported significant lack of sleep/anxiety contributing to the behaviors. Pulled him from rotation — cleared to return after Fitness for Duty. In treatment for ADHD/anxiety.

[signature], MD 5/2/25

Met with Dhruv on 4/15 and 3/24 regarding this form. Also discussed professionalism concerns including cursing loudly in patient care areas, napping on duty, not reporting to trauma bay promptly and going to his car, nearly contaminating the sterile field, unexplained absences from the call room, erratic behavior in OR, touching endoscopy without PPE. He reported significant lack of sleep/anxiety contributing to the behaviors. Pulled from rotation, cleared to return after Fitness for Duty. In treatment for ADHD/anxiety. Sarah Baker, 5/2/2025

# EXHIBIT E

UT SOUTHWESTERN
POLICY HANDBOOK

# EDU-402 Academic Decisions – UT Southwestern Medical School

## Chapter 10: Students, Postdoctoral Scholars, Residents, and Fellows

**Contents**

Policy Link
Policy Rationale and Text
Scope
Procedures
Definitions
Contacts/For Further Information
Policy History

**Administrative Information**

Responsible Office: Dean's Office
Executive Sponsor: Provost
Effective Date: 01/31/1998
Last Updated: 01/11/2024
Contact: policyoffice@utsouthwestern.edu

## Policy Link

To ensure appropriate access when sharing or linking to this policy, *copy and paste* this URL:

https://secure.compliance360.com/ext/CZRBUxUTeHLbBw-azFb7Hg==

## Policy Rationale and Text

The assignment of grades in courses is intended to reflect careful supervision of the student's academic performance and progress. It is UT Southwestern policy that students enrolled in the UT Southwestern Medical School must meet certain academic standards in order to remain and advance in the program. Failure to achieve these standards may result in an adverse academic decision. This policy details the assignment of grades; the designation of academic promotion, remediation, warning, probation, and dismissal; and the procedures for students to submit a grade grievance or appeal an academic decision.

### Grades

To facilitate the transition to medical school, the courses taken and completed in the pre-clerkship period are graded on a Pass/Fail basis. Selectives (which include approved subinternships and ICU/EM rotations) are graded on an Honors/High Pass/Pass/Fail basis. Remaining clerkship and post-clerkship electives and the Scholarly Activity are graded on a Pass/Fail basis. These courses are not included in weighted grade average or class rank.

The core clerkship rotations are graded on the following scale: Honors, Near Honors, High Pass, Pass, and Fail. From the core clerkships, a weighted grade average is calculated for each student at the end of the clerkship period as a measure of cumulative academic performance. This information is available for use in the residency application process. Class rank is not recorded on the permanent academic record (transcript).

Grades are reported to the Registrar within six (6) weeks of official completion date of each course and are available to students immediately.


© 2022 *Handbook of Institutional Policies and Operating Procedures*

UTSouthwestern Medical Center

**PRINTED POLICIES MAY HAVE BEEN UPDATED – SEE CURRENT POLICIES ONLINE**

***Grades Following Remediation***

In situations where a student satisfactorily remediates a course(s) previously failed, the transcript will reflect both grades.

If a graded core clerkship was completed with a passing grade on both attempts, the final grade will be the average grade and grade points of both recorded grades. If the grade from the first attempt was a ***Fail*** and the course was completed with a passing grade on the second attempt, both grades will be recorded on the transcript and the final grade will be a ***Pass*** (regardless of what grade was earned on the second attempt) and will count for 2.0 grade point (out of 4.0) for purposes of grade-average calculation.

***Grades Following Incomplete Coursework***

On the recommendation of the instructor, and subject to the approval of the Associate Deans for Student Affairs, a student may receive an ***I*** (Incomplete) for a course not completed. The incomplete course work must be completed within the time prescribed by the course director and/or the Student Promotions Committee, or a failing grade will be recorded. In addition, early isolated deficiencies may be recorded as incompletes until sufficient competency is demonstrated per the Student Promotions Committee Guidelines. After sufficient demonstrated competency, these grades will be changed to ***Pass***. Failure to demonstrate competency will result in a failing grade recorded on the transcript and possible action by the Student Promotions Committee.

## Academic Promotion, Remediation, Probation, and Dismissal

When a student completes the course requirements of an academic session satisfactorily, they are promoted to the next period, provided there are no reasons to delay or deny promotion. Students with an academic deficiency will be referred to the Student Promotions Committee, which is composed of both appointed and elected faculty. The Dean appoints the Student Promotions Committee Chair and faculty to serve as members of the Committee. In addition, the faculty elects two faculty members to serve on the Committee. The Student Promotions Committee reviews all important aspects of each student referral and makes decisions in accordance with the Student Promotions Committee Guidelines. The Student Promotions Committee will determine a remediation plan for students with academic deficiencies, which may include repeating specific course(s) or an academic year, or removal of the deficiency by other appropriate means. The Student Promotions Committee has complete discretion to make academic decisions and determine appropriate remediation. Academic decisions are not necessarily progressive. For example, the Student Promotions Committee may place a student on Academic Probation for egregious professionalism deficiencies, regardless of whether the student is required to repeat the year. Serious academic deficiencies may result in dismissal, even if a student has not previously been placed on Academic Warning or Academic Probation.

A student who appeals the decision by the Student Promotions Committee to place the student on Academic Warning or on Academic Probation without a repeat of the academic year should continue to attend classes/clerkships and complete all quizzes, exams, and clerkship activities pending resolution of the appeal.

A student who appeals the decision by the Student Promotions Committee to place the student on Academic Probation requiring a repeat of the academic year or to Dismiss the student should consult with the Dean of Medical Students regarding whether or not it is in the student's best interests to continue coursework pending the resolution of the appeal. It is ultimately the decision of the student whether to continue until the appeal is fully resolved.

In all cases, students are responsible for tuition and fees incurred for attendance while an appeal is pending, regardless of the outcome of the appeal. (See EDU-303 Tuition and Fees.)

***Remediation Under Academic Warning***

A student who is required to remediate course or clerkship deficiencies not requiring the repeat of an academic year may be placed on "academic warning" until all deficiencies are successfully remediated. Any further deficiency during the period of academic warning will result in an immediate referral to the Student Promotions Committee for review and additional action, up to and including dismissal.


© 2022 *Handbook of Institutional Policies and Operating Procedures*


**PRINTED POLICIES MAY HAVE BEEN UPDATED – SEE CURRENT POLICIES ONLINE**

***Remediation Under Academic Probation***
A student who is required to remediate course or clerkship deficiencies requiring the repeat of an academic year may be placed on "academic probation" until successful completion of the entire repeated academic year. Any further deficiency during the period of academic probation will result in immediate referral to the Student Promotions Committee for review and additional action, up to and including dismissal.

***Dismissal***
The Student Promotions Committee may find it necessary to dismiss a student who has failed to maintain satisfactory academic performance or progress. Academic dismissal is a permanent separation from the Medical School recorded on the academic record (transcript). Students separated due to academic dismissal may not reapply for admission. For students pursuing a dual M.D./Ph.D. degree through UT Southwestern's Medical Scientist Training Program (MSTP), dismissal from either the Graduate School or the Medical School is a dismissal from the MSTP and a permanent separation from UT Southwestern.

### Withdrawal
Extraordinary circumstances may necessitate that a student withdraw from a course. In these instances, subject to the approval of the Associate Deans for Student Affairs, a grade of ***W*** will be assigned. Any medical student wishing to withdraw from a course or from medical school must contact an Associate Dean for Student Affairs. If a student who is appealing a decision of the Student Promotions Committee wishes to withdraw from medical school, this action must be made before the end of the appeals process. Once all appeals have been exhausted or the time to appeal has run, the academic decision becomes final and part of the student's official record.

A student who is enrolled in UT Southwestern's Medical Scientist Training Program (MSTP) and pursuing a dual M.D./Ph.D. degree may withdraw from the MSTP program and remain enrolled in either the M.D. program in the Medical School or the Ph.D. program in the Graduate School only with prior approval from the Deans of both schools. Approval will be based upon the student's academic performance, degree progress at the time of withdrawal, and space available in the student's desired program.

## SCOPE

This policy applies to students enrolled in UT Southwestern Medical School.

## PROCEDURES

### Grade Grievance Procedure

1. Primary responsibility for assigning grades and making evaluations rests with the course director acting for the chair of the relevant academic department.
2. If not satisfied with the grade:
    a. Preclerkship: The student may submit the written grievance to the course director(s) within five (5) days of the distribution of final course grades. The course directors will review and submit their finding within 10 business days. If not satisfied with the course director's decision, the student may submit the grievance to the Associate Dean for Undergraduate Medical Education for review within five (5) days of the student's receipt of the course director's decision. The Associate Dean will forward a written decision to the student within 10 business days after receiving the grievance. The decision of the Associate Dean for Undergraduate Medical Education is final.
    b. Core Clerkships: The student may submit the written grievance to the grade evaluation committee within five (5) days of the distribution of final clerkship grades. The grade evaluation committee will review at their next scheduled meeting and submit their findings no later than 60 days from the submission of the appeal. If not satisfied with the grade evaluation committee's decision, the student may submit the grievance to the department


© 2022 *Handbook of Institutional Policies and Operating Procedures*
UTSouthwestern Medical Center

**PRINTED POLICIES MAY HAVE BEEN UPDATED – SEE CURRENT POLICIES ONLINE**

chair for review within five (5) days of the student's receipt of the grade evaluation committee's decision. Any items in the grievance to the department chair must have been previously reviewed by the grade evaluation committee. The chair will forward a written decision to the student within 10 business days after receiving the grievance. The decision of the department chair is final.

c. Other electives, selectives, and required courses: The student may submit the written grievance to the course director(s) within five (5) days of the final distribution of course grades. The course director will review and submit their findings within 10 business days. If not satisfied with the course director's decision, the student may submit the grievance to the department chair if applicable (clinical elective) or Associate Dean for Medical Education (multidisciplinary course or non-clinical) within five (5) days of the student's receipt of the course director's decision. The chair or the Associate Dean, as appropriate, will forward a written decision to the student within 10 business days after receiving the grievance. The decision of the department chair or Associate Dean is final.

3. When a grade or evaluation results in an academic deficiency that prompts review by the Student Promotions Committee, this grade grievance procedure does not apply. Students may appeal academic decisions by the Student Promotions Committee in accordance with the procedure outlined below.

## Appealing Academic Decisions by the Student Promotions Committee

1. An Associate Dean for Student Affairs will notify a student when they have been referred to the Student Promotions Committee for an academic deficiency. Before the Committee meets, the student will have the opportunity to provide the Associate Dean for Student Affairs any relevant information the student wants the Committee to consider. The Committee will meet to discuss the student privately, and students may not attend. The Student Promotions Committee will issue a written decision to the student within five (5) business days of the meeting.

2. A student may submit a written appeal to the chair of the Student Promotions Committee within 10 business days of the student's receipt of the Student Promotions Committee's written decision. The student's written appeal should contain the facts on which the appeal is based and any supporting documentation, the reason(s) the student believes the decision by the Student Promotions Committee should be changed, and the remedy sought.

3. The Student Promotions Committee will review the written appeal and meet with the student to discuss the appeal. Only Committee members and the student may attend this meeting.

4. The Student Promotions Committee will forward a written decision to the student within 10 business days after the Student Promotions Committee has heard the appeal.

5. If the student is not satisfied with the Student Promotions Committee's decision, the student may appeal in writing to the Dean within 10 business days after receipt of the Student Promotions Committee's decision.

6. The chair of the Student Promotions Committee will submit to the Dean all materials relevant to the appeal that were considered by the Committee.

7. The Dean shall have the discretion either to determine the appeal personally or to appoint an ad hoc committee or designee to consider the appeal and to make a recommendation to the Dean.

8. If the Dean will personally consider the appeal, the Dean will review the written appeal and may, at the discretion of the Dean, meet with the student to discuss the appeal.

9. The Dean will forward a written decision to the student within 10 business days after receiving the appeal.

10. If the Dean appoints an ad hoc committee or a designee, the committee or designee will review the written appeal and may meet with the student to discuss the appeal.


© 2022 *Handbook of Institutional Policies and Operating Procedures*


**PRINTED POLICIES MAY HAVE BEEN UPDATED – SEE CURRENT POLICIES ONLINE**

11. The ad hoc committee or designee will forward a written recommendation to the Dean within 10 business days after the ad hoc committee has heard the appeal.
12. The Dean will consider the ad hoc committee's or the designee's written recommendation and will forward a written decision to the student within 10 business days after receiving the recommendation.
13. The decision of the Dean is final.

## Definitions

**Academic dismissal** – a permanent separation of the student from the medical school because of inadequate academic performance or progress.

**Academic probation** – the student's academic performance or progress does not meet the standards required to advance in the program and requires the repeat of a year. Academic probation may be reportable to licensing boards.

**Academic suspension** – a temporary separation of the student from the medical school for a specified period (normally no more than one year) because of inadequate academic performance or progress.

**Academic warning** – serves as a warning to the student of inadequate academic performance or progress, but does not require the repeat of a year and is not reportable to most licensing boards.

## Contacts/For Further Information

UT Southwestern Medical School 214-648-2509

## Policy History

January 11, 2024: Added a provision about dismissal for students pursuing a dual M.D./Ph.D. degree through UT Southwestern's Medical Scientist Training Program.

October 2, 2023: Added a timeline of 10 business days to forward the written, final decision of a grievance in a grade received for preclerkship, core clerkship, or other required courses.

November 9, 2022: Added that a student may appeal the first level of grade grievance within five (5) days of the student's receipt of the decision.

October 3, 2022: Completed scheduled review; updated the Grade Grievance Procedure to better align with the Medical School curriculum, allow the grade grievance committee sufficient time to meet and review appeals, and still ensure due process for students.

December 17, 2020: Added #6 under Grade Grievance Procedure to clarify when the grade grievance procedure does not apply.

May 28, 2020: Updated the Director of Enrollment Services to the Registrar.

January 3, 2019: Added clarification that the Student Promotions Committee has complete discretion when making academic decisions; added guidance for students who appeal an academic decision; and outlined the criteria and required approval for students who withdrawal from the Medical Scientist Training Program (MSTP) and wish to remain enrolled in the Medical or Graduate School.

November 22, 2016: Reviewed, revised, and published as EDU-402 Academic Decisions – UT Southwestern Medical School.

January 1998: Published as 3.6.12.1 Appealing Academic Decisions, Grades, and Dismissal in UT Southwestern Medical School.


© 2022 *Handbook of Institutional Policies and Operating Procedures*


**PRINTED POLICIES MAY HAVE BEEN UPDATED – SEE CURRENT POLICIES ONLINE**

# EXHIBIT F

UT Southwestern
Medical Center

May 9, 2025

**Via email: dhruv.nandakumar@utsouthwestern.edu**

Dhruv Nandakumar
2727 Inwood Road
Dallas, TX 75235

Dear Mr. Nandakumar,

The Student Promotions Committee ("Committee") met on Wednesday, May 7, 2025, to consider your professionalism deficiencies, as outlined in the Physicianship Evaluation Forms you received in September 2023 and March 2025. The Committee also considered notes and comments regarding your professional behavior from your supervising faculty in clinical rotations over your clerkship period, as well as your recent letter in response to the Committee. The Committee was particularly concerned about your persistent pattern of dishonesty, including knowingly accessing the anatomy lab without authorization and falsifying medical information about an unexcused absence. The Committee found that you have consistently failed to meet the standards of professional behavior required at UT Southwestern Medical School. After a thorough discussion of your lapses in professionalism and your inability to improve despite multiple counselling and warnings, the Committee voted unanimously to dismiss you from UT Southwestern Medical School. Your academic deficiencies in professionalism are incompatible with the standards required of a medical student and future physician.

Pursuant to EDU-402 Academic Decisions, you may appeal the decision by submitting a written appeal to the Chair of the Student Promotions Committee within 10 business days of receipt of this letter, on or before Friday, May 23, 2025, via campus mail (campus mail code 9073) or via email to Kevin Klein, M.D. Appeals can also be submitted via email to Angela Mihalic, M.D., Blake Barker, M.D., Norberto Rodriguez-Baez, M.D., or Sarah Baker, M.D. A copy of the Medical School's policy on appealing academic decisions, EDU-402, is enclosed.

If you have any questions concerning the Committee's decision, please contact the Associate Deans for Student Affairs at 214-648-2168.

Sincerely,

Kevin Klein, MD

Kevin Klein, M.D.

Professor of Anesthesiology and Distinguished Teaching Professor
Chair, Student Promotions Committee
UT Southwestern Medical Center

cc: Angela Mihalic, M.D., Dean of Medical Students and Associate Dean for Student Affairs

# EXHIBIT G

Dear Dr. Klein,

Thankyou for considering my appeal. Attached are my letter of appeal along with some supporting documentation in support of my integrity, professionalism, and ability to continue my medical education. I have provided an outline of the included content below.

Sincerely,

Dhruv Nandakumar, MS3

**Content**

1. Appeal Letter
2. Character Letters (3)
   a. Dr. Salman Bhai; Assistant Professor Department of Neurology
   b. Manuel Lubinus (PhD): Chief Science Officer, MSU
   c. Dr. Brancaccio; Mentor, Internal Medicine Professor
3. Letter from Psychiatrist – Dr. Isabel A. Clark
4. Evaluations from UTSW faculty during clerkship
5. First appeal letter sent to committee in early May

**Appeal of Dismissal – Dhruv Nandakumar, S188944**

Dear Dr. Klein and Members of the Appeals Committee,

I am writing to respectfully appeal the Student Promotions Committee's decision of May 9, 2025, to dismiss me from medical school due to lapses in professionalism. I fully accept responsibility for the actions that led to this decision, which occurred in September 2023 and March 2025. As I explained in my initial letter to the committee, I am deeply remorseful for my actions, and they do not reflect my character. I am taking this opportunity to explain how I've reflected, grown, and ***taken deliberate steps to ensure that such incidents will never be repeated.***

Upon reflection, I better understand how untreated anxiety and impulsiveness influenced my decision-making. In September 2023, I stepped into the corridor to the lab driven purely by the impulse to help other students who had reached out to me for help given I was a TA the previous summer with no malicious intent. Only once I acted on that impulse did I realize that I could have simply checked with the lab supervisor before entering. ***My overwhelming anxiety combined with my untreated impulsivity shaped my responses in moments of high pressure—not from a place of dishonesty, but from anxiety and confusion***.

In the second instance when I sent the picture of the covid test (March 2025), my overwhelming anxiety surrounding confrontation and desire to escape that anxiety combined with insomnia and illness drove me to make another impulsive decision. This context is not an excuse, but reflects the reality of the mental health challenges I was facing at the time . These incidents do not define me and have been a wake-up call, representing a pivotal turning point in my personal and professional development.

***I have made several key changes to my mental and well-being care. I am currently following an enhanced treatment plan under the care of my psychiatrist (documentation attached).*** I'm also engaged in regular therapy, where I've developed daily coping strategies including mindful meditation and yoga to reduce anxiety, journaling for self-reflection, and structured daily routines to maintain consistency and control. These tools have helped me regain clarity, reduce impulsivity, and manage stress more effectively.

Even as I navigate this difficult period, I have been able to effectively continue onto my sub-internship in a professional and thoughtful manner. My residents, some of whom have interacted with me before my therapy or medications, have remarked on how much more calm and professional I am. This can be attested to by Dr. Kasseff. I believe this demonstrates not only my readiness to continue in the program, but also my ability to professionally provide patient care while managing stress and adversity.

Over the past three years, I have worked hard—excelling academically and professionally during clinical rotations. The unfortunate incidents are stark outliers. Attached is a summary of positive feedback from faculty members that speaks to my character, integrity, and work ethic.

Since my younger days I have faced health challenges and want to connect with others who are facing similar obstacles. This experience has fueled my passion for medicine and my dedication to providing compassionate, honest, and ethical care. Becoming a physician is not simply a career choice- it is my calling.

Dr. Klein, I respectfully ask that my dismissal not be the final word in my journey. These past 3 months have been an incredibly difficult period of introspection, accountability, and healing. ***I have learned painful but invaluable lessons, and I am committed to continuing this growth. I am willing to comply with any conditions the Committee may impose, including mentorship, professionalism and ethics workshops, and/or structured oversight.***

I respectfully request that you accept my sincere apology, consider the context of my mental health challenges, and recognize the meaningful, sustained efforts I am taking to grow even under intense pressure. I hope I have demonstrated that these incidents were isolated and uncharacteristic, and that I possess the integrity and resilience to move forward successfully.

Thankyou for your time and consideration

Sincerely,
Dhruv Nandakumar
S188944
Dhruv.Nandakumar@UTSoutwestern.edu

Salman Bhai, MD
Assistant Professor, Department of Neurology
UT Southwestern
Salman.Bhai@UTSouthwestern.edu
May 20, 2025

Ethics Committee
UT Southwestern

RE: Character Reference for Dhruv Nandakumar

Dear Members of the Committee,

I am writing this letter in strong support of Dhruv Nandakumar, a medical student with whom I have had the privilege of working closely for the past two to three years in my capacity as his research mentor. Over this time, I have come to know Dhruv well, and I would like to speak to his character, professionalism, and potential in the field of medicine.

From our earliest interactions, Dhruv impressed me with his integrity, diligence, and unwavering commitment to learning. He has demonstrated himself to be morally grounded, deeply trustworthy, and intellectually curious, qualities that are foundational in both academic research and clinical medicine. He has been a consistently reliable contributor to our research efforts, often going above and beyond what is expected. He engages in scientific discourse with humility and thoughtfulness, and he has always shown respect for the collaborative and ethical dimensions of academic work.

Recently, Dhruv shared with me a lapse in judgment that occurred during one of his clinical rotations. It took courage and integrity to disclose this mistake, and he did so without excuse or minimization. He expressed deep remorse and took full responsibility for his actions. I was struck by his sincerity and the level of insight he brought to our conversation. He understands the seriousness of the situation and is actively working on a structured plan to remediate the behavior and improve his stress management strategies going forward.

While I do not condone the mistake he made, I firmly believe that this incident does not define who he is. It is, instead, an opportunity for growth and reflection—something I have already witnessed in him. I have seen firsthand his professionalism, empathy, and resilience over several years. Based on this broader context, I remain confident in his ability to emerge from this experience stronger and better equipped to serve patients and colleagues alike.

I urge the committee to exercise discretion and to view this as a teachable moment rather than a disqualifying one. Dhruv has the moral compass, humility, and maturity to learn from this experience and to use it as a foundation for personal and professional development. I am certain he will be a tremendous asset to the medical profession and will contribute meaningfully to patient care and medical scholarship.

Please feel free to contact me directly should you require any further insights. I appreciate your thoughtful consideration of this letter.

Sincerely,
Salman Bhai, MD
Assistant Professor, Department of Neurology
UT Southwestern

Salman.Bhai@UTSouthwestern.edu
Cell: 214-405-2808

MSU Myositis Support & Understanding
EMPOWERING THE MYOSITIS COMMUNITY

To Whom It May Concern,

I am pleased to write this letter in support of Dhruv Nandakumar, a third-year medical student who has been an invaluable part of our Burden of Disease study at Myositis Support & Understanding. I have had the pleasure of working closely with Dhruv for the last three years, and have observed firsthand his commitment, competency, and strong work ethic.

Dhruv played a key role in our study, particularly in summarizing the extensive data from the Myositis Burden of Disease study for various publications. He assisted with data analysis, literature reviews, and statistical evaluations, showing great attention to detail and a keen understanding of medical research. His contributions were integral to advancing the study and ensuring the accuracy and completeness of our findings to submit for publication.

Beyond his technical skills, Dhruv's personal qualities stood out. Dhruv wanted to get involved in research projects with MSU even before he joined medical school and was very interested in our work with patients. He is a highly motivated individual with a natural curiosity, enthusiasm and eagerness to learn. His ability to tackle complex tasks with perseverance and precision was evident throughout the study. Dhruv's professionalism and dedication were matched by his strong communication skills, allowing him to collaborate effectively with the teams at UTSW and MSU.

In conclusion, I wholeheartedly recommend Dhruv for any future academic or professional opportunities. His strong character, dedication to his work, and excellent skills will make him an asset to any team. Please feel free to contact me should you require any additional information.

Sincerely,

Manuel Lubinus

Manuel Lubinus
mlubinus@understandingmyositis.org
Chief Science Officer

Office: 214.477.3246

UTSouthwestern Medical Center

Anne Brancaccio, MD
Associate Professor, General Internal Medicine
North Texas VAMC
4500 L:ancaster Ave
Dallas, TX

May 22. 2025

To Whom It May Concern,

I am writing to support my mentee, Dhruv Nandakumar's appeal to his expulsion from UTSW Medical School. I am quite frankly, shocked that he was expelled.

I have known Dhruv since he started medical school in August 2022. From the start of medical school, Dhruv has shown himself to be a hardworking, capable medical student. He was instrumental in founding a UIL physical program at Woodrow Wilson High School through the Sports Medicine Program. To be clear: there would be no program without him. This year he missed one of the sessions at the high school, and a student and one of the teachers asked me where he was. He has taken time out of his schedule to do last minute physicals for athletes from underprivileged backgrounds so they can compete in high school sports.

He has taught the MSs2 and MS1s in my mentee group more than any other medical student I have ever had, including Senior Mentors. He takes extra time to help them review subjects such as OSCE prep, and refining oral presentations. I have coined the phrase "You need to Dhruv that" when they need help from him.

I had the pleasure of supervising Dhruv for a full month on his Third year rotation in IM at the VAMC, and he did a fantastic job. He showed true compassion for his patients, and showed a maturity beyond his age. At the end of the rotation, I opened his evaluation in MED HUB, and reviewed it with him (as I do with all my students). The evaluation was not signed, pending my final review with the course directors. Due to administrative issues completely beyond his control ( or mine) , there was no final review, and my evaluation—giving him honors – was not calculated into his final grade, and he received a pass. I was never made aware of this by the clerkship directors; Dhruv made me aware and I was livid. He was told there was nothing neither he nor I could do about it. Upon calling the leadership in IM, I was told the same thing. Although he was shaken by this experience, I was impressed by his ability to return strong from adversity. He told me several times "I can't do anything about this, so I will just go forward".

To be perfectly clear, I have seen absolutely no behavior that would warrant expulsion from medical school. In fact, I have seen the opposite, I see an honest, reliable, and dedicated young man that I am proud to have as my Mentee. I hope you carefully review his record and give him the consideration he deserves. Please let me know if I can be of any further assistance .

Sincerely,

ANNE BRANCACCIO
Digitally signed by ANNE BRANCACCIO
Date: 2025.05.22 10:36:13 -05'00'

To Whom It May Concern:

Dhruv has been under my care since 10/15/24 at which time we identified an untreated anxiety disorder and issues with impulsivity and started treatment which included Lexapro. After starting medication, he noticed improvements in his anxiety, insomnia, and impulsivity. We increased Lexapro to 20 mg in 11/2024 and further to 30 mg in 01/2025 and he appreciated additional benefit. At that time, he was also taking trazodone for insomnia.

Although his psychiatric state was improving, I became aware of the significant degree of stress he was under from not only his medical education but also familial and relationship stressors that were perpetuating his anxiety and recurrent panic attacks. During the unfortunate events that took place on his surgery rotation,multiple acute stressors combined with excessive caffeine use led to a decompensated psychiatric state that certainly contributed to his impaired judgement and impulsivity.

I saw him in the clinic on 3/25/25 and at that time he had restabilized after getting adequate sleep with Trazodone. After this event, we added Seroquel for additional treatment of insomnia, discontinued caffeine use, and discussed a possible underlying attention deficit hyperactivity disorder. We started Strattera to target hyperactivity and impulsivity with very good effect. With medication, psychotherapy, partial resolution of stressors and adequate respite, Dhruv's psychiatric state stabilized, and he appreciated improvements in his mood, anxiety, hyperactivity, impulsivity and overall ability to self-regulate and to think and act with clarity and good judgement. From my perspective as one of his mental health providers, I have experienced Dhruv to be psychiatrically stable, reliable and with sound judgement since he has been on his current medication regimen. Additionally, he now has better insight into the importance of stress management, boundary setting and overall professionalism.

Sincerely,
Electronically signed by:
Isabel A. Clark, MD
May 21, 2025
S Building, 5323 Harry Hines Blvd, S Building / Dallas, Texas 75390-7208 / Fax: 214-648-3914/
utswmed.org

## EVALUATIONS FROM CLERKSHIP DIRECTORS AND FACULTY

1.Dr. Johnson, Matthew: **Outstanding in almost every category including professionalism**

Clerkship: SCH 1703 - SCH ACT-CLIN & TRANSL RESEARCH
Rotation: 02/12-05/03/24
**Demonstrates an honest, professional manner, makes the workplace a fun and professional environment. Outstanding role model and an inspiration for others.**

2.Dr. Murphy, Susan **Ranked as outstanding in almost every category including professionalism**
Clerkship: AMB 1804 - AMBULATORY CARE CORE CLERKSHIP
Rotation: 07/01-08/09/24
**Dhruv was the best student we have had rotate through our clinic in many years.**

3.Evaluator: Dr. Gruen, Judah **Outstanding in professionalism**
Clerkship: AMB 1804 - AMBULATORY CARE CORE CLERKSHIP
Rotation: 07/01-08/09/24
**Demonstrates an honest, professional manner, makes the workplace a fun and professional environment. Outstanding role model and an inspiration for others.**

4.Evaluator: Dr. Arar, Stephanie **Outstanding across every area including professionalism**
Clerkship: PED 1803 - PEDIATRICS CORE CLERKSHIP
Rotation: 09/30-10/04/24
**Dhruv is an exceptionally hard-working and thoughtful student. He is very passionate about learning as well as succeeding on his rotations. He reads extensively (truly) and uses relevant resources (not random case reports, but CPG, etc) to help guide his management. He has great critical thinking skills that allow him to adapt the knowledge he gains from the literature to his patients and their unique circumstances. He is engaged throughout rounds, not just on his patients, and asks questions that elevate the learning of the whole team.**

Evaluator: Dr. Kerber, Irwin **OUTSTANDING across every category including professionalism**
Clerkship: OBG 1807 - OB/GYN CORE CLERKSHIP
Rotation: 11/04-12/13/24
Interactive, confident, superior student

5. Evaluators: Dr. Stephens, Jasmine and Dr. Khandai, Abhisek **Outstanding across every category including EXCEPTIONAL PROFESSIONALISM**

Clerkship: PSY 1806 - PSYCHIATRY CORE CLERKSHIP

- Exceptional sensitivity and empathy
- Exceptionally conscientious. Outstanding in attendance, dependability, and punctuality in team activities and patient care responsibilities. Makes extra effort to be an integral team member. Assumes a high level of patient care responsibilities.

6. Evaluator: Dr. Habib, Amyn **Close to outstanding in professionalism**
Clerkship: NEUR 1805 - NEUROLOGY CORE CLERKSHIP
Rotation: 01/06-01/31/25
I am quite pleased with Dhruv's performance during this rotation. He demonstrated an enthusiasm and interest in Neurology that was refreshing. His fund of knowledge was superior. Overall, a strong performance.

7. Evaluator: Dr. Pearson, Mary **Outstanding in professionalism and attitude**
Service: Ambulatory
Clerkship: OBG 1807 - OB/GYN CORE CLERKSHIP
Rotation: 11/04-12/13/24
Outstanding in professionalism and attitude

8. Evaluator: Dr. Bush, Amanda
Service: Gynecology C
Clerkship: OBG 1807 - OB/GYN CORE CLERKSHIP
Demonstrates an honest, professional manner, makes the workplace a fun and professional environment. Outstanding role model and an inspiration for others.

9. Evaluator: Dr. Liu, Christine **Ranked outstanding in every category including professionalism**
Clerkship: FAM 1802 - FAMILY MEDICINE CORE CLERKSHIP

Rotation: 02/03-02/28/25
Dhruv has an excellent fund of knowledge! He is concise yet thorough presentations with a stated differential and a/p. He was able to get really great histories, chart checked well. He is functioning well above his expected level of training! Great to work with him! He was only assigned to work with me one day this month, but he asked to work with me two more, which I welcomed!

10. Evaluator: Dr. Chukwurah, Atiya **Outstanding in every category**
Clerkship: FAM 1802 - FAMILY MEDICINE CORE CLERKSHIP
Rotation: 02/03-02/28/25
Demonstrates an honest, professional manner, makes the workplace a fun and professional environment. Outstanding role model and an inspiration for others.

11. Evaluator: Dr. Kha, Priscilla
Clerkship: FAM 1802 - FAMILY MEDICINE CORE CLERKSHIP
Rotation: 02/03-02/28/25
Dhruv displayed an exceptional attitude while working in a busy community clinic. He demonstrated efficiency at gathering pertinent information and also developing thoughtful differentials and action plans while under the time pressure of clinic. He is a valuable team player, hard worker, and an asset to any residency and healthcare team.

12. Evaluator: Dr. Gu, Jane
Clerkship: FAM 1802 - FAMILY MEDICINE CORE CLERKSHIP
Issue Date: 2/5/2025
Completed: 2/24/2025
Dhruv is an exceptional medical student who displays professionalism, compassion, and a curiosity to learn more. He was enthusiastic to see patients and well-prepared with his pre-charting. He completed a thorough history and physical in a time-efficient manner while building a strong rapport with his patients. It is clear he has a strong fund of medical knowledge, and his plans were evidence-based and detailed. He works at an intern level, and he will be a strong resident and PM&R physician in his future. We will welcome him back in our clinic anytime!

13. Evaluator: Dr. Tsai, Shirling **Close to outstanding in all areas of evaluation**
Service: VA III
Clerkship: SUR 1808 - SURGERY CORE CLERKSHIP
Rotation: 03/03-05/09/25

This assessment is based on feedback from all the attendings, residents and fellows on the service. Everyone enjoyed having Dhruv on the service. He was clearly very knowledgeable and asked excellent questions. Very engaged in the OR. Oral presentations were well organized and prepared. Great attitude and fun to be around. Very short time on the service, but did a great job!

Dear Student Promotions Committee,

First and foremost, thank you for allowing me to present my story to you. I sincerely apologize for my previous actions, and I truly hope you will understand that my actions were not a reflection of who I am or the physician I hope to become. I take full accountability and am deeply remorseful for the mistakes I made. There was no malintent behind any of my actions.

I would now like to provide some insight into the circumstances that led to these events. Please do not read these as excuses, but rather as context to highlight how I have changed, as well as the steps I am taking to be a better student and future medical provider. I hope as a committee, you can offer me a second chance with the confidence that you will not have any issues with me in the future.

During the first incident in question, I was asked by younger medical students to assist them in the anatomy laboratory. Given that I was a TA the previous summer, I was more than eager to assist, as teaching had always been a passion of mine. Looking back, however, I wish I had simply asked the lab supervisors if I could enter the lab to help the students. This would have avoided any problems for me, the students, and the lab staff. The overwhelming impulse to help was the only thing occupying my thoughts at the moment, and I entered without asking permission. When the lab supervisor saw me, I started blabbering excuses rather than accepting accountability and explaining my reasoning. I was scared to get into trouble and was experiencing compounding stress at school and home. After this incident, I looked at the event as a learning experience but did not seek help from a psychiatrist or other people I trust.

After this incident, I now recognize how much my compounding stresses were affecting me. I struggled with recognizing social cues and adapting to a team environment. Additionally, I began to experience health problems that plagued my day-to-day tasks and made me struggle to adapt to my first clerkships. These health issues presented as aggressive acid reflux. Within the course of 4 months, I endured multiple

endoscopies, became food averse losing 30 pounds, and was only able to sleep 3-4 hours a night. I saw several GI doctors who put me on medications that were not helping to reduce my symptoms. In an act of desperation, my mom called a family friend, a GI doctor, who recognized my acid reflux was related to extreme stress and began waning me off the PPI I was on at our appointment. Additionally, I saw Dr. Clark in psychiatry at the recommendation of my PACE advisor, who diagnosed me with GAD (Generalized Anxiety Disorder), adjustment disorder with depression and anxious mood, and initially started me on 10 mg of Lexapro and 50 mg of Trazodone for sleep.

Over the course of the next few clerkships, I learned to control my anxiety. My interactions with people became much more pleasant as I learned when to speak and how to be receptive to criticism. I achieved near honors on ambulatory, honors on psych and pediatrics, near honors on ob-gyn, and honors on neurology and family medicine. However, there were moments when anxiety still threatened to overwhelm me, and I would go to the restroom for a bit to cool off. After this happened, Dr. Clark increased my Lexapro dose to 20 mg and then 30 mg, and things improved again.

Right before my trauma clerkship started, an onslaught of personal tragedies triggered the onset of intense stress and anxiety to the point where I did not sleep for six straight days due to my racing thoughts at night. During this time, I attended my first trauma shift, in which I desperately tried to take naps but was unable to; instead, I chose to fill myself up with 500-600 mg of caffeine to keep myself going through the day. I felt extremely down physically and mentally. However, I was fearful to be honest about what was going on. Feeling “overwhelmed” and “depressed” did not seem like a valid reason to take a break. That following Friday morning, my pre-call day, I woke up with a cough, fever, chills, and myalgias. Per the Covid-19 employees’ grid, I was worried that I had Covid and needed to stay at home and recuperate and emailed my team saying that I had covid and would need to be out until I was afebrile and symptom free. When a faculty member asked me for same-day proof of a positive covid test, I first contacted Occupational Health who were closed. I was then asked to go to an urgent care the same day to get a test. I felt anxious, desperate, and physically and mentally unable to satisfy the request, at which point I made the very poor decision to take a stock image of a Covid test online and say I got tested. I am not proud of this; this decision was not right. The physician later called me out regarding the test’s invalidity and accused me of abusing the absence policy. Once again, out of desperation, I said I would come in with a mask the next morning for my shift.

I made a massive mistake by coming into my shift the next morning. I recognized my deteriorating mental health impaired me and should have asked for help. At the time, I

was trying so hard to keep all my personal relationships and my academic career together that being honest about my mental health would have made me feel like a failure. Looking back on my behavior during that shift, I see a completely foreign person. I was falling asleep in the operating room, wandering off while my team was talking to me, being loud, and touching equipment without proper PPE. I was completely not in control of my actions and impulses. I felt like I was on the outside looking in.

The Monday after that shift, I met with the physician and received a professionalism form. I met with Dr. Baker and Dr. Mihalic soon after, who gave me a letter detailing some of the events that occurred on that shift. Reading the letter, flashbacks replayed across my eyes that didn't even exist in my conscious memory. I completely broke down. I shared with them the personal tragedies that had occurred in my family and my deteriorating physical and mental health, and my lack of sleep for now eight straight days at this point. They referred me to Student Academic Support and an appointment with Dr. Clark. I thank these mentors for recognizing that I needed help when I wasn't well enough to realize it myself.

Subsequently, Dr. Clark increased my dose of trazodone and prescribed me Seroquel 50 mg acutely to help me sleep. I also met with Dr. Davis for therapy and have continued regular meetings with both Dr. Clark and Dr. Davis. Dr. Clark and I explored the possibility of me having ADHD, and after discussing this with her, I realized what a huge role impulse control has played in my struggles. We started Strattera about 7 weeks ago, and now I feel like a completely different person, as I can now speak slower and think before I act. My meetings with Dr. Davis have helped me implement strategies to not rush into things and avoid letting things escalate to the point where they can become harmful. These strategies include:

- Implementing a rule where I wait 5 seconds after another person is speaking to collect my thoughts and think about consequences before I respond
- Doing meditation and yoga with breathing techniques to become more sensitive to physical and mental signs indicating when I need to take a step back and relax
- Setting check-ins with myself 3 times per day to:
    1. Plan for the day
    2. Evaluate how the day is going

3. Identify concrete things to improve upon

I have also had conversations with my care team, my family/friends, and my academic advisors about holding me accountable for speaking to them when I am feeling off. Most importantly, I have reflected on how my mistakes could have been avoided if I had felt comfortable with being honest about my mental health. Additionally, I would like to ensure other students are equipped with the tools they need to succeed and heal if facing similar issues as I have. This is why I have applied to be a peer advocate for next semester and hope to continue to advocate for mental health informally amongst my classmates.

The past three years of medical school have been both academically and personally challenging, and there are many lessons I wish I could have learned earlier. I hope you can see that I have learned them now. I have learned to intentionally pause and think before I speak and act, prioritize my well-being, and set personal boundaries. After all, how can I help others if I can't help myself? Regardless of the circumstances, I want to express full accountability for my mistakes. Not checking into the lab before I entered was a mistake. Stating that I had COVID-19 and sending a stock image test rather than being honest about my mental and physical health was wrong. Coming into work while being mentally unwell and putting myself in harm's way was wrong.

Once again, I am incredibly sorry for my previous behavior and am thankful that no patient was harmed by my actions. After reading my statement, I hope you can see I am actively taking and implementing steps to prevent anything like this from happening again. I know actions speak louder than words, and I hope I can show you that I have learned from my mistakes through my conduct moving forward. I would like to use this situation as an opportunity for learning and growth, and not have it be detrimental to my medical education and future. I want to accomplish my dream of becoming a PM&R physician and was grateful to recently be accepted for an away rotation at Harvard where I will represent the school with distinction and professionalism. I humbly ask that you grant me understanding, flexibility, and compassion in holding me accountable for what I acknowledge was a mistake.

If you have any questions for me, I am happy to speak with any of you to answer them. Thank you again for your time and consideration.

Sincerely,

Dhruv Nandakumar

# EXHIBIT H

UT Southwestern
Medical Center

May 29, 2025

**Via email:** dhruv.nandakumar@utsouthwestern.edu
Dhruv Nandakumar
2727 Inwood Road
Dallas, TX 75235

Dear Mr. Nandakumar,

The Student Promotions Committee ("Committee") met on Wednesday, May 28, 2025, to consider your appeal of its May 7, 2025, decision to dismiss you from UT Southwestern Medical School. The Committee considered your written appeal, all the supporting documentation you submitted, and your oral presentation at the meeting.

After careful deliberation and based on all the available information, the Committee decided to deny your appeal and uphold its decision to dismiss you from medical school. The decision was based on your entire academic record, with particular concern noted about your repeated instances of unprofessional and in some instances dishonest behavior. The Committee was sympathetic to the stressful conditions you state you were undergoing but in their academic judgment, stress does not excuse your pattern of professionalism lapses, especially your unethical response when confronted with concerns about your behavior. The Committee also noted that your summation of your evaluations was incomplete, inaccurate, and misleading, further confirming the Committee's concerns about your deficiencies. Your unprofessionalism does not meet the academic standards of UT Southwestern Medical School.

Pursuant to EDU-402 Academic Decisions, you may appeal this decision by submitting a written appeal to W.P. Andrew Lee, M.D., Dean of Southwestern Medical School, within 10 business days of receipt of this letter, on or before Thursday, June 12, 2025. A copy of the Medical School's policy on appealing academic decisions, EDU-402, is enclosed.

If you have any questions concerning the Committee's decision, please contact the Associate Deans for Student Affairs at 214-648-2168.

Sincerely,

Kevin Klein, MD

Kevin Klein, M.D.
Professor of Anesthesiology and Distinguished Teaching Professor
Chair, Student Promotions Committee

UT Southwestern Medical Center

cc: Angela Mihalic, M.D., Dean of Medical Students and Associate Dean for Student Affairs

# EXHIBIT I

UTSouthwestern
Medical Center

**W. P. Andrew Lee, M.D.**
Executive Vice President for Academic Affairs and Provost
Dean, UT Southwestern Medical School

Professor of Plastic Surgery
Atticus James Gill, M.D. Chair in Medical Science

July 7, 2025

Mr. Dhruv Nandakumar, MS3
UT Southwestern Medical School
***Via Electronic Mail:*** Dhruv.Nandakumar@utsouthwestern.edu

Dear Mr. Nandakumar:

Pursuant to EDU-402 Academic Decisions - UT Southwestern Medical School, I designated Daniel Scott MD, Professor and Vice Chair of Education in the Department of Surgery, to review your appeal and make a recommendation to me. Dr. Scott's recommendation dated June 23, 2025, is enclosed. Dr. Scott did not find sufficient basis to overturn the decision of the Student Promotions Committee (SPC) dismissing you from medical school.

After careful consideration of all the available information, I have decided to accept Dr. Scott's recommendation, and I uphold the decision of the SPC to dismiss you from medical school. I understand this outcome is disappointing. However, I agree with the SPC and Dr. Scott that your persistent pattern professionalism deficiencies over an extended period does not meet the academic standards required of UT Southwestern medical students.

In accordance with EDU-402, my decision is final in all respects.

Sincerely,

W. P. Andrew Lee, M.D.
Executive Vice President for Academic Affairs and Provost
Dean, UT Southwestern Medical School

Cc: Registrar
Kevin Klein, MD
Angela Mihalic, MD

UT Southwestern
Medical Center

**CONFIDENTIAL MEMORANDUM**

TO: W.P. Andrew Lee, MD
Executive Vice President for Academic Affairs and Provost
Dean, University of Texas Southwestern Medical School

FROM: Daniel J. Scott, MD
Frank H. Kidd, Jr. MD Distinguished Professorship in Surgery
Assistant Dean, Simulation & Student Integration, Graduate Medical Education
Director, UT Southwestern Simulation Center

DATE: 6/23/25

RE: Review and Recommendation Regarding the Appeal of Dhruv Nandakumar

---

At your request, I have reviewed the appeal of Dhruv Nandakumar, who is seeking reversal of the decision by the Student Promotions Committee (SPC) to dismiss him from medical school. Dhruv Nandakumar has requested to be reinstated and allowed to complete his medical education. I conducted my review in accordance with EDU-402 Academic Decisions – UT Southwestern Medical School.

As part of my review, I considered the following:

1) Dhruv Nandakumar's written appeal to you, with all supporting documentation.
2) All material considered by the SPC submitted to you by the Associate Dean for Student Affairs, including all prior SPC decisions and Dhruv Nandakumar's appeal of his dismissal to the SPC.

Because the written material was comprehensive, I determined a meeting with Dhruv Nandakumar to discuss the appeal was not necessary.

I reviewed Dhruv Nandakumar's dismissal within the context of his entire academic history. Below is a summary of relevant information:

- Dhruv Nandakumar received his first professionalism form in September of his MS2 year.
    - Professionalism Form 1 (9/6/2023): Fulfilling responsibilities in a reliable manner, maintaining honesty
        - Worked as TA for Human Anatomy during Summer 2023 but not hired for 2023 Human Structure Course. He was aware of the strict policy against unauthorized access to the Willed Body Corridor/cadaver lab and was notified on August 9 that he would not be a TA for the 2023 HS course.
        - On August 18, he was found inside the TA prep room within the Willed Body Corridor. Video footage suggested that he knew he no longer had

access because he was seen repeatedly knocking on door to cadaver lab, attempting to get one of the MS1 students to let him in. He would periodically look through the door window, stepping out of view of being seen by faculty.

        - He told Anatomy Faculty that he was trying to help some MS1 students and that he did not realize that he was not authorized to be there. He told the SPC that he did not want to let the students down, as he had promised to tutor them. He said that he could not stop himself from entering and impulsively provided excuses when confronted by Anatomy Faculty.

- The next concerns arose during his Internal Medicine Clerkship in August 2024, although these did not prompt a professionalism form
    - Dhruv was noted by residents and faculty to lack insight on social ques from both patients and team members. These observations are documented in his evaluations in MedHub.
- There were additional concerns during his Psychiatry Clerkship in October 2024, although these also did not prompt a professionalism form
    - He called the Clerkship Director, Chad Lane, early on Sunday morning, asking about a missing MedHub evaluation.
    - When asked about this, he said that he became very anxious about the evaluation not being submitted and thought he was calling the clerkship coordinator.
- He received his next professionalism form in Spring of his MS3 year.
    - Professionalism Form 2 (3/24/2025): Multiple areas of deficiency
        - After telling other students on his team that he was sick with COVID-19 and attaching a stock image of a COVID-19 test to this communication (indicating that this was his positive test), he reported that he had COVID-19 to the Associate Clerkship Director, Tom Shoultz. Due to concerns that he was lying about the COVID-19 test, Dhruv was asked to get tested by Occupational Health and, since it was after hours, a local urgent care. This was when he attached the same stock COVID-19 test image to an email to Dr. Shoultz, indicating that this was his positive test. When confronted by Dr. Shoultz, he admitted his deception. Around this same time, multiple other concerning behaviors were documented:
        - Loud cursing in patient care areas and making disparaging comments about attendings and patients
        - Touching an endoscopy with patient secretions without PPE

UT Southwestern
Medical Center

    - Not reporting to the trauma bay promptly when directly instructed to do so, instead insisting on going to his car to change clothes and being significantly delayed for unclear reasons
    - Unexplained absences from call room
    - Erratic behavior in the OR, nearly contaminating the sterile field
    - Napping on duty

- He was referred for a Fitness for Duty evaluation and placed on a leave of absence as required by policy until he was cleared to return to medical school by his health care provider and the Student Assistance Committee on April 11, 2025.
- Once Dhruv had been cleared to return, the SPC reviewed his professionalism concerns on 5/7/2025, in the context of his entire academic record, and voted to dismiss him from medical school.
    - He subsequently submitted a written appeal.
    - The Student Promotions Committee reviewed his appeal on 5/28/2025 and upheld its decision for academic dismissal.

I am sympathetic to the personal circumstances described in Dhruv Nandakumar's appeal. However, in my academic judgment, Dhruv Nandakumar has failed to meet the academic standards of the medical school based on his persistent pattern of professionalism deficiencies over an extended period of time. For these reasons, I do not find a sufficient basis to overturn the SPC's decision to dismiss Dhruv Nandakumar from medical school. My recommendation is that the SPC's decision be upheld in all respects.

If you have any questions about my review or this recommendation, please do not hesitate to contact me.

**Kelly Singleton**

---

**From:** DEPTINFO
**Sent:** Tuesday, July 8, 2025 5:24 PM
**To:** FinAidStaff; Student Accounting Team; SAATech; Arlene Sachs; Charlotte Haley; Student Health; Amy Villasana; Randall Duff
**Cc:** Angela Mihalic; Blake Barker; Hannah Cochran; Norberto Rodriguez-Baez; Holli Holbert; Ebony Williams; Jeanine Moore; Kelly Black; Colleges; Chris Faulkner; Amanda Arista; Children's Health Medical Education; Meredith McCabe; Dawn Cureton; Shelley Currie; Betty Shaw; Carmen Davis; Latrelle Cambridge; Adam Abercrombie; Stephanie Miller; Candace Wilson; Yesica Servin; Jasmine Fisher; Kelly Singleton; Suzette Smith; Teresa Hendry
**Subject:** Dhruv Nandakumar (188944) - MS3

Program Dismissal Notification

Student: Dhruv Nandakumar
EMPLID: 188944
Academic Level: MS3
Dismissal Date: 7/7/2025

Thank you,

**Kelly Singleton** (Working Remotely)
Assistant Registrar
Office of the Registrar
5323 Harry Hines Blvd.
Dallas, TX 75390-9162
Phone: 214-648-3606
Deptinfo@UTSouthwestern.edu

---

UT Southwestern
Medical Center
The future of medicine, today.

# EXHIBIT J

**Tatiana Gonzalez**

| | |
|---|---|
| **From:** | Loleta Wallace |
| **Sent:** | Wednesday, June 11, 2025 6:51 PM |
| **To:** | Tatiana Gonzalez |
| **Cc:** | Christine Truong |
| **Subject:** | Student accommodation \| Request to create Maxient file |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Please and thanks!

Loleta

---

**From:** Blake Barker <Blake.Barker@UTSouthwestern.edu>
**Sent:** Monday, June 2, 2025 9:23 PM
**To:** Loleta Wallace <Loleta.Wallace@UTSouthwestern.edu>
**Cc:** Dhruv Nandakumar <Dhruv.Nandakumar@UTSouthwestern.edu>; Angela Mihalic <Angela.Mihalic@UTSouthwestern.edu>; Sarah Baker <Sarah.Baker@UTSouthwestern.edu>
**Subject:** Medical student referral

Hi Loleta,

Cc'd is MS3 Dhruv Nandakumar. He is experiencing some health issues and was interested in more information about the medical accommodations process. If you could connect with him, we'd appreciate it.

BB

Get Outlook for iOS

---

UT Southwestern
Medical Center
The future of medicine, today.

**From:** Loleta Wallace <Loleta.Wallace@UTSouthwestern.edu>
**Sent:** Thursday, June 12, 2025 4:04 PM CDT
**To:** "20241736+utsouthwestern@efc.maxient.com" <20241736+utsouthwestern@efc.maxient.com>
**Subject:** Fw: 2nd attempt - SECURE MAIL | From the Office for Access & Title IX
**Attachment(s):** 2 CAS Student - Auth to Release Info.pdf *163kb*
3 CAS Student - Health Care Prof Certification.pdf *196kb*

---

**From:** Loleta Wallace <Loleta.Wallace@UTSouthwestern.edu>
**Sent:** Tuesday, June 10, 2025 1:02 PM
**To:** Dhruv Nandakumar <Dhruv.Nandakumar@UTSouthwestern.edu>
**Subject:** 2nd attempt - SECURE MAIL | From the Office for Access & Title IX

Hi Drhuv.

I am writing to follow up on the email below. Please let me know if you have questions or require additional guidance to submit an accommodation request.

Sincerely,
Loleta

---

**From:** Loleta Wallace <Loleta.Wallace@UTSouthwestern.edu>
**Sent:** Tuesday, June 3, 2025 9:58 AM
**To:** Dhruv Nandakumar <Dhruv.Nandakumar@UTSouthwestern.edu>
**Subject:** SECURE MAIL | From the Office for Access & Title IX

Hi Dhruv. Happy Tuesday!

The Office for Access and Title IX is responsible for processing reasonable accommodations for qualified applicants and learners, educating the campus community, and promoting equal access and opportunity for individuals with disabilities. **We recently received information that you may be interested in accommodations due to a potential disability.**

To begin the evaluation process for accommodations, you should submit a formal accommodation request using the following link: **Student-Learner/Applicant - Formal Request for Accommodation Due to Disability.** Additionally, we will need the attached forms - **Form 2 - Student Authorization** (for you to complete and sign) and **Form 3 - Healthcare Certification (**to be completed, signed, and returned to us by your physician).

Once you've submitted the online accommodation request, please use the highlighted link below to schedule a 30-minute meeting on a day that works best for you:

**Book time to meet with me**

For more information about our office and its services, please visit the following link: Office for Access & Title IX - UT Southwestern, Dallas, Texas.

I look forward to speaking with you soon!

Sincerely,

Loleta Wallace, M.A., SHRM-CP
Senior Equal Opportunity Specialist
Office for Access & Title IX
P | 214-648-4343
F | 214-648-4348
E | loleta.wallace@utsouthwestern.edu

---

**UT Southwestern**
Medical Center
The future of medicine, today.

# EXHIBIT K

UT SOUTHWESTERN
POLICY HANDBOOK

# EDU-103 Reasonable Accommodations for Qualified Applicants and Learners with Disabilities

## Chapter 10: Students, Postdoctoral Scholars, Residents, and Fellows

**Contents**

Policy Link
Policy Rationale and Text
Scope
Procedures
Definitions
Related Statutes
Appendices
Contacts/For Further Information
Policy History

**Administrative Information**

Responsible Office: Dean's Office
Executive Sponsor: Provost
Effective Date: 01/31/1998
Last Updated: 08/31/2023
Contact: policyoffice@utsouthwestern.edu

## Policy Link

To ensure appropriate access when sharing or linking to this policy, *copy and paste* this URL:

https://secure.compliance360.com/ext/VOfIFqaEqks=

## Policy Rationale and Text

Section 504 of the Rehabilitation Act of 1973, as amended (Section 504), and the Americans with Disabilities Act of 1990, as amended (ADA), prohibit discrimination against qualified individuals with a disability. In accordance with these and other federal and state laws, UT Southwestern is committed to providing equal opportunities for qualified applicants for admission and qualified learners with disabilities.

It is the policy of UT Southwestern that no qualified individual shall, based upon disability, be denied admission to, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in any program or activity at UT Southwestern. All qualified applicants who can perform the essential functions of the desired academic program, with or without reasonable accommodation, will be given equal consideration for admission without regard to disability.

This policy is intended to enhance collaboration among individuals with disabilities, faculty, administrators, and support personnel to ensure that all qualified individuals have an equal opportunity to pursue academic and professional goals at UT Southwestern, free from discrimination. Reasonable accommodations will be provided to enable an individual to participate in UT Southwestern's academic programs, services, or activities, unless doing so would cause undue hardship to the operations of UT Southwestern, cause an alteration or modification to a course or program to the extent it changes the fundamental nature of that course or program, or constitute a direct threat to health or safety.


© 2019 *Handbook of Institutional Policies and Operating Procedures*

All offices and individuals responsible for reviewing and analyzing medical or disability-related records as a part of the accommodations process will maintain the confidentiality of the information on a need-to-know basis to the extent required by law. These records must be maintained separately from other records and must be accessible only to authorized personnel. Medical and disability-related records information may be shared with faculty, administrators, staff, or other authorized individuals, as necessary, for UT Southwestern to (1) determine whether an applicant or learner is otherwise qualified for a program, (2) assess the applicant or learner's records, and (3) determine what accommodations are reasonable. First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment or if any specific procedures are needed in the case of fire or other evacuations. Government officials investigating compliance with applicable laws may also be provided relevant information as requested. Completed requests and forms will be maintained by the Office for Access & Title IX in a confidential manner, in accordance with applicable federal and state law and UT Southwestern's records retention policy.

Learners and applicants may initiate complaints alleging violation of this policy by contacting the Office for Access & Title IX in accordance with the procedure outlined in the Policy Against Discrimination section of the General Catalog. UT Southwestern prohibits retaliation against individuals who request reasonable accommodations or who submit a complaint or participate in an investigation regarding a violation of this policy. Individuals who engage in conduct prohibited by this policy are subject to disciplinary action, up to and including dismissal or non-renewal of appointment.

## Scope

This policy applies to all UT Southwestern learners and applicants to the UT Southwestern Medical School, UT Southwestern Graduate School of Biomedical Sciences, UT Southwestern School of Health Professions, and UT Southwestern Peter O'Donnell Jr. School of Public Health seeking accommodation due to disability. Employees and applicants for employment at UT Southwestern may request reasonable accommodations due to disability in accordance with ETH-152 Reasonable Accommodations for Qualified Applicants and Employees. Residents, fellows, and applicants for acceptance in any UT Southwestern graduate medical education training program may request reasonable accommodations due to disability in accordance with Graduate Medical Education policy Reasonable Accommodations for Qualified Residents with Disabilities. Members of the public may request reasonable accommodations associated with UT Southwestern services, programs, or activities in accordance with ETH-151 Equal Opportunity.

## Procedures

### Accommodations in the Application Process

1. All applicants are expected to read and follow this policy as well as carefully review the essential functions required of learners in the program to which the applicant seeks admission (Appendix A).

2. Applicants who wish to request reasonable accommodations in connection with required testing for application to a particular program (e.g., Medical College Admissions Test, Graduate Record Examination, etc.) may directly contact the organization administering the particular test.

3. Applicants who wish to request reasonable accommodations unrelated to any required testing in the admissions process must submit a written request to the Office for Access & Title IX as soon as practical and prior to the time an accommodation may be needed. The availability of accommodations, if any, may be affected by the timing of the request and the necessary coordination of efforts. It is the applicant's responsibility to provide any required documentation requested by the Office for Access & Title IX.


© 2019 *Handbook of Institutional Policies and Operating Procedures*

UT Southwestern Medical Center

**PRINTED POLICIES MAY HAVE BEEN UPDATED – SEE CURRENT POLICIES ONLINE**

4. The Office for Access & Title IX will work with the relevant school's designated point of contact for admissions or their designee to facilitate any accommodations to be provided to the applicant by UT Southwestern during the admissions process. See the appendices to EDU-119 Admissions for each school's designated point of contact for admissions.

5. Programs that receive requests for accommodations directly must forward those requests to the Office for Access & Title IX and refer the applicant to that office and this policy.

**Requests for Accommodations – Accepted Applicants and Currently Enrolled Learners**

1. Applicants accepted for admission will be provided a list of essential functions that all learners in their program must be able to perform, with or without reasonable accommodation, with their acceptance letters (Appendix A). Accepted applicants are expected to carefully review this list of essential functions and complete the Acknowledgement of Essential Functions (Appendix B). The completed Acknowledgement of Essential Functions is required as a part of the admissions process.

2. Accepted applicants who wish to request reasonable accommodations prior to enrollment should indicate their intention on the Acknowledgement of Essential Functions at the time they accept the offer of admission. Upon receipt of the completed Acknowledgement of Essential Functions, the Office for Access & Title IX will send accepted applicants who indicate that they want to request reasonable accommodations a copy of this policy, formal request forms, and further instructions regarding how to submit a complete request. Accepted applicants may contact the Office for Access & Title IX for information regarding how to request reasonable accommodations.

3. Accepted applicants are encouraged to complete and return all necessary forms and have their Health Care Professional return all supporting medical documentation to the Office for Access & Title IX at least 30 calendar days prior to the date of anticipated enrollment.

4. Currently enrolled learners may obtain a copy of this policy, a copy of a Formal Request for Accommodation due to Disability, and instructions regarding how to submit a complete request from the Office of the Registrar, the Office for Access & Title IX, or the Dean's office. This information is also available online.

5. Currently enrolled learners are encouraged to complete and return all necessary forms and have their Health Care Professional return all supporting medical documentation to the Office for Access & Title IX as soon as practicable after the learner first becomes aware an accommodation may be needed. If a learner is unable to submit a request for accommodation due to unexpected illness or incapacity, a request may be submitted on the learner's behalf.

6. All requests for accommodation must be accompanied by sufficient supporting medical documentation from a Health Care Professional. In order to enable UT Southwestern to evaluate the request, medical documentation must include a description of the nature of physical or mental impairment; the manner in which the impairment limits one or more major life activities; the expected duration of the impairment; and specific recommended accommodations. Applicants and learners are responsible for any costs associated with obtaining the necessary supporting medical documentation.

7. Supporting medical documentation must be current and based upon an evaluation no more than three (3) years old. Depending on the circumstances, UT Southwestern may require a more recent evaluation.

8. Supporting medical documentation must also contain sufficient information for UT Southwestern to determine that it was completed by an appropriate Health Care Professional, e.g., the professional's name and signature, basic credentials, and contact information.

9. In the event medical documentation is incomplete or insufficient, UT Southwestern may request additional information. UT Southwestern may also request that the accepted applicant or learner undergo a second evaluation or assessment.


© 2019 *Handbook of Institutional Policies and Operating Procedures*


**PRINTED POLICIES MAY HAVE BEEN UPDATED – SEE CURRENT POLICIES ONLINE**

10. The process for accepted applicants or learners to request reasonable accommodations is meant to be collaborative. All questions regarding the policy, procedure, necessary forms, sufficiency of medical documentation, etc., should be promptly directed to the Office for Access & Title IX. Failure to submit all necessary forms and sufficient medical documentation, or to participate in the accommodations process, may result in delay or denial of the request.

**Evaluation of Requests for Accommodations from Accepted Applicants and Currently Enrolled Learners**

1. Upon receipt of a completed request for accommodations, including all necessary forms and supporting medical documentation, the Office for Access & Title IX will contact the accepted applicant or learner to confirm receipt of the request. If the request is incomplete, the Office for Access & Title IX will work with the accepted applicant or learner to obtain additional information or forms, as necessary.

2. Requests for accommodation will be evaluated through an informal, interactive process involving the accepted applicant or learner, their program, and the Office for Access & Title IX. The Office for Access & Title IX may consult with members of the Academic Accommodations Advisory Committee (AAAC) during the interactive process. The primary purpose of the AAAC is to make recommendations regarding reasonable accommodations in light of the specific essential functions of the accepted applicant or learner's program. All meetings, communications, and deliberations by the AAAC are considered confidential.

3. The Office for Access & Title IX may, at its discretion, approve provisional accommodation for the accepted applicant or learner while the interactive process is ongoing.

4. The Office for Access & Title IX may grant accommodations that differ from the specific approaches suggested by the accepted applicant or learner or the Health Care Professional(s) providing documentation in support of the request, as long as the accommodations achieve the objective of nondiscrimination as required by law.

5. As soon as possible and within 30 calendar days after receipt of a completed request, the Office for Access & Title IX will notify the accepted applicant or learner in writing whether the request for accommodation has been approved or denied.

6. If the request for accommodation has been approved, the notice will contain a description of the nature of the accommodations the accepted applicant or learner will receive. The Office for Access & Title IX will notify appropriate program personnel of the accommodations an accepted applicant or learner is to receive. Accepted applicants or learners should notify the Office for Access & Title IX if their accommodation needs change.

**Leaves of Absence Due to Disability (Medical Leaves of Absence)**

1. This policy applies to learners who must interrupt study temporarily because of their own disability and want to take a leave of absence due to disability, which is also known as a medical leave of absence. Learners may request a leave of absence due to disability using the accommodation request procedures in this policy. Only the Office for Access & Title IX may approve a leave of absence due to disability. No one may approve a leave of absence due to disability for a learner outside of the procedures in this policy.

2. Learners who are approved for a leave of absence due to disability must complete a Leave Request Form, which their school will provide, for leave processing purposes only. The school will forward the Leave Request Form to the Office of the Registrar so that the Office of the Registrar can update the learner's enrollment status.

3. During an approved leave of absence under this policy, a learner is not enrolled and does not pay tuition. Learners may retain UT Southwestern email accounts or other access to UT Southwestern systems as appropriate during an approved leave of absence.

4. A leave of absence may impact the visa status of certain international learners; therefore, all international learners are encouraged to seek assistance from the Office of International Affairs.


© 2019 *Handbook of Institutional Policies and Operating Procedures*


**PRINTED POLICIES MAY HAVE BEEN UPDATED – SEE CURRENT POLICIES ONLINE**

5. A leave of absence may impact financial aid eligibility, loan deferment, or repayment terms; therefore, all learners are encouraged to consult the Office of Financial Aid to discuss their specific situation.

6. Learners approved for a leave of absence under this policy must comply with all requirements related to their leave, including but not limited to periodically updating their program and the Office for Access & Title IX regarding their plans for resuming their studies at UT Southwestern. Learners must notify the Office of the Registrar, appropriate school administrators, and the Office for Access & Title IX of any change in their contact information during their leave of absence.

7. Learners returning from a leave of absence due to disability must contact the Office for Access & Title IX at least 30 calendar days prior to their estimated return date. Before returning from a leave of absence due to disability, learners must comply with all requirements related to their return and verify that they can perform the essential functions of their program, with or without reasonable accommodation, which may require certification from a Health Care Professional. The Office of the Registrar is responsible for notifying learners of other generally applicable requirements that they must meet in order to return from leave, e.g., undergoing a new background check (see EDU-114 Background Checks).

8. A learner who timely returns from a leave of absence approved under this policy is not required to reapply for admission but must complete all coursework and meet all program or degree requirements prior to graduation, with or without reasonable accommodation.

9. A learner who does not timely return from an approved leave of absence may be deemed to have voluntarily withdrawn from UT Southwestern and may be required to reapply for admission, in competition with other applicants. Learners may request to extend a leave of absence due to disability using the accommodation request procedures in this policy. Extension requests must be received prior to the end of the approved leave period. If a learner is unable to submit an extension request due to unexpected illness or incapacity, a request may be submitted on the learner's behalf.

## DEFINITIONS

**Academic Accommodations Advisory Committee** – a committee of qualified faculty, staff, and administrators with the appropriate experience and training that will review accommodation requests submitted by accepted applicants and learners and make recommendations upon request from the Office for Access & Title IX.

**Essential Functions** – the cognitive, physical, educational, clinical, training, and other tasks that a student must be able to perform, with or without reasonable accommodation, in order to satisfactorily complete the curriculum of an academic program. Appendix A sets forth the specific essential functions for individuals in the UT Southwestern Medical School, UT Southwestern Graduate School of Biomedical Sciences, UT Southwestern School of Health Professions, and UT Southwestern Peter O'Donnell Jr. School of Public Health.

**Health Care Professional** – an individual who possesses the skills, knowledge, and professional credentials to assess whether an individual has a physical or mental impairment that limits one or more major life activities and to recommend reasonable accommodations. The term "Health Care Professional" may include physicians, psychiatrists, psychologists, nurses, physical therapists, occupational therapists, speech therapists, vocational rehabilitation specialists, and licensed mental health professionals.

**Learner** – for the purposes of this policy, an individual enrolled in the UT Southwestern Medical School, UT Southwestern Graduate School of Biomedical Sciences, UT Southwestern School of Health Professions, or UT Southwestern Peter O'Donnell Jr. School of Public Health, or a postdoctoral scholar appointed to an academic training position.

**Qualified Individual with a Disability** – an individual with a physical or mental impairment that substantially limits a major life activity, an individual with a record of such impairment, or an individual who is regarded as having such impairment, who otherwise meets the qualifications or eligibility requirements for admission and participation in the desired school, program, or


© 2019 *Handbook of Institutional Policies and Operating Procedures*


**PRINTED POLICIES MAY HAVE BEEN UPDATED – SEE CURRENT POLICIES ONLINE**

activity, and who can perform the essential functions of the school, program, or activity, with or without reasonable accommodation.

**Reasonable Accommodation** – an adjustment, modification, or auxiliary aid that allows the individual with a disability equal access to, participation in, or benefits of the desired school, program, or activity. An accommodation is not reasonable if it will cause undue hardship, financial or otherwise, to the institution; fundamentally alter the curriculum or educational experience; or pose a direct threat to health or safety. Accommodations may not be reasonable with respect to certain academic requirements that are essential to the instruction being pursued by the student or to any directly related licensing requirements.

## Related Statutes, Policies, or Standards

EDU-109 Learner Pregnancy and Parenting Nondiscrimination

EDU-114 Background Checks

EDU-119 Admissions

EDU-120 Nonmedical Leaves of Absence

ETH-151 Equal Opportunity

ETH-152 Reasonable Accommodations for Qualified Applicants and Employees

Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794(a), and its implementing regulations

The Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101, et seq., and its implementing regulations

## Appendices

EDU-103A Appendix A - Technical Standards and Essential Functions

EDU-103B Appendix B - Acknowledgement of Essential Functions and Acceptance of Admission Form

## Contacts/For Further Information

Office for Access & Title IX 214-648-3694

Campus Accessibility Services 214-648-4343

Office of the Registrar 214-648-3606

## Policy History

August 31, 2023: Updated references to the Office of Institutional Equity & Access to the department's new name: Office for Access & Title IX.

July 27, 2023: Replaced the role of the Learning Specialist with the Office of Institutional Equity & Access.

January 23, 2023: Added references to the UT Southwestern Peter O'Donnell Jr. School of Public Health to the Scope and definitions of "Essential Functions" and "Learner."

September 2, 2022: Updated Policy Rationale and Text to direct complaints to the Office of Institutional Equity & Access.

June 1, 2022: Revised to align the process to take a medical leave of absence with the process in EDU-120 Nonmedical Leaves of Absence.


© 2019 *Handbook of Institutional Policies and Operating Procedures*

December 27, 2019: Completed schedule review; updated the policy as necessary.

December 27, 2018: Updated references to Office of Diversity & Inclusion and Equal Opportunity to the department's new name: Office of Institutional Equity & Access.

November 22, 2016: Revised the Scope so that the policy applies specifically to learners, as defined in the policy, and refers employees and all other individuals to other appropriate offices and policies. Revised the Procedure to streamline the process for learners to obtain accommodations by working primarily through the Learning Specialist.

May 24, 2016: Added provision allowing accommodation requests to be submitted on behalf of a student who is unable to do so due to unexpected illness or incapacity.

February 7, 2014: Reviewed, revised, and published as EDU-103 Learners with Disabilities

January 1998: Published as 3.1.4.2 Students with Disabilities.


© 2019 *Handbook of Institutional Policies and Operating Procedures*

# EXHIBIT L

UT Southwestern
Medical Center
Access and Title IX

**PERSONAL AND CONFIDENTIAL**

June 27, 2025

Dhruv Nandakumar
Sent electronically to Dhruv.Nandakumar@UTSouthwestern.edu

Regarding Case Number: 2024173601

Dear Dhruv,

The Office for Access & Title IX (OATIX) is responsible for processing reasonable accommodations related to disability, pregnancy, or religious beliefs for faculty, staff, and students and promoting equal access and opportunity for the university community.

On June 12, 2025, OATIX received information that you may be interested in seeking accommodations for a potential disability. Our office subsequently reached out to you on several occasions, providing you with the accommodation request process and forms required for evaluation. Additionally, sufficient time was extended to submit a formal request for accommodations and the required documentation. To date, our office has not received your completed accommodation request packet. As such, your file with our office is closed, and no further action will be taken.

If, in the future, you require accommodations for access to your courses, please complete our student ADA request https://cm.maxient.com/reportingform.php?UTSouthwestern&layout_id=3

Feel free to contact us at 214-648-4343 or email Accessibility@UTSouthwestern.edu if you have any questions.

Sincerely,

Loleta Wallace, M.A., SHRM-CP
Senior EO Specialist